**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**Charleston Division**

| | |
|---|---|
| STERLING MISANIN, on his own behalf and on behalf of those similarly situated; JANE DOE, on her own behalf and on behalf of those similarly situated; JILL RAY, on her own behalf and on behalf of those similarly situated; NINA NOE, by and through her parent and next friend, Nancy Noe, on her own and on behalf of those similarly situated; NANCY NOE, on her own and on behalf of those similarly situated; GRANT GOE, by and through his parent and next friend, Gary Goe, on his own and on behalf of those similarly situated; GARY GOE, on his own and on behalf of those similarly situated;<br><br>*Plaintiffs*,<br><br>v.<br><br>ALAN WILSON, in his official capacity as Attorney General of South Carolina; SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS); ROBERT KERR, in his official capacity as Director of DHHS; SOUTH CAROLINA PUBLIC EMPLOYEE BENEFIT AUTHORITY (PEBA); PEGGY BOYKIN, in her official capacity as Executive Director of South Carolina PEBA; MEDICAL UNIVERSITY OF SOUTH CAROLINA (MUSC); JAMES LEMON; GUY CASTLES III; DONALD R. JOHNSON II; RICHARD M. CHRISTIAN, JR.; HENRY FREDERICK BUTEHORN III; G. MURRELL SMITH, SR.; W. MELVIN BROWN III; PAUL T. DAVIS; MICHAEL E. STAVRINAKIS; WILLIAM H. BINGHAM, SR.; CHARLES W. SCHULZE; THOMAS L. STEPHENSON; TERRI R. BARNES; BARBARA JOHNSON-WILLIAMS; THE HONORABLE JAMES A. BATTLE, JR.; BARTLETT J. WITHERSPOON, JR., each in their official capacities as board members of MUSC; DAVID COLE, in his official capacity as President of MUSC;<br><br>*Defendants*. | Case No.: 2:24-cv-04734-BHH<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs,[1] by and through their attorneys, bring this Complaint against the above-named Defendants, and state the following in support thereof:

## INTRODUCTION

1.      On May 21, 2024, Governor Henry D. McMaster of South Carolina signed into law House Bill 4624 ("H 4624"). H 4624 broadly prohibits healthcare professionals from providing medically necessary and potentially lifesaving gender-affirming healthcare to transgender adolescents, even though these treatments are available to cisgender adolescents. H 4624 also prohibits public funds from being used to fund any gender-affirming care, regardless of the age of the patient, and prevents Medicaid from reimbursing or providing coverage, depriving transgender people across South Carolina of necessary medical care.

2.      H 4624 flies in the face of widely accepted professional standards of medical care for transgender people, rejects the opposition of medical experts and healthcare providers to government-imposed bans on treatment, and ignores the pleas of South Carolina families who urged lawmakers not to interfere with the medical decision-making of individuals, their families, and their doctors.

_____

[1] As set forth in the concurrently-filed motion to proceed pseudonymously, Plaintiffs Jane Doe and Jill Ray seek to proceed pseudonymously in order to protect their right to privacy given that disclosure of their identities "would reveal matters of a highly sensitive and personal nature, specifically [their] transgender status and [their] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 182552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019); *see also Hersom v. Crouch*, 2:21-CV-00450, 2022 WL 908503, at *2 (S.D.W. Va. Mar. 28, 2022) (allowing a plaintiff to proceed pseudonymously because of the stigma associated with their transgender identity). Plaintiffs Nina Noe and her parent and next friend, Nancy Noe, and Grant Goe and his parent and next friend, Gary Goe, seek to proceed pseudonymously in order to protect their right to privacy for the same reasons that apply to Doe and Ray as transgender people and also because Nina Noe and Grant Goe are minors.

3.      Medical providers have long followed evidence-based and comprehensive clinical practice guidelines that recommend certain medical treatments for gender dysphoria—a serious medical condition characterized by clinically significant distress caused by incongruence between a person's gender identity and their sex designated at birth. These guidelines—including those promulgated by the World Professional Association for Transgender Health ("<u>WPATH</u>") and the Endocrine Society—provide a framework for the safe and effective treatment of gender dysphoria, which, if left untreated, can have dire consequences for the health and wellbeing of transgender people, including adolescents.

4.      All the major medical associations in the United States—including the American Medical Association, the American Academy of Pediatrics, the American Academy of Child & Adolescent Psychiatry, among many others—recognize these medical guidelines as authoritative and further recognize that adolescents with gender dysphoria may require medical interventions to treat clinically significant distress associated with their condition.

5.      H 4624 seeks to deny or impede access to "gender transition procedures," defined to include many of the exact treatments recommended by these well-established medical guidelines. In particular, H 4624 (1) categorically prohibits medical professionals from providing "gender transition procedures" to individuals under the age of 18, S.C. Code Ann. § 44-42-320 (the "<u>Healthcare Ban</u>" or the "<u>Ban</u>"); (2) prohibits "public funds" from being used "directly or indirectly for gender transition procedures," regardless of age, S.C. Code Ann. § 44-42-340 (the "<u>Public Funds Restriction</u>"); and (3) excludes "gender transition procedures" from coverage under the South Carolina Medicaid Program, again regardless of age, S.C. Code Ann. § 44-42-35 (the "<u>Medicaid Restriction</u>").

6.     While H 4624's sponsors contend that gender-affirming care is "experimental," decades of clinical experience and research demonstrate otherwise: gender-affirming health care is safe and effective, and it improves the health and well-being of adolescents (and adults) with gender dysphoria.

7.     Moreover, and critically, the three challenged provisions of H 4624—the Healthcare Ban, the Public Funds Restriction, and the Medicaid Restriction—do not seek to broadly prohibit the medical treatments at issue for all purposes; rather they prohibit the provision of these treatments *only* when they are performed for the purpose of "gender transition." In other words, the law *permits* many of the medical interventions denied to transgender individuals seeking treatment for gender dysphoria if used to treat cisgender individuals; for example, to treat precocious puberty, prostate cancer, breast cancer, or endometriosis. Likewise, the law permits surgical interventions, such as breast augmentation or reconstruction, to be covered by Medicaid or paid for (indirectly or directly) by public funds for cisgender people, but not for transgender people seeking treatment for gender dysphoria (even when medically necessary). This distinction reveals that the purpose of H 4624 is not to regulate harmful medical practices or protect the public but to deny transgender people seeking treatment for gender dysphoria—and ***only*** transgender people seeking treatment for gender dysphoria—access to medical care permitted for non-transgender people.

8.     H 4624 has had and will continue to have devastating consequences for transgender individuals and their families in South Carolina. Transgender people diagnosed with gender dysphoria will be unable to obtain the medical care that those who understand their diagnosis—their doctors and, in the case of transgender youth, also their parents—agree they need. Untreated gender dysphoria is associated with severe harm, including anxiety, depression, and suicidality.

Cutting off vulnerable individuals from treatment or withholding necessary care will inevitably and directly cause significant harm.

9.      Indeed, in the face of H 4624, some parents of transgender adolescents are making plans to uproot their lives and their families by fleeing the State in order to protect their children's health and safety and to obtain the medical treatment their children need. Those with the resources to do so will have to leave their jobs, businesses, extended families, and communities. Others will shoulder the hardship of disruptive and expensive travel to secure medical care for their children out of state, often at the expense of the adolescent's time in school and the parents' time at work.

10.     Other individuals and families that do not have the resources or are otherwise unable to leave or travel are terrified about what will happen if the law continues to remain in effect. For these families and hundreds of others across South Carolina, H 4624 has created a sense of desperation at the prospect of watching their loved one's suffering resume and symptoms possibly worsen as they are unable to access the medical care that they need.

11.     H 4624 not only gravely threatens the health and wellbeing of transgender adolescents and adults in South Carolina; it is unconstitutional and violates federal statutory prohibitions on discrimination based on sex and disability. H 4624 violates the Equal Protection Clause of the Fourteenth Amendment because it draws distinctions based on sex and transgender status and lacks an exceedingly persuasive justification. *See Kadel v. Folwell,* 100 F.4th 122 (4th Cir. 2024) (*en banc*). H 4624 additionally violates the Due Process Clause of the Fourteenth Amendment because it curtails the fundamental rights of parents to make decisions concerning the care of their children. The law's sex-based discrimination also violates the Medicaid Act and the Affordable Care Act, and, by singling out people with gender dysphoria for discrimination, H 4624 also violates the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

12.     Given the grave harms imposed by the Healthcare Ban, the Public Funds Restriction, and the Medicaid Restriction, Plaintiffs urgently seek relief from this Court.

## PARTIES

### I.    Plaintiffs

#### A.    Minor Plaintiffs and Their Families

13.     **Plaintiffs Nina Noe and Nancy Noe** live in South Carolina.  Nancy Noe is the mother of Nina Noe, her 15-year-old daughter. Nina Noe is transgender. She knew from a young age that her gender identity did not match her sex assigned at birth. Nina, who has been diagnosed with gender dysphoria, has been prescribed and had previously been receiving medically necessary care that is currently prohibited by the Healthcare Ban. She will no longer have access to this care once the statutory "taper-off" period ends on January 31, 2025. Furthermore, until the Medicaid Restriction went into effect, Nina had insurance coverage for her treatment through Medicaid. Due to the Medicaid Restriction, Nancy and her family will have to pay-out-pocket for any care Nina is able to secure outside of South Carolina.

14.     **Plaintiffs Grant Goe and Gary Goe** live in South Carolina. Gary is the father of Grant, his seventeen-year-old son. Grant is transgender. Grant knew from a very young age that his gender identity did not match his sex assigned at birth. Grant, who has been diagnosed with gender dysphoria, has been prescribed and had previously been receiving medically necessary care that is currently prohibited by the Healthcare Ban. He will no longer have access to this care once the statutory "taper-off" period ends on January 31, 2025.

#### B.    Adult Plaintiffs

15.     **Plaintiff Sterling Misanin** is a 32-year-old transgender man living in Charleston, South Carolina. Misanin, who has been diagnosed with gender dysphoria, receives primary care through the Medical University of South Carolina ("MUSC"). At the recommendation of his

6

healthcare providers, Misanin planned to have gender-affirming surgery at a MUSC Health facility this year.  After obtaining pre-authorization from his private insurer, and scheduling the procedure, MUSC denied Misanin treatment and stated, "due to the enactment of recent SC legislation H 4624, MUSC Health cannot offer patients gender transition procedures." At personal expense, Misanin was forced to delay his treatment in order to obtain additional pre-authorization for a procedure at a different facility, where he will not have continuity of care with his primary care provider.

16.    **Plaintiff Jill Ray** is a 36-year-old transgender woman living in Richland County, South Carolina. Ray, who has been diagnosed with gender dysphoria, is enrolled in and receives health care coverage through the South Carolina Public Employee Benefit Authority ("PEBA") and Veterans Affairs ("VA") Health Care. At the recommendation of her health care providers, Ray plans to have gender-affirming surgery, which was covered by PEBA until the passage of H 4624. Ray received referrals and had even selected a specific doctor to perform her surgery. Ray has been enrolled in PEBA at all times relevant to this complaint.

17.    **Plaintiff Jane Doe** is a 32-year-old transgender woman and physician living in Charleston, South Carolina. Doe, who has been diagnosed with gender dysphoria and is enrolled in and receives health care coverage through PEBA. Doe started hormone therapy in 2021 and has scheduled surgery for November 11, 2024. Doe's gender-affirming medical care had always been covered by her PEBA insurance, until the passage of H 4624. Doe has now been informed by her health plan administrators because the state health plan is required to adhere to state law, including H 4624, her insurance will not cover the cost of her surgical care; without insurance coverage, she cannot proceed with her scheduled surgery. Doe has been enrolled in PEBA at all times relevant to this complaint.

7

## II.    Defendants

18.    **Defendant Alan Wilson** is the Attorney General of South Carolina. The Attorney General is headquartered at 1000 Assembly Street, Room 519, Columbia, SC 29201. Under H 4642, Defendant Wilson in his capacity as Attorney General is responsible for enforcing South Carolina's prohibitions on gender transition procedures. S.C. Code Ann. § 44-42-360(F). Defendant Wilson is sued in his official capacity.

19.    **Defendant South Carolina Department of Health and Human Services** ("DHHS") is the "single state agency" charged with administering the Medicaid program in South Carolina ("SC Medicaid"). 42 U.S.C. § 1396a(a)(5); S.C. Code Ann. § 44-6-30 (2024).

20.    Defendant DHHS is a "health program or activity" within the meaning of section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557").

21.    Defendant DHHS is a recipient of federal financial assistance, such as grants, contracts, and other financial assistance from the United States Department of Health and Human Services, as well as federal Medicare and Medicaid funds.

22.    DHHS must abide by the anti-discrimination mandates that follow those funds and is a covered entity that is subject to the anti-discrimination mandate of Section 1557 of the Affordable Care Act. 42 U.S.C. § 18116; 45 C.F.R. § 92.4.

23.    DHHS is also a "public entity" as defined by the ADA.

24.    Upon information and belief, Defendant DHHS was at all relevant times a recipient of federal financial assistance and, therefore, subject to the Rehabilitation Act.

25.    SC Medicaid supports the health and wellbeing of more than one million South Carolinians—nearly one in five people across the state—by providing critical health insurance

coverage for individuals and families with low incomes, as well as medically fragile children, children adopted through foster care, and people with severe disabilities.

26.     DHHS is a recipient of federal financial assistance. DHHS receives federal funding to support the SC Medicaid Program and uses the funds it receives from the federal government in part to cover healthcare services for persons enrolled in the SC Medicaid Program. The state, through DHHS, is responsible for the nonfederal share of the costs of medical services provided under the Program.

27.     **Defendant Robert Kerr** is the Director and head of DHHS. S.C. Code Ann. § 44-6-10 (2024). In this capacity, Defendant Kerr oversees and directs all functions at DHHS, including its Medicaid operations. S.C. Code Ann. § 44-6-100. Defendant Kerr is sued in his official capacity.

28.     **Defendant South Carolina Public Employee Benefit Authority** manages the health plans of over 530,000 South Carolinian state employees and their dependents.

29.     PEBA receives both state and federal funds, including $71 million in ARPA funds and over $210 million in Medicare Part D subsidies in fiscal year 2023.

30.     PEBA is a "health program or activity" within the meaning of Section 1557.

31.     PEBA must abide by the anti-discrimination mandates that follow those funds and is a covered entity that is subject to the anti-discrimination mandate of Section 1557 of the Affordable Care Act. 42 U.S.C. § 18116; 45 C.F.R. § 92.4.

32.     PEBA is also a "public entity" as defined by the ADA.

33.     Upon information and belief, Defendant PEBA was at all relevant times a recipient of federal financial assistance and, therefore, subject to the Rehabilitation Act.

34.     **Defendant Peggy Boykin** is the Executive Director of the South Carolina PEBA. Defendant Boykin is "charged with the affirmative duty to carry out the mission, policies, and direction" of PEBA. S.C. Code Ann. § 9-4-10(J). State law anticipates suits in equity against Defendant Boykin in her official capacity. *See* S.C. Code Ann. § 9-4-15 ("The State shall defend officers and management employees of PEBA against a claim or suit that arises out of or by virtue of performance of official duties.").

35.     **Defendant Medical University of South Carolina** operates medical facilities, known as MUSC Health.

36.     MUSC receives both state and federal funds. *E.g.* S.C. Code Ann. § 59-123-60.

37.     In Fiscal Year 2024, MUSC will receive more than $121 million in state funds.

38.     MUSC is a "health program or activity" within the meaning of Section 1557.

39.     MUSC must abide by the anti-discrimination mandates that follow those funds and is a covered entity that is subject to the anti-discrimination mandate of Section 1557 of the Affordable Care Act. 42 U.S.C. § 18116; 45 C.F.R. § 92.4.

40.     MUSC is also a "public entity" as defined by the ADA.

41.     Upon information and belief, Defendant MUSC was at all relevant times a recipient of federal financial assistance and, therefore, subject to the Rehabilitation Act.

42.     The Board of Trustees of the Medical University of South Carolina (the "Board") is the governing body of the Medical University of South Carolina. S.C. Code Ann. § 59-123-40. In that capacity, the Board is vested with the management and control of MUSC, including MUSC Health and the insurance plan offered to MUSC employees and dependents, the MUSC Health Plan.

43.    Defendant **James Lemon, D.M.D.**, is the Chairman of the Board. Defendant **C. Guy Castles III, M.D.** is a member of the Board and serves as the designee of the Governor. S.C. Code Ann. § 59-123-40. Defendants **Donald R. Johnson II, M.D.**, **Richard M. Christian, Jr., M.D.**, **Henry Frederick Butehorn III, M.D.**, **G. Murrell Smith, Sr., M.D.**, **W. Melvin Brown III, M.D.**, **Paul T. Davis, D.M.D.**, **Michael E. Stavrinakis, B.S.**, **William H. Bingham, Sr., P.E.**, **Charles W. Schulze, C.P.A.**, **Thomas L. Stephenson, Esq.**, **Terri R. Barnes, B.S.**, **Barbara Johnson-Williams, Ed.S.**, **The Honorable James A. Battle, Jr., M.B.A.**, and **Bartlett J. Witherspoon, Jr., M.D.** (collectively and together with Defendants Lemon and Castles, the "MUSC Board Defendants") are members of the Board. The Medical Board Defendants are sued in their official capacities.

44.    **Defendant David J. Cole, M.D., FACS** is the president of MUSC. Defendant Cole is sued in his official capacity.

45.    Defendants Wilson, Kerr, Boykin, and Cole and the MUSC Board Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment. Defendants are therefore liable for both their violation of the right to equal protection and for their violation of Parent Plaintiffs' fundamental rights under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

46.    This action arises under the U.S. Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 18116(a), 42 U.S.C. § 1396a(a), 42 U.S.C. § 12101 (2009) et seq., and 29 U.S.C. § 794 (2016).

47.    This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343.

48.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by Plaintiff have occurred in the District of South Carolina and the Defendants are located in the District.

49.     Venue is proper in the Charleston division under Local Civil Rule 3.01 because that is where several Plaintiffs and Defendants reside and where a substantial portion of the events or omissions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

**III.    Gender-Affirming Care is the Standard Treatment for Gender Dysphoria**

**A.    Gender Identity and Gender Dysphoria**

50.     The term "gender identity" refers to an individual's innate, deeply felt sense of their own belonging to a particular gender, including male and female.[2] Every person has a gender identity.

51.     Gender identity has a strong biological basis. Researchers agree that external efforts to change a person's gender identity are unsuccessful and unethical.[3]

52.     In the majority of cases, a person's gender identity is congruous with the sex assigned to them by a physician or parent at birth. "Sex assigned at birth" or "sex designated at birth" refers to the sex marker given to an infant at birth based on external physiological characteristics.[4]

_____

[2] WPATH, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("SOC 8"), Appendix B (Glossary).

[3] AMA Issue Brief, Sexual orientation and gender identity change efforts (so-called "conversion therapy"), available at https://www.ama-assn.org/system/files/conversion-therapy-issue-brief.pdf.

[4] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/GenderIncongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology and Metabolism    3869,    3875    tbl.    1    (2017),    available    at

53.     Though H 4624 uses the term "biological indication" (e.g., § 44-42-310), "sex assigned at birth" or "sex designated at birth" are more precise terminology than "biological indication" because the physiological aspects of a person's sex are not always in alignment with one another or with the person's chromosomal configuration. For example, some intersex persons may have a chromosomal configuration typically associated with persons assigned male at birth, but genital characteristics associated with persons assigned female at birth. The Endocrine Society, an international medical organization representing over 18,000 endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.[5]

54.     Transgender people are those whose gender identity is different from their sex assigned at birth. A transgender boy or man is someone who has a male gender identity but was designated female at birth. A transgender girl or woman has a female gender identity but was designated male at birth. A nonbinary person is someone whose gender identity does not clearly align with either male or female identity, and many nonbinary people identify themselves as transgender because their gender identity does not align with their sex assigned at birth.[6]

55.     Mental health professionals have consistently observed that people are happier when they are able to live in a manner consistent with their gender identity. For most people, this is not difficult because their sex assigned at birth is in alignment with their gender identity. These people are sometimes referred to as "cisgender." For transgender individuals, however, the incongruence between sex assigned at birth and gender identity can create distress.

---

https://academic.oup.com/jcem/article/102/11/3869/4157558  ("Endocrine Society Guideline"); SOC 8 at S76.

[5] Endocrine Society Guideline at 3875 tbl. 1.

[6] SOC 8, Appendix B (Glossary).

13

56.     When this incongruence creates clinically significant distress, clinicians diagnose the distress as "gender dysphoria." WPATH defines "gender dysphoria" as "a state of distress or discomfort that may be experienced because a person's gender identity differs from that which is physically and/or socially attributed to their sex assigned at birth."[7]

57.     Gender dysphoria is a serious medical condition included in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorder, Fifth Edition, Text Revision* ("DSM-5-TR") (2022).

**B.     Standards of Gender-Affirming Medical Care**

58.     To treat gender dysphoria, doctors in South Carolina and across the United States apply evidence-based, well-researched standards of care. These standards are based on decades of clinical experience and published, peer-reviewed research. These standards recommend an individualized plan for treatment that focuses on helping a person live in accordance with their gender identity and feel at home in their body. Generally, this methodology is referred to as "gender-affirming" or "transition-related" medical care, and it is the only evidence-based treatment for gender dysphoria. There is consensus in the medical community that without access to this care, individuals who suffer from gender dysphoria are worse off. Gender-affirming medical care may include a range of treatments, including counseling, medication, and, in some cases, surgical interventions and procedures, that are tailored to each individual's experience with the condition and their transition.

59.     Gender-affirming care seeks to alleviate or eliminate feelings of gender dysphoria by helping a transgender person live in alignment with their gender identity, specifically by

---

[7] SOC 8, Appendix B (Glossary).

prescribing treatment and procedures which will bring the sex-specific characteristics of a transgender person's body into alignment with their identity.

60.     Gender-affirming care may be recommended for all patients who experience gender dysphoria, including both adults and minors.[8] The standards of gender-affirming care for minors (including children[9] and adolescents[10]) vary by age: for example, no medical treatments are available or recommended for those who have not yet started puberty.[11] But medical professionals agree that adolescents experiencing gender dysphoria nevertheless require the same individualized approach as adults to create a successful treatment plan.

61.     The treatment of gender dysphoria with gender-affirming medical care is not new—medical and mental health professionals have long provided assistance to transgender people to live in accordance with their gender identity, including by providing gender-affirming medical care.

62.     WPATH, an "interdisciplinary professional and educational organization devoted to transgender health,"[12] has issued published versions of standards of gender-affirming care since 1979. The most recent version, published in 2022, is *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("SOC 8").

---

[8] "Minor" is used to refer to anyone under eighteen years of age, as it is used in the law at issue, S.C. Code Ann. § 44-42-310 *et seq.*, and as it is used in the WPATH Standards of Care, SOC 8 at S44; S62.

[9] "Child," "children" and "childhood" are used to describe persons below the legal age of majority who have not yet started puberty (prepubescent). SOC 8 at S67.

[10] "Adolescent," "adolescents," and "adolescence" are used to describe persons below the legal age of majority who have begun puberty. SOC 8 at S44.

[11] SOC 8 at S110, S128 (listing only adolescents and adults as potential surgery recipients).

[12] WPATH, Mission & Vision, https://wpath.org/about/mission-and-vision.

63.     SOC 8's recommendations are based on a rigorous and methodological evidence-based review of existing data and clinical experience.

64.     The Endocrine Society, a professional society representing those in the field of adult and pediatric endocrinology, has a set of clinical practice guidelines for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults (the "Endocrine Society Guideline").[13]

65.     SOC 8 and the Endocrine Society Guideline are widely accepted in the medical community. The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations follow the WPATH and Endocrine Society standards of care and clinical practice guidelines, which are comparable to guidelines that those professional medical organizations use to treat other conditions.

66.     Gender-affirming medical care is multidisciplinary: it may include hormones or medication, surgical procedures, voice therapy, hair removal, reproductive care, and counseling and mental health therapy.[14]

67.     Some transgender patients are prescribed hormone therapy which allows for the patients' physical development to match their gender identity, including by the development of secondary sex-characteristics (sex-specific characteristics not associated with internal or external

---

[13] *See* Hembree, Wylie C, et al. "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline." The Journal of Clinical Endocrinology & Metabolism, vol. 102, no. 11, 2017, pp. 3869-3903., https://doi.org/10.1210/jc.2017-01658.

[14] SOC 8 at S5.

16

genitalia). Typically, hormone therapy consists of testosterone for transgender boys and men, and estrogen and testosterone-suppression for transgender girls and women.

68.    Hormone therapy allows transgender individuals to align their secondary sex-characteristics and gender identity, thereby alleviating feelings of gender dysphoria. For this reason, hormone therapy is considered medically necessary for some transgender people.

69.    Surgical procedures are also an important component of gender-affirming care for many transgender patients. Gender-affirming surgical procedures can be employed to align both secondary and primary sex characteristics with a person's gender identity. These surgeries are not typically performed in adolescence.

70.    For example, gender-affirming chest and breast surgeries, including subcutaneous mastectomy and breast augmentation, may help a transgender person alleviate feelings of gender dysphoria related to their torso. Facial feminization, facial masculinization, and hair removal may help a transgender person alleviate feelings of gender dysphoria related to their face.

71.    Other surgical procedures are intended to alter genitalia or primary sex characteristics, including phalloplasty, metoidioplasty, vaginoplasty and vulvoplasty, as well as orchiectomy and hysterectomy.[15] Each of these procedures may be medically necessary to alleviate symptoms of gender dysphoria.

72.    Treatment for gender dysphoria may include other disciplines including voice and communication therapy;[16] sexual and reproductive healthcare;[17] and mental health care to address

---

[15] *See* SOC 8, Appendix E, for a complete list of gender-affirming surgical procedures.

[16] SOC 8 at S137. Endocrine Society Guideline at 3893.

[17] SOC 8 at S156.

distress, anxiety and other psychiatric symptoms, including those presenting as a result of stigma, discrimination, and trauma.[18]

### C.    Additional Standards for Children and Adolescents

73.    In recognition of the "unique aspects that distinguish adolescence from other developmental stages,"[19] including an emerging sense of identity, the onset of puberty, and the importance of parental or caregiver involvement, clinical guidelines for treatment of gender dysphoria include recommendations specific to minor patients, both children and adolescents.

74.    For children experiencing gender dysphoria before the onset of puberty, under SOC 8 and the Endocrine Society Guideline, no medical interventions are indicated.

75.    As minor patients enter adolescence and particularly the early stages of puberty, medical interventions are sometimes necessary to ensure gender dysphoria is appropriately managed. For adolescent patients, SOC 8 and the Endocrine Society Guideline recommend an individualized approach to patients' needs. This may include puberty-delaying treatment, hormone therapy, and—much less frequently—limited surgical procedures for older adolescents.[20]

76.    SOC 8 first recommends that providers "undertake a comprehensive biopsychosocial assessment of the adolescent" prior to initiating any medical treatment, and "that this be accomplished in a collaborative and supportive manner."[21]

77.    Adolescent patients are only eligible for medical treatment under the guidelines upon reaching the "Tanner stage 2" of puberty. "Tanner staging refers to five stages of pubertal

---

[18] SOC 8 at S171.

[19] SOC 8 at S49.

[20] SOC 8 at S50-51.

[21] *Id.*

development ranging from prepubertal (stage 1) to post-pubertal and adult sexual maturity (stage 5). [Tanner stage 2] is defined by the occurrence of breast budding [or] ... the achievement of a testicular volume of greater than or equal to 4ml."[22]

78.    Typically, medical treatment for adolescents beginning at early puberty (Tanner stage 2) will first consist of puberty-delaying medications (also known as "puberty-blockers"). This medication pauses puberty at the stage it is at when treatment begins and allows transgender adolescents and their family time to understand their gender identity and to work with their medical and mental health providers to develop a course of treatment that suits their individual needs.

79.    For transgender girls assigned the male sex at birth, who would otherwise undergo male puberty, puberty-delaying treatments pause the development of secondary sex characteristics like facial hair and an "Adam's apple." For transgender boys assigned the female sex at birth, who would otherwise undergo female puberty, puberty-delaying treatments pause the development of breasts and menstruation. In addition to pausing what may be discomforting developments for those experiencing gender dysphoria, using puberty-delaying treatment may reduce the need for later surgical interventions.

80.    Puberty-delaying treatment has been shown to be effective at treating gender dysphoria.

81.    Puberty-delaying treatment is safe.

82.    Puberty-delaying treatment prevents the onset of physical changes to the body which would worsen gender dysphoria for many people and can be necessary to effectively treat gender dysphoria in transgender adolescents.

---

[22] SOC 8 at S64.

83.    Puberty-delaying treatment does not permanently affect fertility on its own, though adolescents wishing to begin using puberty-delaying treatment are first counseled about the effect later hormone therapy (separate from puberty-delaying treatment) may have on fertility.

84.    Puberty-delaying treatment is reversible. If a patient discontinues puberty-delaying treatment, endogenous puberty resumes.

85.     Even considering the reversible nature and well-documented safety of these medications, both the Endocrine Society Guideline and SOC 8 have robust criteria for ensuring that puberty-delaying treatment is appropriate for individual adolescents experiencing gender dysphoria.

86.    The Endocrine Society Guideline dictates that transgender adolescents who have reached the onset of puberty may be eligible for puberty-delaying treatment, if:

(1) A qualified MHP [mental health professional] has confirmed that: (a) the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed), (b) gender dysphoria worsened with the onset of puberty, (c) any coexisting psychological, medical, or social problems that could interfere with treatment (*e.g.*, that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment, (d) the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment,

(2) And the adolescent: (a) has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility, (b) has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,

(3) And a pediatric endocrinologist or other clinician experienced in pubertal assessment (a) agrees with the indication for [puberty blocker] treatment, (b) has confirmed that puberty has started in the

20

adolescent (Tanner stage ≥ G2/B2), (c) has confirmed that there are no medical contraindications to [puberty blocker] treatment.[23]

87.     SOC 8 similarly provides that medical providers should provide puberty-delaying treatment or other gender-affirming medical treatment and procedures for adolescents who have reached the onset of puberty (Tanner stage 2), only if:

    a.     The adolescent meets necessary diagnostic criteria for gender dysphoria or incongruence;

    b.     the experience of gender dysphoria or incongruence is marked and sustained;

    c.     the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent to the treatment;

    d.     the adolescent's mental health concerns that may interfere with diagnostic clarity, capacity to consent, or medical treatment have been addressed; and

    e.     the adolescent has been informed of side-effects including reproductive effects, and has been made aware of options to preserve fertility.[24]

88.     Providers may also prescribe hormone therapy for adolescents who have begun puberty. Adolescents may receive hormone therapy after pausing their endogenous puberty using puberty-delaying treatment. For adolescents who seek treatment later in puberty, they may not be eligible for pubertal suppression and may instead be treated only with hormone therapy.

89.     Because hormone therapy may affect fertility, adolescents are required to first receive counseling on those effects and on options to preserve reproductive capacity through other means. Hormone therapy does not necessarily cause the end of reproductive capacity, and many people treated with hormone therapy can go on to conceive and give birth to children.

---

[23] Endocrine Society Guideline at 3878 tbl. 5.

[24] SOC 8 at S57-S64 (Statements 6.12a-f).

90.     Additionally, under both SOC 8 and the Endocrine Society Guideline, all the requirements to begin puberty-delaying treatment are necessary to begin treatment with hormone therapy.

91.     As with adults, hormone therapy consists of testosterone for transgender boys, and estrogen and testosterone suppression for transgender girls.

92.     Gender-affirming hormone therapy is also safe and effective at treating dysphoria in adolescents, alleviating symptoms through the development of secondary sex characteristics aligned with the adolescent's gender identity.

93.     When provided under appropriate clinical supervision, the risks and side effects of gender-affirming hormone therapy in adolescents are rare and manageable.

94.     Finally, some older adolescents may, in some cases, receive recommendations for surgical intervention, most typically chest masculinization, before the age of 18. However, SOC 8 recommends that such treatment take place only after an adolescent has had at least 12 months of previous hormone therapy.

## IV.    Treatments Used for Gender Dysphoria Are Also Used for Other Medical Conditions

95.     In addition to being a common part of treatment for adolescents diagnosed with gender dysphoria, puberty-delaying medication is commonly used to treat central precocious puberty. Central precocious puberty is the premature initiation of puberty by the central nervous system—before 8 years of age in people designated female at birth and before 9 years of age in people designated male. When untreated, central precocious puberty can lead to the impairment of final adult height as well as antisocial behavior and lower academic achievement.

96.     Likewise, hormone therapy can be prescribed for adolescents for conditions other than gender dysphoria. For example, non-transgender boys with delayed puberty may be prescribed testosterone if they have not begun puberty by 14 years of age. Without testosterone,

for most of these patients, puberty would eventually initiate naturally. However, testosterone is prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as their peers. Likewise, non-transgender girls with primary ovarian insufficiency (premature impairment of ovaries' typical function including hormone and egg production), hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop) may be treated with estrogen. Moreover, non-transgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants and estrogen.

97.    The side effects of these treatments are comparable when used to treat gender dysphoria and when used to treat other conditions. The use of these treatments for gender dysphoria is not any riskier than for other conditions and diagnoses for which the same medical and surgical treatments are regularly used. In each circumstance, doctors advise patients and their parents about the risks and benefits of treatment and tailor recommendations to the individual patient's needs. For adolescents, parents must consent to treatment, and the patient must give their assent. Treatment cannot be administered without agreement from doctors, parents, and the transgender adolescent.

98.    Furthermore, the level of evidence supporting these treatments' efficacy is similar to the level of evidence supporting other widely accepted pediatric medical treatments. The evidence supporting efficacy of gender-affirming medical care for adolescents includes cross-

sectional and longitudinal studies as well as years of clinical experience. This is comparable to the base level of evidence supporting much of pediatric medical care.

## V.    South Carolina's H 4624

### A.    Text of the Law

99.    On May 9, 2024, the South Carolina General Assembly passed H 4624. The law went into effect on May 21, 2024, after it was signed by Governor McMaster.

100.    H 4624 makes it unlawful for health care professionals to "knowingly provide" or "engage in the provision or performance of gender transition procedures to a person under eighteen years of age." S.C. Code Ann. § 44-42-320(A)-(B). It also prohibits the use of public funds "directly or indirectly for gender transition procedures" and prohibits South Carolina's Medicaid Program from "reimburs[ing] or provid[ing] coverage for" gender transition procedures for all people, including adults. S.C. Code Ann. §§ 44-42-340; 44-42-350.

101.    H 4624 defines "gender transition procedures" as "puberty-blocking drugs, cross-sex hormones, or genital or non-genital gender reassignment surgery, provided or performed for the purpose of assisting an individual with a physical gender transition." S.C. Code Ann. § 44-42-310(6). The law defines "gender transition" as "the process in which a person goes from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex, [which] may involve social, legal, or physical changes." S.C. Code Ann. § 44-42-310(5). It further defines "sex" as "the biological indication of male and female in the context of reproductive potential or capacity, such as sex chromosomes, naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth, without regard to an individual's psychological, chosen, or subjective experience of gender." S.C. Code Ann. § 44-42-310(1).

102.    H 4624 provides for a limited period to reduce existing treatment for adolescents. If (1) "prior to August 1, 2024, a health care professional initiated a course of treatment that includes the prescription, delivery, or administration of a puberty-blocking drug or a cross-sex hormone to a person under the age of eighteen," and (2) "the health care professional determines and documents in the person's medical record that immediately terminating the person's use of the drug or hormone would cause harm to the person," "the health care professional may institute a period during which the person's use of the drug or hormone is systematically reduced." That period may not extend beyond January 31, 2025. S.C. Code Ann. § 44-42-320(C).

103.    H 4624 prohibits medical professionals from initiating a new course of treatment for a minor that includes the administration of puberty-blocking or cross-sex hormones for the purpose of gender transition or a surgical gender transition procedure, and from providing that care to existing patients after January 31, 2025.

104.    H 4624 exempts the otherwise prohibited care—puberty-blocking drugs, cross-sex hormones, and genital or non-genital gender reassignment surgery—for purposes other than providing gender-affirming care. It exempts the following:

      a.    "care for persons being treated for "precocious puberty, prostate cancer, breast cancer, endometriosis, or other procedure unrelated to gender transition, or to a person who was born with a medically verifiable disorder of sexual development including, but not limited to, a person with external biological sexual characteristics that are ambiguous including, but not limited to, people who were born with forty-six XX chromosomes with virilization or forty-six XY chromosomes with under virilization or having both ovarian and testicular tissue";

      b.    "appropriate medical services to treat a disorder of sexual development arising because the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action that was diagnosed through genetic or biochemical testing";

c.      "treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures, whether or not the gender transition procedure was performed in accordance with state or federal law;" and

d.      "any procedure undertaken because the person suffers from a physical disorder, physical injury, or physical illness that would, as certified by a physician, place the person in imminent danger of death or impairment of a major bodily function unless treated by the physician."

S.C. Code Ann. § 44-42-330(1-4).

105.    H 4624 states that health care professionals who provide or offer to provide such "gender transition" treatment and procedures are subject to professional discipline by the appropriate regulatory agency, S.C. Code Ann. § 44-42-360(A), and may be sued by the Attorney General or private parties, S.C. Code Ann. § 44-42-360(F). The Ban creates a twenty-one-year statute of limitations for the private right of action given to minors. S.C. Code Ann. § 44-42-360(C). The Ban also makes "[a] physician who knowingly performs genital gender reassignment surgery in violation of this chapter" "guilty of inflicting great bodily injury upon a child"—a felony. S.C. Code Ann. § 44-42-320(E).

**B.    Legislative History**

106.    The General Assembly passed H 4624, despite hearing testimony from South Carolina doctors about the lifesaving benefits of the banned care for their patients, the rigorous standards of diagnosis and treatment they follow when providing gender-affirming care to minors, and the grave harm to their patients' health and well-being if they are prohibited from receiving this care. The General Assembly also heard testimony from both transgender South Carolinians, who shared their experiences of years of struggle, feelings of hopelessness, and desire to end their lives prior to receiving gender-affirming care, as well as the positive and transformational impact that gender-affirming medical treatment has on them, and parents of transgender children with

gender dysphoria, who spoke about the torture in wondering whether their child would die by suicide prior to gender-affirming treatment and the relief that came from watching their child's despair lessen with gender-affirming treatment.

107.    At various points during legislative debates, proponents of H 4624 within the General Assembly defended the bill based on general criticisms and stereotypes of transgender people. A sponsor of the bill described gender-affirming procedures as "heinous," and another house member identified gender dysphoria as the result of "peer pressure." *House Med., Mil., Pub. & Mun. Affs. Comm. -- 3-M Full Comm. on H.4617 and H.4624* (Jan. 10, 2024) (Statement of Rep. Pace, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. at 32:18-21); *id.* (Statement of Rep. Beach, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. at 37:10-15; 39:40-40:00). A third house member called into question the validity and existence of gender dysphoria. *Id.* (Statement of Rep. White, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. at 59:09-25) ("For me it's a mental disorder, for others it's gender dysphoria."). Members of the Senate Medical Affairs Committee compared students coming out to their teachers as transgender to students dressing up as animals. *Senate Comm. on Med. Affs – Senate Med. Affs. Subcomm. on H4624* (Feb. 21, 2024) (Statements of Sens. Garrett and Loftis, Members, S. Comm. on Med. Affs. at 7:50-9:30).

108.    H 4624 is just one piece of a wider discriminatory legislative agenda targeting transgender persons. During the most recent legislative session, the Senate introduced 12 bills targeting transgender people, and the House introduced 17, in addition to the H 4624. In June, the General Assembly passed a state budget for Fiscal Year 2024-2025 that restricts transgender students' access to school restrooms and locker rooms. S.C. General Appropriations Bill H. 5100, Part IB, Section 1, Proviso 1.120.

## VI.    There Are No Legitimate Justifications for H 4624

109.    There are no legislative findings offering any purpose or justification for H 4624.

110.    Purported concerns about protecting minors do not justify categorically prohibiting medical treatments (like prescribing puberty-delaying medications) only when they are used to provide gender-affirming medical care to treat transgender adolescents, when the Healthcare Ban permits the provision of the same medications for purposes other than gender dysphoria treatment.

111.    Moreover, the safety and efficacy of this care is supported by decades of research and clinical evidence. Indeed, the body of research that supports the safety and efficacy of the banned care is comparable to the research supporting many other treatments—but only gender-affirming medical care for adolescents is targeted by the Healthcare Ban.

112.    The senate sponsor of H 4624, Senator Cash, repeatedly expressed during committee hearing that the Healthcare Ban was akin to any other South Carolina law limiting the rights of minors, such as laws prohibiting tattoos and drinking. But tattoos and drinking are not medical care, and those comparisons are inapt because such laws apply to all minors and do not employ sex and transgender status-based classifications.

113.    Any purported interest in protecting minors from potential physical and emotional risks associated with the medical treatment at issue likewise cannot justify the Healthcare Ban. The majority of potential risks and side effects related to puberty-delaying treatment, hormone therapy, and chest surgeries for gender dysphoria are comparable to those risks and side effects when such treatments are used for other indications and are comparable to many other forms of medical treatment patients and their families routinely consent and assent to. But the Healthcare Ban does not target other forms of medical care that have similar risks (such as other treatments that carry fertility risks), further indicating that the point of the Healthcare Ban is not to protect minors from these risks but to discriminate on the basis of sex and transgender status.

114.    Indeed, every medical intervention carries potential risks and potential benefits. Weighing the potential benefits and risks of the treatment for gender dysphoria is part of the informed consent process that healthcare providers, parents, and adolescent patients routinely navigate. Minor patients and their parents often make decisions about treatments with comparable evidence bases and similar risks as the treatments prohibited by the Healthcare Ban.

115.    The current clinical practice guidelines for treating gender dysphoria in minors are consistent with general ethical principles of informed consent. Existing clinical practice guidelines for providers extensively discuss the potential benefits, risks, and alternatives to treatment, and providers' recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the minor's decision-making capacity.

116.    There is nothing unique about any of the medically accepted treatments for adolescents with gender dysphoria that justify singling out these treatments for prohibition.

**VII.    H 4624 Will Cause Severe Harm to Transgender Youth and Adults**

117.    Withholding gender-affirming medical treatment from individuals with gender dysphoria when it is medically indicated puts them at risk of severe and irreparable harm to their health and well-being.

118.    Laws like H 4624 that prohibit access to medically necessary health care gravely and directly threaten the mental health and physical wellbeing of transgender people in South Carolina. Individuals with untreated gender dysphoria can suffer serious and life-threatening medical consequences, including depression, post-traumatic stress disorder, possible self-harm and suicidal ideation. Studies have found that as many as 40% of transgender people have attempted

suicide at some point in their lives.[25]  Accordingly, major medical and mental health organizations, including the American Medical Association, the American Psychiatric Association, and the American College of Obstetricians and Gynecologists, oppose the denial of this medically necessary care and support public and private health insurance coverage for treatment of gender dysphoria as recommended by the patient's physician.

119.    The risks of denying medically necessary care to adults are grave. Adults already receiving this care face additional barriers to, and even termination of, that care, including necessary therapies and surgery.

120.     The risks of denying medically indicated care to individuals with gender dysphoria are also acute for adolescents.

121.    When adolescents have access to puberty-delaying medication and hormone therapy, which prevent them from going through endogenous puberty and allow them to go through puberty consistent with their gender identity, their dysphoria decreases, and their mental health improves. Both clinical experience and multiple medical and scientific studies confirm that for many young people, this treatment is not only safe and effective, but it is positively transformative. Indeed, transgender adolescents able to access this medically necessary and evidence-based medical care often go from suffering to becoming thriving young persons.

122.    If patients are not able to start or continue puberty-delaying drugs or hormone therapy due to the Healthcare Ban, patients will be forced to undergo potentially irreversible changes from endogenous puberty. This will result in extreme distress for patients who would rely on medical treatments to prevent the secondary sex characteristics that come with their endogenous

---

[25] Sandy E. James et al., *Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equal. 5 (Dec. 2016), available at https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

puberty. These bodily changes can cause severe distress for transgender adolescents with gender dysphoria that otherwise would have been relieved by medical treatment.

123.    The effects of undergoing one's endogenous puberty may not be reversible, even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in adolescent patients who are unable to access gender-affirming medical care. For instance, bodily changes from puberty as to stature, bone structure, genital growth, voice, and breast development can be more difficult (if not impossible) to counteract.

124.    Medical treatment in adolescence can reduce life-long gender dysphoria, possibly eliminating the need for surgical intervention in adulthood, and can improve mental health outcomes significantly.

## VIII.    H 4624 Will Cause Irreparable Harm to Plaintiffs

125.    ***Sterling Misanin***. Sterling Misanin is a 32-year-old transgender man.

126.    Misanin lives and works in Charleston, South Carolina, and has been a resident of South Carolina since August 2021. He is a Learning and Development Manager for a global shipping company.

127.    Misanin experiences and has been diagnosed with gender dysphoria.

128.    Misanin has experienced feelings of gender dysphoria from a very young age. At five years old, he asked others to use the pronouns "he" and "him" until his parents told him to stop. Since he was in elementary school, he was interested in dressing and acting in a typically masculine manner. In college, he started to understand that the word "transgender" was the right word to describe his experience, but did not yet feel comfortable coming out. During the 2020 COVID-19 pandemic, Misanin realized that he wanted to live more authentically, and decided to begin coming out to friends and family.

31

129.    After coming out, Misanin sought medical care to address his feelings of gender dysphoria. He spoke with his primary care physician at MUSC and was referred to MUSC Endocrinology in January 2022. At that time, there was a long wait to meet with endocrinologists, so Misanin started hormone therapy with a physician at Planned Parenthood in Charleston. Before beginning treatment, Misanin was counseled about the risks and benefits of hormone therapy and was given time to carefully consider his treatment plan.

130.    After several months of hormone therapy, and consulting with a physician, Misanin was also able to receive chest masculinization surgery. In order to alleviate feelings of gender dysphoria, Misanin had been wearing chest binders for a long time and had begun to develop painful rashes and back pain as a result. Misanin and his provider felt the best solution to improve his dysphoria would be chest masculinization surgery. Misanin received counseling for this surgery beginning in March 2022 and underwent chest masculinization surgery in August of 2022.

131.    Hormone therapy and chest masculinization brought Misanin a strong sense of euphoria. He was excited to see more masculine features in his appearance and voice and felt more comfortable in his body. Misanin believes that this care has improved his well-being and looks forward to continuing to receive gender-affirming medical care.

132.    Misanin does still experience some gender dysphoria and is seeking further treatment. After counseling with his physicians, Misanin decided to undergo a gender-affirming hysterectomy, which his surgeon requires for further gender-affirming surgeries like phalloplasty.

133.    Misanin and his physicians decided that for quality and continuity of care, MUSC would be the best place to undergo a hysterectomy. This procedure required Misanin to obtain a pre-authorization from his private insurer, Aetna. Misanin obtained said pre-authorization and was

able to schedule a surgery with MUSC. This process took several months.  Misanin was eventually scheduled for surgery on June 28, 2024.

134.    Just days before Misanin's scheduled surgery, he was informed that the surgery was cancelled and that MUSC would no longer be able to conduct gender-related hysterectomies. After submitting a formal complaint, it was confirmed to Misanin that this was the case, and he was told that he would be best served by getting surgery out-of-state or with a private provider.

135.    This cancellation has caused Misanin a great deal of hardship. Finding affirming private providers in South Carolina has been difficult, and Misanin will no longer have continuity of care at MUSC for this procedure or other future procedures. Misanin eventually wants to undergo further gender-affirming surgery including phalloplasty, and he will not be able to receive that care at MUSC.

136.    The delay to his most recent surgery has also caused Misanin direct and substantial harm. Misanin had to restart the arduous pre-authorization process in order to get private coverage and eventually obtain surgery, a process resulting in months-long delay. Because he has had to reschedule his surgery and inconvenience his colleagues, Misanin also feels his reputation at work has been damaged. South Carolina's interference with his healthcare decisions has deeply frustrated and harmed Misanin.

137.    ***The Goe Family.*** Gary Goe and his wife are the parents of Grant, their seventeen-year-old son, as well as a nineteen-year-old daughter. Gary lives in Anderson County, South Carolina, where he is a welder. Gary and his wife have built a life and community they love in South Carolina.

138.    Grant is extremely smart and creative. He loves ceramics, creative writing, English literature, and science and is enjoying his senior year of high school.

139.    Grant Goe is transgender. Although Grant was assigned female at birth, at a young age Grant knew his gender identity is not female. Puberty caused Grant mental anguish because he did not feel like he fit in the body he was supposed to. It was difficult for Grant to watch the boys in his grade go through puberty while he experienced something very different.

140.    When Grant was thirteen, he realized he is a boy. Grant asked his friends to use "he" and "him" pronouns for him.  Shortly after, just before high school, Grant told his parents he is a boy. Gary and his wife were not surprised when they learned Grant is transgender. They had known something was different about Grant since Kindergarten when he only wanted to hang out with other boys and do stereotypically boyish things. Having raised their daughter, Gary and his wife knew Grant was just different. They even referred to Grant using a shortened, gender-neutral version of his deadname before he came out as transgender.

141.    When Grant told his parents about being transgender, Grant was receiving counseling for anxiety. Gary learned from Grant's therapist that Grant brought up being transgender to her. After speaking to Grant and his therapist, Gary and his wife began to research being transgender, gender dysphoria, and gender-affirming care. Gary and his wife knew little about being transgender, so they prioritized educating themselves about it and about the options for treating gender dysphoria.

142.    Gary took Grant to see an adolescent medicine specialist, who diagnosed Grant with gender dysphoria.

143.    After receiving that diagnosis, Gary and his wife, with input from Grant, embarked on a thorough examination of all possible treatments and their side-effects. Gary spoke with Grant's medical team and discussed every available option. Gary and his wife discussed the information and consent forms Grant's doctors gave them. Grant's family, including Grant, took

the decision very seriously. Gary spoke to Grant's doctors and mental health providers multiple times. Though their decision was neither easy nor fast, they wanted to be 100% sure of the choice they made.

144.    Eventually, with the support of Grant's medical team, and with the consent of Gary and his wife, Grant began hormone replacement therapy ("HRT") in the form of testosterone, and a menstrual suppressant. Gary and his wife determined the risks of HRT were far outweighed by the potential benefits. Before Grant started testosterone, Gary and his wife signed informed consent forms.

145.    Grant started testosterone in 2022. After temporarily suspending his treatment because of his debilitating fear of needles, Grant's doctors informed Gary that Grant could receive testosterone topically and he immediately began doing so in April 2024. Grant has now been on testosterone consistently for four months. Gary, his wife, and Grant have all noticed a night-and-day difference in Grant. Grant is happier and excited about the things he loves at school and his friends. The physical changes caused by testosterone have noticeably boosted Grant's confidence.

146.    Grant is terrified of going off testosterone, which he will have to do by the end of this year because of the Healthcare Ban. Without access to testosterone, there will be devastating harm to Grant's mental health.

147.    Grant and his family do not want to leave South Carolina, which would mean upending their lives during Grant's senior year. But Gary knows stopping testosterone would be life-threatening to Grant. He and his wife are so concerned about the harm going off testosterone would cause that they have been forced to consider moving to a different state.

148.    ***The Noe Family.*** Nancy Noe is the mother of Nina Noe, her 15-year-old daughter. Nancy and Nina have lived in South Carolina with their family for their entire lives. Nancy is a

medical assistant at a pediatric care office in her community, and Nina has just started the tenth grade. Nina is a budding artist who loves to make music, paint, and knit.

149.    Nina Noe is transgender. Nina was assigned male at birth but has known that she is a girl since she was very young. As a young child, Nina liked to wear Nancy's makeup and heels, and identified with the female characters in the television shows she watched. When she was seven years old, Nina told Nancy that she had a "girl brain" and a "boy body." She did not have a formal "coming out" to her parents because her family has always understood and supported her transgender identity.

150.    In the third grade, Nina began to experience heightened discomfort with the disconnect between her identity and dress at school. Nina worried that her body would start to change in ways that might upset her. Nina did not want to experience changes of male puberty like vocal changes or growing facial hair, because she knew these changes would make her feel less comfortable in her body. As Nina grew more anxious about these changes, her mental health declined, and she had less interest in activities. Nancy was also concerned about her daughter and had noticed that she was having a hard time in school and was less interested in her art.

151.    Nancy and Nina decided that Nina should visit a doctor who specializes in care for transgender adolescents and children. Nancy took Nina to visit a pediatric endocrinologist in July 2017. The doctors at that office explained how puberty-delaying medications, hormone therapy, and other treatments work. They told Nina that medical treatment would not be available until the onset of puberty and recommended that in the interim Nancy take Nina to see a mental health provider. Nina began seeing a mental health therapist in 2017 and was subsequently diagnosed with gender dysphoria.

152.    At that time, Nina began to wear dresses at school, grow out her hair, and began using "she" and "her" pronouns, at first with family, then also at school. For the most part, her classmates and teachers were supportive of her social transition. As Nina was able to live more fully as herself, her mental health improved, and she experienced a stark improvement in stress and anxiety levels. Nancy noticed that Nina's interest in schoolwork and hobbies returned.

153.    However, in seventh grade, Nina's anxiety began to worsen again as she started to experience early signs of male puberty. Nina had a lot of anxiety because she knew these changes would worsen her gender dysphoria. Nancy and Nina decided to return to a pediatric endocrinologist, who conducted lab work verifying Nina was beginning endogenous male puberty.

154.    Nina's provider advised that the best course of treatment at this stage in Nina's pubertal development would be hormone therapy. Nina's provider counseled Nancy and Nina on the benefits and risks of beginning hormone therapy. After weighing these risks and benefits and further discussions with Nina's provider, Nina and Nancy decided that Nina should begin hormone therapy.

155.    Nina began hormone treatment with an incrementally increasing dose of estrogen. Within a few months, Nina started to notice positive changes in her body and her symptoms of gender dysphoria began to be alleviated.

156.    Nina has now been receiving hormone therapy for three years and has observed marked improvements in her mental health and well-being. She is an outgoing, creative and confident girl, and Nancy believes this is in large part thanks to the treatment Nina has received.

157.    When Nancy and Nina first learned about H 4624, they were very upset. Nina felt scared and betrayed, and worried about how her life would change if she could not get access to gender-affirming care. Nancy does not want her daughter's mental health to slip back to the way

it once was. Nancy believes that without access to this lifesaving care, Nina would be much worse off.

158.    Nina is insured through her family's Medicaid coverage. With Medicaid no longer covering the cost of treatment for Nina's gender dysphoria, Nancy and Nina's family will have to pay prohibitively high out-of-pocket costs for Nina's care. They will also have to travel across state lines to receive care and attend medical appointments, resulting in further financial hardship due to loss of pay for missed work. Nancy is worried about what H 4624 will mean for her family's financial future, and for Nina's mental health and well-being.

159.    ***Jill Ray.*** Jill Ray is a 36-year-old transgender woman.

160.    Ray receives coverage for her health care both through the VA Health Plan—as a veteran—and as a dependent of her wife's PEBA plan.

161.    Ray experiences and has been diagnosed with gender dysphoria.

162.    Before she came out as transgender and began receiving gender-affirming care, Ray was experiencing such severe depression and anxiety that she did not even feel comfortable leaving her house.

163.    Ray came out as transgender three and a half years ago to her wife, who was not surprised when Ray told her. With her wife's affirmation and support, Ray decided to seek out medical care at the VA. Her primary care doctor referred her to a psychologist, who diagnosed Ray with gender dysphoria in May 2021.

164.    Following the diagnosis of gender dysphoria and working with and under the care of her medical and mental health providers, Ray began undergoing hormone therapy as medically necessary treatment for her gender dysphoria in July 2021.

165.    At present, Ray is being prescribed estrogen, progesterone, and spironolactone as treatment for her gender dysphoria. She sees her endocrinologist approximately every 6 months and fills her prescriptions every 3 months.

166.    Accessing gender-affirming health care is the best decision Ray made for herself. Hormone therapy allows her to live as the woman she is and has given Ray her life back, but it does not address the totality of her dysphoria.

167.    In consultation with and under the care of her medical and mental health providers, Ray has decided to seek gender-affirming surgery. Ray obtained referral letters from her endocrinologist, primary care doctor, and a psychology evaluator at the VA Hospital in South Carolina in order to receive surgical care.

168.    The surgical treatment Ray plans to obtain was covered by her PEBA insurance until H 4624 went into effect.

169.    Ray cannot afford to pay the $100,000-$250,000 that the surgery is likely to cost. The health care she receives through the VA only covers her hormone replacement therapy.

170.    Being able to obtain hormone therapy in the form of estrogen, progesterone, and spironolactone has made Ray feel like a whole new person. The impact of the gender-affirming care she has received on her life and wellbeing cannot be overstated. The care she has received has brought her even closer to her spouse. Ray has formed meaningful, lasting friendships and community that bring her joy and fulfillment.

171.    The difference between the person she was before and the woman she is now is remarkable. Before coming out she could not leave the house and her relationships were suffering. Now, she is involved in her community, thriving, confident, and happy.

172.    Although her family, who are religious, were at first hesitant when she told them she is a woman, they have since understood and accepted Ray for who she is. Ray feels more comfortable in her relationships with her family now that she can openly be herself.

173.    The gender-affirming surgery recommended by Ray's medical and mental health providers is medically necessary. It will allow Ray to bring her body more fully into alignment with who she is. Without gender-affirming surgery, she will continue to experience pain and harm. Although hormone therapy has significantly improved her wellbeing, without gender-affirming surgery Ray is unable to be her most authentic and happiest self, spouse, and parent.

174.    South Carolina's law prohibiting Ray's spouse's PEBA plan from covering gender-affirming care has caused Ray a great deal of distress and anxiety. When she learned of the law, Ray had to put all her plans for her gender-affirming surgery on hold, despite already receiving referrals and selecting a doctor to perform the procedure.

175.    For Ray, it is incredibly stressful and debilitating to have to worry about whether she will be able to get the medical care that she needs. South Carolina's decision to deny transgender people like herself access to medically necessary healthcare and being treated differently than others solely for being transgender is a burden on Ray's mental and physical health.

176.    ***Jane Doe.*** Jane Doe is a 32-year-old transgender woman.

177.    Doe is a physician and resident of Charleston, South Carolina. She lives there with her wife of eight years. They are expecting a child next year.

178.    Doe and her family moved to South Carolina in 2020 in order to pursue an opportunity with a medical residency program in the state.

179.    Doe receives her healthcare through a state employee healthcare plan administered by PEBA. She has received healthcare coverage through PEBA since 2020.

180.    Doe experiences and has been diagnosed with gender dysphoria. She has dealt with symptoms of gender dysphoria her entire life, and always felt that she was living in the wrong body. In her community growing up, she did not feel safe to come out as transgender or voice her feelings associated with her gender dysphoria. She was particularly worried about her family's reaction.

181.    When she and her wife were able to move further away from Doe's family in 2020, and were financially independent, Doe felt that she was in a position to live fully as herself. Doe first came out to her wife, who was supportive of her transition.

182.    Doe then began therapy with a licensed professional counselor, who diagnosed her with gender dysphoria in early 2021. After consulting with a doctor and learning more about gender-affirming care, she began hormone therapy. She has been accessing this treatment for the last three years. This year, Doe and her medical providers decided that surgery was the next step in her continuing care and began making plans for Doe to undergo surgical treatment. Doe wanted to complete this treatment before the end of the year, so that she could be fully recovered in time for her wife to give birth in February 2025. She has scheduled gender-affirming surgery for November 11, 2024.

183.    Doe feels that her gender-affirming care has improved her life dramatically and makes her a more complete and authentic person. She is able to provide better care for her patients when she is the best and most complete version of herself, and this healthcare helps her do that.

184.    Doe is a state employee who receives healthcare through PEBA. This plan had always covered Doe's hormone therapy, and she understood it would also cover future surgical

41

treatment. However, in July of this year, she was informed that PEBA is required to adhere to state law, thereby indicating to her that PEBA would no longer cover the cost of surgical care. Doe's only option for receiving care is now to pay out of pocket, which may cost up to hundreds of thousands of dollars. Doe will not be able to access this care without insurance coverage due to the cost.

185.    Doe and her wife are heartbroken that the cost of Doe's medical care will not be covered by their insurance. Doe was excited for her surgery and hoped that it would further ease feelings of gender dysphoria. However, without the assistance of their insurance plan, the cost of paying for Doe's surgery will be an immense financial burden. Doe and her wife have already taken on a great deal of medical costs this year as they welcome a child into their home. They are anxious about the financial future of their family as a result of H 4624's denial of coverage.

## CLASS ACTION ALLEGATIONS

186.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

187.    Minor Class: Plaintiffs Grant Goe and Nina Noe assert their claims on behalf of the following Class: All minors in South Carolina diagnosed with gender dysphoria and whose medically indicated treatment, as judged by their licensed medical professional, includes or will include the provision of "gender transition procedures," as defined by H 4624.

188.    Parent Class: Plaintiffs Gary Goe and Nancy Noe assert their claims on behalf of the following Class: All parents and legal guardians of minors diagnosed with gender dysphoria and whose medically indicated care, as judged by their licensed medical professional, includes or will include the provision of "gender transition procedures," as defined by H 4624.

189.    Insurance Class: Plaintiffs Jill Ray, Jane Doe, and Nina Noe assert their claims on behalf of the following Class: All individuals with gender dysphoria who receive health insurance

through a state-funded health insurance plan, such as South Carolina Medicaid or South Carolina's

PEBA, and who, because of S.C. Code Ann. § 44-42-340, are or will be denied coverage for

medically indicated "gender transition procedures," as defined by H 4624.

190.     MUSC Class: Plaintiff Sterling Misanin asserts his claims on behalf of the

following Class: All individuals with gender dysphoria who receive medical care through MUSC

but who, because of S.C. Code Ann. § 44-42-340, are or will be denied medically indicated "gender

transition procedures," as defined by H 4624.

191.     Each Class Representative and the members of the Class they represent have been

equally affected by H 4624. *See* Motion for Class Certification ("Class Cert. Mot.") at 12-18.

192.     The persons in the proposed Classes are so numerous that joinder of all members

is impracticable. Although the precise number of class members has not been determined at this

time, each Class contains at least 40 members. *See* Class Cert. Mot. at 11-12; *see also In re Zetia*

*(Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) ("As a general guideline, ... a class

that encompasses fewer than 20 members will likely not be certified ... while a class of 40 or more

members raises a presumption of impracticability of joinder based on numbers alone." (citing

*Newberg on Class Actions* § 3:12 (5th ed. 2021)).

    a.    Minor Class: The Williams Institute estimates that there are 3,700 transgender youth ages 13-17 in South Carolina.[26] Of those, on information and belief, at least 40 were receiving "gender transition procedures" prior to the enactment of H 4624. *See In re Zetia*, 7 F.4th at 234.

    b.    Parent Class: Each member of the Minor Class has at least one corresponding member in the Parent Class, so the Parent Class includes over 40 members.

---

[26] Jody L. Herman, Andrew R. Flores & Kathryn K. O'Neill, *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Institute (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

c.   <u>Insurance Class</u>: State-funded insurance plans cover hundreds of thousands of people throughout South Carolina. For example, PEBA's insurance plans cover more than 530,000 people throughout South Carolina,[27] and Medicaid covers more than 1 million people throughout South Carolina.[28] Of those, on information and belief, at least 40 were receiving "gender transition procedures" prior to the enactment of H 4624. *See In re Zetia*, 7 F.4th at 234.

d.   <u>MUSC Class</u>: The MUSC Health System admits over 50,000 patients every year.[29] Of those, on information and belief, at least 40 were receiving "gender transition procedures" prior to the enactment of H 4624. *See In re Zetia*, 7 F.4th at 234.

193.   The common questions of law and fact include, but are not limited to:

a.   Whether H 4624 and Defendants' implementation thereof, as applied to members of the proposed Minor, Parent, Insurance, and MUSC Classes, violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

b.   Whether H 4624 and Defendants' implementation thereof, as applied to members of the MUSC Class and the Insurance Class, violate the prohibition on sex discrimination under Section 1557 of the Affordable Care Act;

c.   Whether H 4624 and Defendants' implementation thereof, as applied to members of the MUSC and Insurance Classes, violate the Americans with Disabilities Act;

d.   Whether H 4624 and Defendants' implementation thereof, as applied to members of the MUSC and Insurance Classes, violate the Rehabilitation Act;

e.   Whether H 4624 and Defendants' implementation thereof, as applied to the members of the proposed Parent Class, violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; and

---

[27] *State Health Plan: Our membership and participating employers*, peba.sc.gov (Jan. 2023) https://www.peba.sc.gov/value#:~:text=PEBA%E2%80%99s%20insurance%20programs%20cover%20more%20than%20530%2C000%20people%20throughout%20South%20Carolina.

[28] *Fact Sheet: Medicaid in South Carolina*, KFF (Aug. 2024) https://files.kff.org/attachment/fact-sheet-medicaid-state-SC.

[29] *MUSC Fact Sheet*, MUSC (March 2022) https://web.musc.edu/-/sm/global-files/fact-books/enterprise-wide-fact-book.pdf.

f.      Whether Defendants should be enjoined from enforcing the challenged provisions.

194.    The questions of law and fact listed above will yield common answers for the Plaintiffs and the proposed Classes.

195.    Plaintiffs' claims are typical of those members of the proposed Classes.

a.      Grant Goe is a transgender minor resident of South Carolina and can no longer access gender-affirming care in South Carolina because of the Healthcare Ban. Nina Noe is a transgender minor resident of South Carolina and can no longer access gender-affirming care in South Carolina because of the Healthcare Ban. Grant Goe and Nina Noe, representing the Minor Class, and members of the proposed Classes share the same legal claims under the Equal Protection Clause. *See* Class Cert. Mot. at 3-4, 16.

b.      Gary Goe is a resident of South Carolina and a parent to Grant Goe, a transgender minor; Gary Goe can no longer make decision regarding his child's medical care with respect to gender dysphoria, because of the Healthcare Ban. Nancy Noe is a resident of South Carolina and a parent to Nina Noe, a transgender minor; Nancy Noe can no longer make decision regarding her child's medical care with respect to gender dysphoria, because of the Healthcare Ban. Gary Goe and Nancy Noe, representing the Parent Class, and members of the proposed Classes share the same legal claims under the Equal Protection Clause and the Due Process Clause. *See* Class Cert. Mot. at 5, 16.

c.      Jill Ray, Jane Doe, and Nina Noe are transgender residents of South Carolina who can no longer receive state-funded insurance coverage for their gender-affirming care because of the Public Funds Restriction. Ray, Doe, and Nina Noe, representing the Insurance Class, and members of the proposed Insurance Class, share the same legal claims under the Equal Protection Clause, Affordable Care Act, Americans with Disabilities Act and the Rehabilitation Act. *See* Class Cert. Mot. at 16-17.

d.      Sterling Misanin is a transgender resident of South Carolina who can no longer receive necessary gender-affirming surgery because of the Public Funds Restriction. Misanin, representing the MUSC Class, and members of the proposed MUSC Class share the same legal claims under the Equal Protection Clause, the Affordable Care Act, the Americans with Disabilities Act, and the Rehabilitation Act. *See* Class Cert. Mot. at 17.

196.    Plaintiffs will fairly and adequately represent the interests of the proposed Classes and have retained counsel experienced in complex class action litigation. *See* Class Cert. Mot. at 18-19.

197.    Class treatment is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds that apply generally to the proposed Classes such that final injunctive relief or corresponding declaratory relief would be appropriate for the proposed Classes as a whole.

**CAUSES OF ACTION**

**COUNT ONE**
**H 4624 VIOLATES THE FOURTEENTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION UNDER THE LAW**

**(ALL PLAINTIFFS AND ALL CLASSES AGAINST DEFENDANT WILSON)**
**(PLAINTIFFS NINA NOE AND NANCY NOE AGAINST DEFENDANT KERR)**
**(PLAINTIFFS JILL RAY, JANE DOE, AND NINA NOE AND THE INSURANCE CLASS AGAINST DEFENDANTS BOYKIN AND KERR)**
**(PLAINTIFF STERLING MISANIN AND THE MUSC CLASS AGAINST DEFENDANTS COLE AND THE MUSC BOARD DEFENDANTS)**

198.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

199.    Defendants Wilson, Kerr, Boykin, Cole, and the MUSC Board Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

200.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

201.    H 4624's Healthcare Ban bars the provision to minors of various forms of medically necessary care only when the care is "provided or performed for the purpose of assisting an individual with a physical gender transition," meaning "the process in which a person goes from

46

identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex." S.C. Code Ann. §§ 44-42-310(5)-(6); 44-42-320. It permits the use of these treatments for other purposes. S.C. Code Ann. § 44-42-330.

202.    In addition, H 4624's Public Funds Restriction prohibits the use of state funds "directly or indirectly" only when they are spent for care "provided or performed for the purpose of assisting an individual with a physical gender transition," meaning "the process in which a person goes from identifying with and living as a gender that corresponds to his or her sex to identifying  with and living as a gender different from his or her sex." S.C. Code Ann. §§ 44-42-310(5)-(6); 44-42-340.

203.    H 4624's Medicaid Restriction similarly prohibits the South Carolina Medicaid Program from "reimburs[ing] or provid[ing] coverage" for care "provided or performed for the purpose of assisting an individual with a physical gender transition," meaning "the process in which a person goes from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex." S.C. Code Ann. §§ 44-42-310(5)-(6); 44-42-320; 44-42-350. It permits the expenditure of state funds on and Medicaid coverage for the provision of these medications and surgical interventions for other purposes. S.C. Code Ann. § 44-42-330.

204.    In doing so, H 4624 explicitly classifies based on sex and transgender status, including classifying Minor Plaintiffs Grant Goe and Nina Noe and Adult Plaintiffs Sterling Misanin, Jill Ray, and Jane Doe and the Class Members they represent, based on their transgender status and sex, including their failure to conform to stereotypes and expected behavior associated with their sex designated at birth. This classification is not substantially related to an important government interest.

205.    H 4624 also classifies parents of transgender youth on the basis of their children's sex and transgender status. This includes the Parent Plaintiffs Gary Goe and Nancy Noe, and the Parent Class, who are denied the ability to secure urgently needed medical care for their children that other parents can obtain, on the basis of transgender status and sex-based grounds. This classification is not substantially related to an important government interest.

206.    In addition to facially classifying based on sex and transgender status, H 4624 was passed in part because of its effects on transgender people, not in spite of them, and triggers heightened scrutiny for this reason as well.

207.    H 4624 was enacted with the specific intent to discriminate against transgender people.

208.    Discrimination based on transgender status and sex is subject to heightened scrutiny under the Equal Protection Clause and is therefore presumptively unconstitutional, placing a demanding burden of justification upon the State to provide at least an exceedingly persuasive justification for the differential treatment.

209.    Transgender people have obvious, immutable, and distinguishing characteristics that define that class as a discrete group. These characteristics bear no relation to transgender people's abilities to perform in or contribute to society.

210.    Transgender people have historically been subject to discrimination in South Carolina and across the country and remain a very small minority of the American population that lacks political power.

211.    Gender identity is a core, defining trait that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

48

212.    H 4624 does not substantially advance an interest in the health or well-being of minors. To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying them access to necessary care without justification for its limitation only on the rights of transgender minors. H 4624 does nothing to protect the health or well-being of adults, either; South Carolina offers no justification why state-funded procedures for transgender people are prohibited while the same state-funded procedures are permitted for cisgender persons.

213.    H 4624's discriminatory treatment of healthcare for transgender adolescents is not adequately tailored to any sufficiently important government interest, nor is it even rationally related to any legitimate government interest. South Carolina cannot point to any legitimate government interest that justifies infringing only on the rights of transgender minors and transgender recipients of state-funded care.

214.    H 4624's targeted prohibition on medically necessary care for transgender individuals is based on generalized fears, negative attitudes, stereotypes, and moral disapproval of transgender people, which are not legitimate bases for unequal treatment under any level of scrutiny.

215.    H 4624 violates the equal protection rights of the Minor Plaintiffs, the Minor Class, the Parent Plaintiffs, the Parent Class, the Adult Plaintiffs, the MUSC Class, and the Insurance Class.

**COUNT TWO**
**THE HEALTHCARE BAN VIOLATES THE RIGHT TO PARENTAL AUTONOMY**
**GUARANTEED BY THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE**

**(PARENT PLAINTIFFS AND PARENT CLASS AGAINST DEFENDANT WILSON)**
**(PLAINTIFF NANCY NOE AGAINST DEFENDANT KERR)**

216.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

217.    Wilson and Kerr are governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

218.    Wilson is charged with enforcing compliance with H 4624. S.C. Code Ann. § 44-42-360(F).

219.    Kerr oversees and directs all functions at DHHS, including Medicaid, of which Nancy Noe's daughter Nina is a beneficiary.

220.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

221.    That fundamental right of parents includes the right to direct the medical care of their minor children, including by seeking and following medical advice.

222.    Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on an appropriate course of medical treatment.

223.    The Healthcare Ban's prohibition against well-accepted medical treatments for adolescents with gender dysphoria deprives South Carolina parents of their fundamental right to make decisions concerning the care of their children. The Healthcare Ban also discriminates

50

against the Parent Plaintiffs and the Parent Class with respect to the exercise of this fundamental right.

224.    The Healthcare Ban does nothing to protect the health or well-being of minors. To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying their parents the ability to obtain necessary medical care for them without justification for its limitation only on the rights of transgender minors and their parents.

225.    The Healthcare Ban's prohibition against the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling government interest, nor is it rationally related to any legitimate government interest. South Carolina cannot point to any legitimate government interest that justifies infringing only on the rights of transgender minors and their parents.

226.    The Healthcare Ban violates the fundamental rights of the Parent Plaintiffs and Parent Class.

227.    The Public Funding Ban's prohibition on the use of state funds, including Medicaid funds, for well-accepted medical treatments for adolescents with gender dysphoria deprives South Carolina parents of children on Medicaid and other state-funded insurance of their fundamental right to make decisions concerning the care of their children.

228.    The Public Funding Ban violates the fundamental rights of the Nancy Noe, whose daughter is a beneficiary of Medicaid.

## COUNT THREE
## THE PUBLIC FUNDING AND MEDICAID RESTRICTIONS VIOLATE SECTION 1557 OF THE AFFORDABLE CARE ACT

## (PLAINTIFFS JILL RAY, JANE DOE, NINA NOE, AND THE INSURANCE CLASS AGAINST DEFENDANTS PEBA, BOYKIN, DHHS, AND KERR)

**(PLAINTIFF MISANIN AND THE MUSC CLASS AGAINST DEFENDANTS COLE,
THE MUSC BOARD DEFENDANTS, and MUSC)
(PLAINTIFF NINA NOE AGAINST DEFENDANTS DHHS AND KERR)**

229.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

230.    Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, provides, in relevant part that, "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a); *see* 45 C.F.R. § 92.3.

231.    Discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics are all forms of discrimination encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

232.    Defendant DHHS is engaged in a health program or activity in that it is responsible for many aspects of public health in South Carolina and provides health services to many South Carolinians across the state. Defendant DHHS receives federal financial assistance, including grants, contracts, and other financial assistance from the United States Department of Health and Human Services, as well as federal Medicare and Medicaid funds. Defendant Kerr oversees and directs all functions at DHHS, including its Medicaid operations.

233.    PEBA is a government program administered by Defendant Boykin that receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.

234.    MUSC is a medical university administered by the MUSC Board Defendants and Defendant Cole that receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.

235.    Jill Ray, Jane Doe, Nina Noe, and the Insurance Class, seek the benefits of healthcare coverage funded by the state.

236.    Plaintiffs and the Insurance Class will be denied those benefits and subjected to discrimination on account of their sex because the Public Funds Restriction prohibits entities receiving public funds from using those funds "for the purpose of assisting an individual with a physical gender transition." S.C. Code Ann. §§ 44-42-310(6); 44-42-340.

237.    Sterling Misanin and the MUSC Class seek the benefits of healthcare from providers funded by the state.

238.    Misanin and the MUSC Class will be denied those benefits and subjected to discrimination on account of their sex because the Public Funds Restriction prohibits entities receiving public funds from using those funds "for the purpose of assisting an individual with a physical gender transition." S.C. Code Ann. §§ 44-42-310(6); 44-42-340.

239.    Nina Noe seeks the benefits of Medicaid.

240.    Nina Noe will be denied those benefits and subjected to discrimination on account of her sex because the Medicaid Restriction prohibits entities receiving public funds from using those funds "for the purpose of assisting an individual with a physical gender transition." S.C. Code Ann. §§ 44-42-310(6); 44-42-350.

241.    The Public Funds Restriction and the Medicaid Restrictions necessarily require the DHHS, PEBA, MUSC, Boykin, Kerr, Cole, and the MUSC Board Defendants to violate Section

1557 by requiring that they discriminate on the basis of sex and transgender status, to the substantial injury of the Plaintiffs and Class Members who will be deprived of medical care.

242.    The Plaintiffs and the Insurance and MUSC Classes are therefore entitled to declaratory and injunctive relief prohibiting the Defendants from complying with the Public Funds and Medicaid Restrictions. Without injunctive relief from the discriminatory law, Plaintiffs and the Class they represent will continue to suffer irreparable harm in the future.

## COUNT FOUR
### THE PUBLIC FUNDS RESTRICTIONS AND THE MEDICAID RESTRICTIONS VIOLATE THE MEDICAID ACT'S COMPARABILITY AND AVAILABILITY REQUIREMENTS

### (PLAINTIFF NINA NOE AGAINST DEFENDANTS DHHS AND KERR)

243.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

244.    The Medicaid Act's Comparability Requirement, 42 U.S.C. § 396a(a)(10)(B)(i), provide that the "medical assistance made available to [eligible individuals] shall not be less in amount, duration, or scope than the medical assistance made available to" other eligible individuals. The Medicaid Act's Availability Requirement, 42 C.F.R. § 440.230(b), requires that South Carolina cover both mandatory and optional services in sufficient "amount, duration, and scope to reasonably achieve its purpose."

245.    Defendant DHHS is the "single state agency" charged with administering Medicaid program in South Carolina. 42 U.S.C. § 1396a(a)(5); S.C. Code Ann. § 44-6-30 (2024). Defendant Kerr oversees and directs all functions at DHHS, including its Medicaid operations.

246.    Nina Noe seeks the benefits of Medicaid.

247.    Nina Noe will be denied those benefits on account of her gender dysphoria diagnoses because the Medicaid Restriction prohibits Medicaid from covering treatments provided

"for the purpose of assisting an individual with a physical gender transition." S.C. Code Ann. §§ 44-42-310(6); 44-42-350.

248.    The Public Funds and Medicaid Restrictions, and Defendants' refusal, based on the Restrictions, to provide coverage for services for the treatment of gender dysphoria to Noe, while covering the same services for other South Carolina Medicaid beneficiaries with different diagnoses, violate the Medicaid Act's Comparability and Availability Requirements, 42 U.S.C. § 1396a(a)(10)(B)(i), 42 C.F.R. § 440.230(b), which are enforceable by Plaintiffs under 42 U.S.C. § 1983.

## COUNT FIVE
## H 4624 VIOLATES THE AMERICANS WITH DISABILITIES ACT

**(PLAINTIFF STERLING MISANIN AND THE MUSC CLASS AGAINST MUSC)**
**(PLAINTIFFS JANE DOE, JILL RAY, AND NINA NOE AND THE INSURANCE CLASS AGAINST PEBA AND DHHS)**

249.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

250.    Plaintiffs and the Classes they represent suffer from a "disability" within the meaning and scope of 42 U.S.C. § 12102 (2009) based on their gender dysphoria. *Williams v. Kincaid*, 45 F.4th 759, 766 (4th Cir. 2022). Thus, Plaintiffs and the Classes they represent are members of the class of persons protected by the ADA.

251.    The ADA prohibits public entities from discriminating against an individual with a disability, or denying the benefits of the services, programs, or activities of a public entity or entity receiving federal funds to a person based on their disability.

252.    PEBA, DHHS, and MUSC are state government agencies or instrumentalities of the State and are therefore public entities within the meaning of the ADA.

253.    PEBA, DHHS, and MUSC, through their agents, violated Title II of the ADA by discriminating against Plaintiffs and the Classes they represent on the basis of their disability and denying them the benefits of public services, programs, and activities because of their disability. Specifically, PEBA, DHHS, and MUSC have violated Title II's non-discrimination mandate by:

      a.     implementing and enforcing H 4624's irrational and discriminatory provisions, including the Healthcare Ban, the Public Funding Restriction, and the Medicaid Restriction, that only apply to individuals seeking treatment for gender dysphoria, a protected disability; and

      b.     applying those discriminatory provisions against Plaintiffs, thereby depriving them of medically necessary treatment and causing avoidable and gratuitous pain and suffering.

254.    Such actions and behaviors have and will continue to physically, emotionally, and psychologically harm Plaintiffs and the Classes they represent.

255.    PEBA, DHHS, and MUSC are not entitled to immunity under the Eleventh Amendment for this cause of action.

256.    As a direct and legal result of PEBA's actions and omissions, Plaintiffs Doe, Ray, and the Insurance Class have suffered and continue to suffer injury, including, but not limited to, serious physical, psychological, and emotional harm and mental anguish, distress, humiliation, and indignity.

257.    As a direct and legal result of DHHS's actions and omissions, Plaintiff Nina Noe and the Insurance Class have suffered and continue to suffer injury, including, but not limited to, serious physical, psychological, and emotional harm and mental anguish, distress, humiliation, and indignity.

258.    As a direct result of MUSC's actions and omissions, Plaintiff Misanin and the MUSC Class have suffered and continue to suffer injury, including, but not limited to, serious

physical, psychological, and emotional harm and mental anguish, distress, humiliation, and indignity.

**COUNT SIX**
**H 4624 VIOLATES THE REHABILITATION ACT**

**(PLAINTIFF STERLING MISANIN AND THE MUSC CLASS AGAINST MUSC)**
**(PLAINTIFFS JANE DOE, JILL RAY, AND NINA NOE AND THE INSURANCE CLASS AGAINST PEBA AND DHHS)**

259.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

260.    Based on their diagnoses of gender dysphoria, Plaintiffs and the Classes they represent suffer from a "disability" and are members of the class of persons protected under Section 504 of the Rehabilitation Act. The act prohibits entities receiving federal funds from discriminating against an individual with a disability, or denying the benefits of the services, programs, or activities of a public entity or entity receiving federal funds to a person with a disability.

261.    PEBA, DHHS, and MUSC receive federal financial assistance for health care services through multiple avenues, including Medicaid, which is funded by both the federal government and the state.

262.    PEBA, DHHS, and MUSC discriminated against Plaintiffs and the Classes they represent on the basis of their disability and denied them the benefits of public services, programs, and activities as a result of their disability by, among other things, failing to provide adequate and necessary medical treatment and depriving Plaintiffs and the Classes they represent of the benefits of programs and activities. Such actions and behaviors have detrimentally affected the health of Plaintiffs and the Classes they represent.

263.    PEBA, DHHS, MUSC, and their agents violate Section 504 of the Rehabilitation Act, which prohibits discrimination on the basis of physical and mental disability and protects persons like Plaintiffs and the Classes they represent from the injuries set forth herein.

264.    PEBA, DHHS, and MUSC are not entitled to immunity under the Eleventh Amendment for this cause of action.

265.    As a direct and legal result of PEBA's actions and omissions, Plaintiffs Doe, Ray, and the Insurance Class have suffered and continue to suffer injury, including, but not limited to, serious physical, psychological, and emotional harm and mental anguish, distress, humiliation, and indignity.

266.    As a direct and legal result of DHHS's actions and omissions, Plaintiff Nina Noe and the Insurance Class have suffered and continue to suffer injury, including, but not limited to, serious physical, psychological, and emotional harm and mental anguish, distress, humiliation, and indignity.

267.    As a direct result of MUSC's actions and omissions, Plaintiff Misanin and the MUSC Class have suffered and continue to suffer injury, including, but not limited to, serious physical, psychological, and emotional harm and mental anguish, distress, humiliation, and indignity.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.    Enter a judgment declaring that S.C. Code Ann. §§ 44-42-310 et seq., which categorically prohibits the provision of medically necessary gender-affirming medical care for the treatment of gender dysphoria to minors and prohibits state funding of gender-affirming care for all individuals, as applied to Plaintiffs and the putative Classes:

    i.     violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against

        a.   transgender adolescents on the basis of sex and transgender status,

        b.   the parents of transgender children with regards to

            1.   their exercise of the right to parental autonomy and

            2.   their ability to secure necessary medical care for their children that other parents can obtain, and

        c.    individuals who receive gender-affirming care from providers who receive state funding or whose health insurance coverage is state-funded;

and is therefore unenforceable;

    ii.    violates the Due Process Clause of the Fourteenth Amendment by infringing upon parents' fundamental right to make decisions concerning the care of their children, and is therefore unenforceable;

   iii.    violates Section 1557 of the Affordable Care Act by discriminating against transgender individuals on the basis of sex, and is therefore unenforceable; and

   iv.    violates the comparability and availability requirements of the Medicaid Act by discriminating against transgender individuals on the basis of sex, and is therefore unenforceable;

    v.    violates Title II of the ADA by discriminating against transgender individuals on the basis of their disability and denying them the benefits of public services, programs, and activities because of their disability;

      vi.    violates Section 504 of the Rehabilitation Act by discriminating against transgender individuals on the basis on their disability and denying them the benefits of public services, programs, and activities because of their disability;

B.    Issue preliminary and permanent injunctions enjoining Defendants, their employees, agents, and successors in office and those in active concert or participation with them from implementing or enforcing H 4642 against the Plaintiffs and the putative Class Members;

C.    Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

D.    Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and all other applicable statutes and sources of law; and

E.    Grant such other relief as the Court deems just and proper.

Dated: August 29, 2024

Respectfully submitted,

/s/ Meredith McPhail
_____
Allen Chaney (Fed. Id. No. 13181)
Meredith McPhail (Fed. Id. No. 13500)
**ACLU OF SOUTH CAROLINA**
P.O. Box 1668
Columbia, SC 29202
T: 864-372-6881
achaney@aclusc.org
mmcphail@aclusc.org

/s/ Sruti Swaminathan
_____
Sruti Swaminathan*
Harper Seldin*
**AMERICAN CIVIL LIBERIES UNION
 FOUNDATION**
125 Broad St., Fl 18
New York, NY 10004
T: 212-549-2500
hseldin@aclu.org
sswaminathan@aclu.org

/s/ Julie Singer
_____
David S. Flugman*
Corey Stoughton*
Julie Singer*
**SELENDY GAY PLLC**
1290 Avenue of the Americas
New York, NY  10104
T: 212-390-9000
dflugman@selendygay.com
cstoughton@selendygay.com
jsinger@selendygay.com

*\* Application for Admission Pro Hac Vice
Forthcoming*

*Attorneys for Plaintiffs*