# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### Charleston Division

STERLING MISANIN, et al.,

        *Plaintiffs*,

v.

ALAN WILSON, in his official capacity as Attorney General of South Carolina, et al.,

        *Defendants*.

Case No.: 2:24-cv-04734-BHH

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

I.      Guidelines for the Treatment of Gender Dysphoria ....................................................3

II.     Treatment of Adolescents with Gender Dysphoria.............................................5

III.    South Carolina Restricts Access to Gender-Affirming Care Through H 4624 .................8

IV.     South Carolina's Ban on Gender-Affirming Care Inflicts Severe and Irreparable Harms ........................................................................................................10

LEGAL STANDARD...........................................................................................11

I.      Plaintiffs Are Likely to Succeed on Their Equal Protection Claim................................12

        A.      Heightened Scrutiny Applies Because H 4624 Classifies Based on Transgender Status and Sex ...................................................................12

                1.      H 4624 Classifies Based on Transgender Status.................................13

                2.      H 4624 Facially Classifies Based on Sex .................................15

        B.      H 4624 Fails Heightened Equal Protection Scrutiny .............................................17

II.     Parent Plaintiffs Are Likely to Succeed on the Merits of their Due Process Claim .........21

        A.      The Ban Infringes Upon the Fundamental Rights of Parents to Direct the Medical Care of Their Minor Children..................................................21

        B.      H 4624 Cannot Survive Strict Scrutiny .................................................22

III.    Plaintiffs Are Likely to Succeed on Their ACA Claim .....................................23

IV.     Plaintiffs Are Likely to Succeed on Their Medicaid Act Claim........................................24

        A.      H 4624's Categorical Prohibition on Gender-Affirming Medical Care Violates the Medicaid Act's Availability Requirement.........................................24

        B.      The Coverage Restrictions' Prohibition on Gender-Affirming Care Violates the Medicaid Act's Comparability Requirement .................................................26

V.      A Preliminary Injunction is Necessary ...........................................................26

        A.      Plaintiffs Suffer Immediate and Irreparable Harm While H 4624 is in Effect ....................................................................................................26

1.      Plaintiffs Cannot Access Medically Necessary Care ................................. 27

2.      Plaintiffs Are Denied Insurance Coverage for Medically Necessary
        Care ............................................................................................................ 29

3.      Plaintiffs Cannot Access Necessary Care from the Medical
        Professionals Well-Suited to Provide Them with Safe and Effective
        Care ............................................................................................................ 30

B.      The Balance of Equities Favors Plaintiffs and a Preliminary Injunction is in
        the Public Interest ............................................................................................. 31

VI.     A Classwide Injunction Is Necessary to Protect the Classes ............................................ 32

CONCLUSION ....................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. Betlach*,
    572 F. App'x 519 (9th Cir. 2014) ............................................24

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001) ............................................13

*Beal v. Doe*,
    432 U.S. 438 (1977) ............................................25

*Bernal v. Fainter*,
    467 U.S. 216 (1984) ............................................22

*Bontrager v. Indiana Fam. & Soc. Servs. Admin.*,
    697 F.3d 604 (7th Cir. 2012) ............................................25

*Brandon v. Marshall*,
    No. 2:24-CV-00265, 2024 WL 2834014 (S.D. W. Va. June 4, 2024)....................................32

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021) *aff'd*, 47 F.4th 661 (8th Cir. 2022) ..........11, 19, 21, 22

*Brandt v. Rutledge*,
    677 F. Supp. 3d 877 (E.D. Ark. 2023) ............................................18

*Centro Tepeyac v. Montgomery Cnty.*,
    722 F.3d 184 (4th Cir. 2013) ............................................32

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ............................................13

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) ............................................13

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ............................................12, 13, 16, 17

*Guilford College v. McAleenan*,
    389 F. Supp. 3d 377 (M.D.N.C. 2019) ............................................11

*J.O.P. v. U.S. Dep't of Homeland Security*,
    409 F. Supp. 3d 367 (D. Md. 2019) ............................................32

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ........................................................... *passim*

*Kadel v. Folwell*,
    620 F. Supp. 3d 339 (M.D.N.C. 2022) ............................................. *passim*

*Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*,
    12 F.4th 422 (4th Cir. 2021) ....................................................................3

*L. W. by & through Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir.) ...........................................................................22

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ...............................................................26, 32

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .................................................................31

*Morrison v. Garraghty*,
    239 F.3d 648 (4th Cir. 2001) .................................................................13

*Nken v. Holder*,
    556 U.S. 418, 129 S. Ct. 1749 (2009)...................................................11

*Parham v. J.R.*,
    442 U.S. 584 (1979)...............................................................................21

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)...............................................................................16

*Pinneke v. Preisser*,
    623 F.2d 546 (8th Cir. 1980) .................................................................25

*Rodriguez v. Providence Comty. Corrs., Inc.*,
    155 F. Supp. 3d 758 (M.D. Tenn. 2015)...............................................32

*Roe v. Dep't. of Def.*,
    947 F.3d 207 (4th Cir. 2020) .................................................................11

*Santosky v. Kramer*,
    455 U.S. 745 (1982)...............................................................................22

*Schall v. Martin*,
    467 U.S. 253 (1984)...............................................................................22

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017).................................................................................20

*Troxel v. Granville,*
    530 U.S. 57 (2000) ................................................................................21

*United States v. Virginia,*
    518 U.S. 515 (1996) .......................................................................12, 17

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977) ............................................................................16

*White v. Beal,*
    555 F.2d 1146 (3d Cir. 1977) .............................................................26

*Williams v. Kincaid,*
    45 F.4th 759 (4th Cir. 2022) ..............................................................14

**Statutes**

42 C.F.R. § 440.230 ....................................................................................24

42 U.S.C. § 1396a(17) .................................................................................24

S.C. Code Ann. § 16-3-95(A) .......................................................................9

S.C. Code Ann. §§ 44-42-310, et. seq. ..................................................*passim*

**Other Authorities**

Local Civ. R. 7.02 .........................................................................................1

Local Civ. R. 7.04 .........................................................................................1

Local Civ. R. 7.05 .........................................................................................1

*Senate Comm. on Med. Affs - Senate Med. Affs. Subcomm on H 4624* (Feb. 14,
    2024) ......................................................................................................8

South Carolina Department of Health and Human Services, "Physicians Services
    Provider Manual," available at
    https://provider.scdhhs.gov/internet/pdf/manuals/Physicians/Manual.pdf ...........................23

Standards of Care for the Health of Transgender and Gender Diverse People,
    Version 8 ........................................................................................4, 5, 6

Statement of Rep. Beach, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. ...................17

Statement of Rep. Pace, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. ................16, 17

Statement of Rep. White, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. ...................17

Statements of Sens. Garrett and Loftis, Members, S. Comm. on Med. Affs.................................17

WPATH, *Mission and Vision*, www.wpath.org/about/mission-and-vision....................................4

Plaintiffs respectfully submit this motion for a preliminary injunction.[1]

## PRELIMINARY STATEMENT

On April 29, 2024, the Fourth Circuit ruled that refusing state funding for gender-affirming medical care constitutes unlawful discrimination under the Equal Protection Clause, Section 1557 of the Affordable Care Act, and the Medicaid Act. *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc). Less than a month later, South Carolina enacted a law that categorically denies medically necessary care for minors with gender dysphoria, excludes coverage for "gender transition procedures" under the Medicaid Act, and prohibits any state funding from being used "directly or indirectly" to provide "gender transition procedures." Because the law is facially discriminatory, flouts directly controlling precedent, and is already causing serious and irreparable harm, this Court should immediately grant a preliminary injunction enjoining enforcement of the law against Plaintiffs and members of the putative Classes, restoring the pre-enactment status quo.

House Bill 4624 ("H 4624"), codified in South Carolina Code Annotated §§ 44-42-310 *et seq.*, imposes significant barriers to healthcare for transgender people.[2] In particular, H 4624: (1) categorically prohibits medical professionals from providing necessary and potentially lifesaving care to adolescents under the age of 18 who have been diagnosed with gender dysphoria, even

---

[1] Plaintiffs do not submit an accompanying memorandum of law because a full explanation of the motion as set forth in Loc. Civ. R. 7.05 is contained within this motion. *See* Loc. Civ. R 7.04 (D.S.C.). Further, as of the filing of this motion, conferral with opposing counsel has not been possible under Loc. Civ. R. 7.02 because opposing counsel has not yet entered an appearance or otherwise identified themselves to Plaintiffs.

[2] Transgender people are those whose gender identity is different from their sex assigned at birth. A transgender boy or man is someone who has a male gender identity but was designated female at birth. A transgender girl or woman has a female gender identity but was designated male at birth. A nonbinary person is someone whose gender identity does not clearly align with either male or female identity, and many nonbinary people identify themselves as transgender because their gender identity does not align with their sex assigned at birth. *See* Compl. ¶ 54.

1

though these treatments are available to non-transgender adolescents, S.C. Code Ann. § 44-42-320 (the "Healthcare Ban" or the "Ban"); (2) prohibits "public funds" from being used "directly or indirectly for gender transition procedures," regardless of age, S.C. Code Ann. § 44-42-340 (the "Public Funds Restriction"); and (3) excludes "gender transition procedures" from coverage under the South Carolina Medicaid Program, again regardless of age, S.C. Code Ann. § 44-42-350 (the "Medicaid Restriction" and, together with the Public Funds Restriction, the "Coverage Restrictions"). These provisions prevent transgender South Carolinians from receiving medically necessary care that remains available to non-transgender people.

Plaintiffs are adolescents and adults who have been diagnosed with gender dysphoria and who access medically necessary gender-affirming healthcare, as well as the parents of adolescent plaintiffs. Plaintiffs have either received denials of care or anticipate receiving such denials.

H 4624 took effect on May 21, 2024. Since then, some South Carolinians have already lost their care, while others face imminent loss of care or an inability to start care. Absent intervention by this Court, H 4624 will inflict irreparable harm on transgender adolescents and adults, as well as their families, who must suffer without essential healthcare or go to extreme lengths to secure it elsewhere for themselves or their loved ones.

All relevant considerations strongly weigh in favor of preliminary injunctive relief. The Fourth Circuit's recent ruling in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), which struck down virtually identical Coverage Restrictions, confirms that Plaintiffs' challenges to H 4624's Healthcare Ban and Coverage Restrictions under the Equal Protection Clause, the Due Process Clause, the Affordable Care Act and the Medicaid Act are likely to succeed. Because H 4624 is causing, and will continue to cause, immediate and irreparable harm to all Plaintiffs and the

corresponding Class members, and the balance of equities and the public interest both weigh heavily in favor of a preliminary injunction, this Court should grant Plaintiffs' requested relief.

## STATEMENT OF FACTS

### I.    Guidelines for the Treatment of Gender Dysphoria

Gender identity is a person's "deeply felt, inherent sense of their gender." *Kadel*, 100 F.4th at 136; *see also* Karasic Decl. ¶ 31 (citing American Psychological Association, 2015, at 834). Gender identity does not always align with a person's sex assigned at birth, which is generally based on the appearance of a newborn's external genitalia. *See Kadel*, 100 F.4th at 137; Karasic Decl. ¶ 31; Olson-Kennedy Decl. ¶ 26. Gender identity, which has biological bases, is not a product of external influence and not subject to voluntary change. Karasic Decl. ¶ 31; Olson-Kennedy Decl. ¶ 27; *see Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021).

The term "gender dysphoria" refers to "a condition characterized by clinically significant distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Kadel,* 100 F.4th at 137; *see also,* Karasic Decl. ¶ 32; Olson-Kennedy Decl. ¶ 29. For both adolescents and adults, the clinical diagnosis of gender dysphoria involves two major diagnostic criteria: (1) a marked incongruence between the gender experienced and expressed by an individual and the gender assigned to that individual, and (2) associated clinically significant distress or impairment in social, occupational, or other important areas of functioning. Karasic Decl. ¶¶ 34-35 (quoting *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ("DSM-5") (DSM-5 released in 2013)).

To reduce or eliminate this distress, treatment—referred to as gender-affirming medical care—seeks to align an individual's body and presentation with their gender identity. *See* Karasic

3

Decl. ¶ 52. The medical community recognizes gender-affirming medical care as well-established and evidence-based: it is neither experimental nor investigational. Antommaria Decl. ¶¶ 36, 71. The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have developed longstanding, continuously maintained, evidence-based guidelines for gender-affirming medical care (the "Guidelines").[3] *Kadel*, 100 F.4th at 137-38; Karasic Decl. ¶¶ 37-40. The Guidelines include WPATH's Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 ("SOC 8"), and the Endocrine Society's standard of care for the provision of hormone therapy as treatment for gender dysphoria ("Endocrine Society Guideline").

The Guidelines recommend interventions that are individualized based on patient needs, and treatment may include puberty-delaying medications, hormone therapy, and surgeries. *Kadel*, 100 4th at 136–37; Karasic Decl. ¶ 41. Puberty-delaying medications are indicated primarily for adolescents to pause the development of secondary sex characteristics that are inconsistent with their gender identity (and avoid the accompanying distress) and to provide additional time for adolescents to explore their gender identity before making further decisions about puberty. Shumer Decl.¶¶ 62, 67; *see also* SOC 8 at S60. Hormone therapy allows for physical development more closely aligning with a person's gender identity, helping alleviate gender dysphoria. Shumer Decl. ¶ 71; *see also* SOC 8 at S110. Both puberty-delaying medications and hormone

---

[3] WPATH, an "interdisciplinary professional and educational organization devoted to transgender health," has issued published versions of standards of gender-affirming care since 1979 anchored in methodological and evidence-based medical science and based on a systemic review of all available scientific evidence and the clinical experience of many experts in the field. WPATH, *Mission and Vision*, www.wpath.org/about/mission-and-vision (last visited Aug. 28., 2024). The most recent version, published in 2022, is Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 ("SOC 8"). The Endocrine Society, a professional society of endocrine scientists and clinicians, has promulgated a similar standard of care and a set of clinical practice guidelines for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults ("Endocrine Society Guideline").

therapy (primarily testosterone and estrogen) are used in minors and adults to treat a variety of conditions other than gender dysphoria. Shumer Decl. ¶¶ 64, 68; Olson-Kennedy Decl. ¶¶ 39, 69-71; Antommaria Decl. ¶¶ 74-75. Gender-affirmation surgery (GAS) refers to a "constellation of procedures designed to align a person's body with their gender identity." SOC 8 at S128; *see also* Karasic Decl. ¶¶ 37-62. Many of these procedures are used to treat conditions other than gender dysphoria. *See, e.g.*, Antommaria Decl. ¶ 75.

The denial of medically indicated care to transgender people not only prolongs and intensifies their gender dysphoria, but also causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality. Karasic Decl. ¶ 66. It is "undisputed that gender dysphoria is a serious diagnosis that, if left untreated, can lead to self-mutilation and suicide." *Kadel v. Folwell*, 620 F. Supp. 3d 339, 380 (M.D.N.C. 2022). Accordingly, major medical organizations, such as the American Medical Association, American Psychiatric Association, and American College of Obstetricians and Gynecologists, endorse the treatment guidelines contained in SOC 8 and the Endocrine Society Guideline, oppose the denial of this medically necessary care and support public and private health insurance coverage for treatment of gender dysphoria as recommended by the patient's physician. Karasic Decl. ¶ 59; Antommaria Decl. ¶ 34; Olson-Kennedy Decl. ¶ 32; Shumer Decl.¶ 53.

## II.    Treatment of Adolescents with Gender Dysphoria

Recognizing the "unique aspects that distinguish adolescence from other developmental stages,"[4] SOC8 at S49, the Guidelines also provide specific evidence-based recommendations for

---

[4] These aspects include identity exploration, caregiver/parent involvement, and the onset of puberty, all of which require a specialized regimen of treatment for gender dysphoria in adolescents. SOC8 at S49; Karasic Decl.¶¶ 43-47.

5

the treatment of adolescents with gender dysphoria. Karasic Decl. ¶¶ 37, 44; Shumer Decl. ¶ 36. Under the Guidelines, gender-affirming medical care is only provided when an adolescent patient has: (i) gender incongruence that is both marked and sustained over time; (ii) a diagnosis of gender dysphoria; (iii) sufficient emotional and cognitive maturity to understand the potential side effects and provide informed consent; (iv) actually provided informed consent; and (v) the absence or mitigation of any countervailing mental health concerns. Karasic Decl. ¶ 43; SOC 8 at S48. Parental consent is also required for adolescents to access medical care. Karasic Decl. ¶ 44; *see also* SOC 8 at S58; Antommaria Decl. ¶¶ 45, 47 ("The current treatment paradigm for treating gender dysphoria … is consistent with general ethical principles instantiated in the practices of informed consent.").

Treatment for gender dysphoria depends on, among many other individualized factors, a patient's state of pubertal development. Under the Guidelines, no medical treatments are provided before the onset of puberty. Karasic Decl. ¶ 41; SOC 8 at S59. Adolescents diagnosed with gender dysphoria who have reached the stage of puberty wherein the physical effects of testosterone or estrogen production are first apparent on physical exam (referred to as "Tanner Stage 2") may begin medical treatment, usually starting with puberty-delaying medications, sometimes referred to as puberty-blockers. Shumer Decl. ¶ 62.

Puberty-delaying medications are a fully reversible treatment. Shumer Decl. ¶ 64; Olson-Kennedy Decl. ¶ 39. They work by pausing endogenous puberty at its present stage when the treatment begins, forestalling the influence of a person's endogenous hormones on their body. Shumer Decl. ¶ 63. For example, a transgender girl will pause progression of physical changes caused by testosterone, including facial and body hair, an Adam's apple, or masculinized facial

structures. *Id.* And, in a transgender boy, those medications pause progression of breast development, menstruation, and widening of the hips. *Id.*

For adolescents and adults, the Guidelines provide for medical interventions that are individualized based on patient needs and may include puberty-delaying medications, hormone therapy, or (rarely for adolescents) surgeries. *See* Karasic Decl. ¶¶ 47-49. As with all medical interventions, the ultimate course of treatment is individualized based on and responsive to the particular medical and mental health needs of each patient. *Id.* at ¶ 49.

In some cases, hormone therapy may be medically necessary. *Id.* at ¶ 46. For adolescents, gender-affirming hormone therapy in adolescence can minimize dysphoria later in life and may eliminate the need for surgery. *See id.* at ¶¶ 9-12. These hormone therapies are used to facilitate development of sex-specific physical changes congruent with one's gender identity. Shumer Decl. ¶ 71; Olson-Kennedy Decl. ¶ 51. For example, a transgender boy prescribed testosterone will develop a lower voice as well as facial and body hair, while a transgender girl prescribed estrogen will experience breast growth, female fat distribution, and softer skin. Shumer Decl. ¶ 71.

Regardless of the treatment plan prescribed, at every encounter with the care team, there is a re-evaluation of the patient's gender identity and their transition goals. Shumer Decl. ¶ 75. Should a patient desire to discontinue a medical intervention, the intervention is discontinued. *Id.* Studies in which participants have undergone comprehensive evaluation prior to gender-affirming medical care show low levels of regret. *Id.* at ¶ 75 (citing de Vries, et al., 2011; van der Loos, et al., 2022; Wiepjes, et al., 2018); Antommaria Decl. ¶ 60.

Without gender-affirming medical care, transgender adolescents may experience extreme distress as they go through puberty in accordance with the sex assigned to them at birth. Karasic Decl. ¶ 66; Olson-Kennedy Decl. ¶¶ 38-39. Provision of puberty blockers and gender-affirming

hormones for transgender youth decreases depression, anxiety, and suicidality. Shumer Decl. ¶¶ 34, 84, 87; Karasic Decl. ¶ 52. Denial of access to this care for transgender adolescents is thus opposed by mainstream organizations responsible for the care of youth, including the American Medical Association, American Psychiatric Association, the Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and American Academy of Pediatrics. Karasic Decl. ¶¶ 6, 65 (citing American Medical Association, 2021; American Psychiatric Association, 2018; Endocrine Society, 2012, American Congress of Obstetricians and Gynecologists, 2021; American Academy of Family Physicians, 2020); *Senate Comm. on Med. Affs – Senate Med. Affs. Subcomm on H 4624* (Feb. 14, 2024) (Testimony of Dr. Elizabeth Mack, President of the South Carolina Chapter of the American Academy of Pediatrics at 52:36-1:30:32) (citing the American Academy of Pediatrics' Guidelines opposing denial of gender-affirming care).

Furthermore, there is no evidence-based alternative to gender-affirming medical care for treating gender dysphoria in adolescents where such interventions are medically indicated. Karasic Decl. ¶ 67. While behavioral health interventions are an important component of treatment for many, the literature has established for decades that mental health interventions alone are insufficient to treat gender dysphoria. Karasic Decl. ¶ 68.

## III.    South Carolina Restricts Access to Gender-Affirming Care Through H 4624

H 4624, signed by Governor McMaster on May 21, 2024 and effective as of that date, prohibits healthcare professionals from "knowingly [providing] gender transition procedures to a person under eighteen years of age," § 44-42-320(A); categorically excludes the use of public funds "directly or indirectly" for *any* gender transition procedures, including procedures provided to adults, § 44-42-340; and prohibits Medicaid reimbursement from the South Carolina Medicaid

8

Program for "practices prohibited under the provision of this chapter," presumably referring to the provision of "gender transition procedures" to minors. § 44-42-350.[5]

The law defines "gender transition procedures" to include "puberty-blocking drugs," ("any drug to suppress or delay normal pubertal development in children"); "cross-sex hormones" ("testosterone, estrogen, or progesterone given to an individual in an amount greater than would normally be produced endogenously . . ."); and "gender reassignment surgery," including "any surgical service that seeks to surgically alter or remove healthy physical or anatomical characteristics . . . typical for the individual's sex, in order to instill or create physiological . . . characteristics that resemble a sex different from the individual's sex." § 44-42-310.

The Healthcare Ban subjects healthcare professionals who provide minors with gender transition procedures to both professional discipline and criminal penalties. The provision of prohibited services is considered "unprofessional conduct . . . subject to discipline by the licensing entity with jurisdiction over the physician." § 44-42-360. Furthermore, "[a] physician who knowingly performs genital gender reassignment surgery in violation of [H 4624] is guilty of inflicting great bodily injury upon a child." § 44-42-320. (The crime of "great bodily injury upon a child" is a felony carrying a maximum penalty of twenty years imprisonment. S.C. Code Ann. § 16-3-95(A).) The healthcare professionals may also be sued by the Attorney General or private parties. § 44-42-365.

H 4624 is part of a wave of legislation in this state designed to isolate, stigmatize and discriminate against transgender people. During the most recent legislative session, the Senate introduced 12 bills targeting transgender people and the House introduced 17 such bills, in addition

---

[5] Because the Public Funds Restriction, § 44-42-340, would necessarily include the Medicaid program, the prohibition on Medicaid reimbursement also extends to adult patients.

to H 4264.[6] In June, the General Assembly passed a state budget for Fiscal Year 2024-2025 that restricts transgender students' access to school restrooms and locker rooms. S.C. General Appropriations Bill H 5100, Part IB, Section 1, Proviso 1.120.

## IV. South Carolina's Ban on Gender-Affirming Care Inflicts Severe and Irreparable Harms

By cutting off access to treatment that transgender South Carolinians rely on for their health and well-being and limiting future access to treatment, H 4624 causes immediate, severe, and irreparable harm to all of the Plaintiffs and Classes. Minor Plaintiffs Grant Goe and Nina Noe are experiencing anxiety, distress, and potentially permanent physiological changes if they are denied the critical gender-affirming medical care they need for gender dysphoria. Adult Plaintiffs Sterling Misanin, Jane Doe, and Jill Ray are experiencing anxiety, distress, and potentially permanent physiological changes if they are cut off from the funding of their critical gender-affirming medical care, or from preferred providers of that care. Parent Plaintiffs Nancy Noe and Gary Goe have had their parental judgment and decision-making authority usurped by the government and will either have to disrupt their lives at great cost to seek care out of state or endure watching their children suffer without the medical treatment they need.

---

[6] SC H 4624; H 3197, H 3485, SB 1213, H 3304, H 3466, H 3728, H 3827, H 4663, H 4707, SB 0743, SB 234, SB 274, SB 424 (prohibiting mandatory gender or sexual diversity training in higher education and local education agencies, or limiting the discussion of transgender topics in education and schools, including use of "preferred" pronouns and/or forced outing of students); H 3551, H 4619, H 4624, SB 127, SB 243, SB 627 (alternate versions of gender-affirming care ban); H 3611, H 3801, SB 0975 (protecting the right to discriminate against transgender individuals on moral or religious grounds); H 3616, SB 585 (criminalizing drag shows in a manner that targets transgender performers); H 4535, H 4538, H 5407 (restricting transgender people's access to bathrooms); SB 623, SB 364 (restricting right of transgender individuals to obtain gender markers on identification documents).

## LEGAL STANDARD

A preliminary injunction is warranted where a plaintiff (1) is "likely to succeed on the merits;" (2) is "likely to suffer irreparable harm in the absence of preliminary relief;" (3) can show "the balance of equities tips in [its] favor;" and (4) can show the injunction "is in the public interest." *Roe v. Dep't. of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (citation omitted) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When a preliminary injunction is sought against the government, these last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009); *see also Guilford College v. McAleenan*, 389 F. Supp. 3d 377, 395 (M.D.N.C. 2019).

## ARGUMENT

Plaintiffs here meet each of the requirements for a preliminary injunction.

*First*, as discussed further below, Plaintiffs are likely to succeed on each of their claims. The Fourth Circuit has already held that where, as here, a law or restriction bars transgender individuals from receiving categories of care available to others, that law or restriction violates the Equal Protection Clause. *See Kadel v. Folwell*, 100 F.4th at 141-157. Similarly, because H 4624 prevents Parent Plaintiffs from securing doctor-recommended care for their children, they are also likely to succeed on the merits of their substantive due process claim. *See, e.g., Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021) *aff'd*, 47 F.4th 661 (8th Cir. 2022). Finally, as with Plaintiffs' Equal Protection Claim, the Fourth Circuit has already confirmed in *Kadel* that similar restrictions on the provision of gender-affirming care violate both the ACA and the Medicaid Act. *See Kadel*, 100 F.4th at 161-64.

*Second*, by being denied access to necessary healthcare, and having their health insurance coverage cut off for this care, Plaintiffs and the members of the Classes they represent are likely

11

to—and have already suffered—irreparable harm due to H 4624. Although the State's violation of Plaintiffs' and the Classes' constitutional rights alone justifies an injunction, the harms in this case concern critical, and potentially lifesaving, medical care and go far beyond any legal formality.

*Finally*, given the significant harm suffered by Plaintiffs if South Carolina continues to block access to life-saving care, contrary to existing medical guidelines recognized as authoritative by all mainstream medical associations in the United States, and in the absence of any scientifically credible basis for denying that care or any articulated, permissible state interest, the balance of equities and public interest weighs in favor of a statewide injunction to prevent irreparable harm against Plaintiffs and the Classes.

## I.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim

H 4624 imposes the same categorical prohibitions on medical care for individuals diagnosed with gender dysphoria that the Fourth Circuit has already held impermissibly violates the Equal Protection Clause. In *Kadel*, the Fourth Circuit ruled that similar denials of gender-affirming medical care to people diagnosed with gender dysphoria through North Carolina and West Virginia's publicly-funded insurance plans violated those individuals' rights under the Equal Protection Clause. *See Kadel*, 100 F.4th at 141–157. As in *Kadel*, H 4624 classifies based on sex and transgender status, is not substantially related to a sufficiently important government interest and cannot survive the "exacting" test imposed by heightened equal protection scrutiny. *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 555 (1996); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020).

### A.    Heightened Scrutiny Applies Because H 4624 Classifies Based on Transgender Status and Sex

The Equal Protection Clause of the Fourteenth Amendment prohibits state action that "creates arbitrary or irrational distinctions between classes of people out of a bare … desire to harm a

politically unpopular group." *Grimm*, 972 F.3d at 606–07. Different "level[s] of scrutiny" apply to state actions depending on the "basis of the distinction between the classes of persons." *Id.* at 607; *see also Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Laws that employ "quasi-suspect" classifications are subject to heightened scrutiny, "meaning that they fail unless they are substantially related to sufficiently important governmental interests." *Grimm*, 972 F.3d at 608 (citation omitted).

Because H 4624 facially classifies based on transgender status and sex, it is subject to at least heightened scrutiny. *See Kadel*, 100 F.4th at 142–43 (applying heightened scrutiny to indistinguishable North Carolina and West Virginia healthcare bans); *Grimm*, 972 F.3d at 611–13.[7]

### 1.    H 4624 Classifies Based on Transgender Status

The plain text of H 4624 classifies based on transgender status. The title of the law itself—"An Act to . . . Prohibit the Provision of Gender Transition Procedures to a Person Under Eighteen Years of Age . . ."—uses "gender transition" as a proxy for transgender status to impose disparate treatment. The Coverage Restrictions extend that classification to adults. The law expressly classifies patients—both adolescents and adults—for differential treatment based on transgender status. "[G]ender dysphoria is so intimately related to transgender status as to be virtually

---

[7] Although this Court is bound by precedent to apply heightened scrutiny, H 4624 notably cannot withstand any level of scrutiny. There is no rational basis to conclude that allowing minors with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten legitimate interests of [South Carolina] in a way that" allowing that treatment for other purposes "would not." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people while allowing access for married people). Nor is there any rational basis to conclude that funding gender-affirming medical care would threaten any legitimate interest of South Carolina. Even under rational basis review, the justifications for H 4624 "ma[k]e no sense in light of how the [statute] treat[s] other [procedures] similarly situated in relevant respects." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001).

13

indistinguishable from it." *Kadel*, 100 F.4th at 146; *see also id.* ("[I]ncongruity between sex assigned at birth and gender identity [is] the very heart of transgender status."); *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (observing as a matter of constitutional avoidance that the Court has "little trouble concluding that a law excluding" gender dysphoria from protection "would discriminate against transgender people as a class").

As in *Kadel*, by prohibiting medical treatments based on whether they are "provided or performed for the purpose of assisting an individual with a physical gender transition"—"the process in which a person goes from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her sex," § 44-42-310(5-6)—H 4624 expressly and exclusively targets transgender people. *See Kadel*, 100 F.4th at 143–49 (holding (1) treatments "in connection with sex changes" are "treatments for gender dysphoria," (2) "gender dysphoria, a diagnosis inextricable from transgender status, is a proxy for transgender identity," and (3) classifications that prevent treatment for gender dysphoria, "bar treatments on the basis of transgender identity by proxy"). Because non-transgender adolescents may continue receiving the very same puberty-delaying, hormonal, and, rarely, surgical treatments that H 4624 denies to transgender adolescents, § 44-42-310(6),[8] and because public funds may still be used to

---

[8] *See* Shumer Decl. ¶¶ 64, 68 ("As an experienced pediatric endocrinologist, I treat patients with these same medications for both precocious puberty and gender dysphoria and in both cases the side effects are comparable and easily managed."), 69 (Puberty delaying treatments are prescribed off-label for adolescents for conditions including for endometriosis and growth hormone deficiency.), 78, 80 (Puberty delaying treatments prescribed for adolescents for other conditions, including precocious puberty.), 85 (Hormone therapy is prescribed to adolescents to treat other conditions, including "delayed puberty, hypogonadism, Turner Syndrome, Klinefelter Syndrome, agonism, premature ovarian failure, and disorders of sex development."); Antommaria Decl. ¶¶ 38 (The level of evidence supporting prescription of GnRH to adolescents with gender dysphoria the same "as supports the use of GnRH analogs for the treatment of central precocious puberty which the Ban permits[.]"), 57 ("[T]he potential risks of gender affirming medical care are comparable

14

provide non-transgender adults with the same care that is no longer covered for those diagnosed with gender dysphoria, § 44-42-340, H 4624 "transparently discriminates against . . . transgender" people. *Kadel*, 620 F. Supp. 3d at 376; *see also*, *Kadel*, 100 F.4th at 152 (exclusions for treatment of gender dysphoria were "obviously discriminatory" against transgender people).

### 2. H 4624 Facially Classifies Based on Sex

H 4624 is also subject to heightened scrutiny because, like the laws challenged in *Kadel*, the law on its face classifies based on sex and assigns disparate treatment based on that classification. *Kadel*, 100 F.4th at 153. As set forth above, H 4264's restrictions apply ***if*** the treatment in question is "provided or performed for the purpose of assisting an individual with a physical gender transition," defined as "the process in which a person goes from identifying with and living as a gender that corresponds to his or her sex to identifying with and living as a gender different from his or her ***sex***." § 44-42-310(5-6), 44-42-320(A-B) (emphasis added). In other words, H 4624 is "textbook sex discrimination"; applying restrictions on care only when the purpose of that care is to "align a patient's gender presentation with a gender identity that does not match their sex assigned at birth." *Kadel*, 100 F.4th at 153. By prohibiting treatment if and only if one's gender presentation does not match their sex designated at birth, a person's sex necessarily determines their treatment under the law: it is a but-for cause of the disparate treatment. *Id.*; *see also id.* at 147 ("restriction on funding is impermissibly discriminatory when it "cannot be done ... without inquiring into a patient's sex assigned at birth and comparing it to their gender identity").

H 4624 also discriminates on the basis of sex by punishing a person's failure to conform to sex stereotypes or expectations associated with a particular sex designated at birth. As *Grimm*

---

to the risks parents and adolescents are permitted to assume in numerous other treatment decisions, including decisions explicitly authorized by this legislation.")

recognized, "policies [that] punish transgender persons for gender non-conformity" constitute impermissible sex stereotyping. 972 F.3d at 608; *see also Kadel*, 100 F.4th at 154 ("[A] policy that conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes."). H 4624 enforces such stereotypes. If an individual conforms with their sex assigned at birth, they can access care without restriction under H 4624. Shumer Decl. ¶¶ 64, 68, 69, 78, 80, 85; *see also* Antommaria Decl. ¶¶ 38, 57. But if the care is for a gender transition—to live in accordance with a gender that diverges from sex assigned at birth—the law strictly prohibits any new course of care for that purpose and prohibits state funding to that end. Accordingly, H 4624 "tethers [people] to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel*, 446 F.Supp.3d at 14.[9]

---

[9] Although the Court need not reach this issue given that *Kadel*'s facial discrimination analysis controls, even if H 4624 did not explicitly classify based on transgender status and sex, it would still be subject to heightened scrutiny as a law passed in part "because of," not just "in spite of," its adverse effects on transgender individuals. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In line with the title of the law that openly declares its aim to "Prohibit the Provision of Gender Transition Procedures," enforcing state-mandated gender conformity was not an incidental effect of the statute, but rather its purpose. This discriminatory intent is only understood by H 4624's legislative history. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) (holding a clear pattern, unexplainable on grounds other than the protected characteristic, is determinative of discriminatory intent). The General Assembly passed H 4624 despite hearing from fifty-three South Carolinians, including parents of transgender children and their doctors, that the law would cause harm. Instead of heeding the warnings and lived experiences of their constituents, proponents of H 4624 within the General Assembly defended the bill based on general criticisms and stereotypes of transgender people. A sponsor of the bill described gender-affirming procedures as "heinous," and another house member identified gender dysphoria as the result of "peer pressure." House Med., Mil., Pub. and Mun. Affs. Comm. — 3-M Full Committee on H.4617 and H.4624 (Jan. 10, 2024) (Statement of Rep. Pace, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. at 32:18-21); *Id.* (Statement of Rep. Beach, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. at 37:10-15; 39:40-40:00). A third house member called transgender identity "a mental disorder." *Id.* (Statement of Rep. White, Member, H. Comm. on Med., Mil. Pub. and Mun. Affs. at (59:09-25). Members of the Senate Medical Affairs Committee compared

**B.    H 4624 Fails Heightened Equal Protection Scrutiny**

To survive the heightened scrutiny required here, South Carolina must, at a minimum, provide an "exceedingly persuasive justification" for H 4624's classifications, *Kadel*, 100 F.4th at 156, which must be "substantially related to a sufficiently important governmental interest," *Grimm*, 972 F.3d at 607. H 4624 cannot survive this "exacting" test, which places a "demanding" burden of justification "entirely on the State." *VMI*, 518 U.S. at 533, 555.

South Carolina has not even attempted to meet its burden. H 4624 asserts no state interest and includes no legislative findings whatsoever. The State has thus provided no record to support any interest purportedly advanced by the law other than discriminatory animus toward transgender people.[10]

South Carolina has not presented, and cannot present, any evidence that would justify treating gender-affirming healthcare differently from all other healthcare posing similar risks and benefits or supported by comparable evidence of efficacy. As is now well recognized in this Circuit,[11] the gender-affirming medical treatments prohibited by H 4624 are safe, effective, and evidence-based. Karasic Decl. ¶ 25; Olson-Kennedy Decl. ¶¶ 50, 55-59; *see also* Antommaria Decl. ¶ 31 (explaining that gender-affirming medical care is neither harmful nor experimental.). Gender

---

students coming out to their teachers as transgender to students dressing up as animals. Senate Comm. on Med. Affs – Senate Med. Affs. Subcomm. on H 4624 (Feb. 21, 2024) (Statements of Sens. Garrett and Loftis, Members, S. Comm. on Med. Affs at 7:50-9:30).

[10] In the absence of a factual record supporting a genuine contemporaneous interest, the State cannot retroactively construct a state interest in response to this action. *See Kadel*, 100 F.4th at 156 ("A law that discriminates against a quasi-suspect class 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (quoting *VMI*, 518 U.S. at 533)).

[11] *See, e.g.*, *Kadel*, 620 F. Supp. 3d 339, 380 (M.D.N.C. 2022) (Defendants West Virginia and North Carolina could not point to any evidence that WPATH standard treatments are ineffective in treating gender dysphoria).

dysphoria often intensifies if left untreated, leading to depression, anxiety, and suicidality. *See, id.* at ¶ 48; Karasic Decl. ¶ 67; Olson-Kennedy Decl. ¶ 78; Shumer Decl. ¶ 39.

Evidence supports the efficacy of these treatments for both adolescents and adults. The scientific literature supporting gender-affirming care for gender dysphoria includes cross-sectional and longitudinal studies, and extensive clinical experience. Karasic Decl. ¶¶ 50-59; Olson-Kennedy Decl. ¶¶ 40, 46, 53, 67; Shumer Decl. ¶ 40. This evidence base is comparable to the level of evidence supporting many other pediatric medical treatments. Antommaria Decl. ¶ 6; Karasic Decl. ¶ 38; Shumer Decl. ¶ 89-90. Again, this fact is well established both in the medical literature and by this Circuit's jurisprudence. *See, e.g., Kadel*, 620 F. Supp. 3d at 380 ("[Defendants] cover many [gender-affirming procedures] for other serious illnesses notwithstanding their risks and side effects."). All of the endocrine treatments—pubertal suppression, testosterone, estrogen and testosterone suppression—prohibited by H 4624 are used to treat other conditions in adolescents, including precocious puberty, and carry comparable risks and side effects regardless of the indication for which they are prescribed. Shumer Decl. ¶¶ 64, 68-69, 78,80, 85. Other medical treatments prohibited by H 4624, when prescribed to transgender adolescents, are used to treat other conditions in non-transgender adolescents and carry comparable risks and side effects regardless of the indication for which they are prescribed. *See* Antommaria Decl. ¶¶ 42, 54; *see also Brandt v. Rutledge*, 677 F. Supp. 3d 877, 902-04 (E.D. Ark. 2023). The treatments provided to adolescents with gender dysphoria do not affect an individual's future fertility any more than those who receive similar care for other indications. *See* Antommaria Decl. ¶¶ 49-52.

Ordinarily, "*doctors and patients*, when fully aware of the risks and elusive benefits of available treatments, should decide if medicine or surgery is necessary." *Kadel*, 620 F.Supp.3d at 380 (emphasis in original) (citing state expert's testimony). "This is Plaintiffs' request: that they

18

and their doctors, not their sex or transgender status, determine when their treatments are appropriate." *Id.* "There is nothing unique about the risks of gender-affirming medical care for adolescents that warrants taking this medical decision out of the hands of adolescent patients, their parents, and their doctors." *Brandt*, 677 F. Supp. 3d at 902–04.

Further, while all medical treatment comes with risk, decades of research and clinical experience show that any risks are greatly outweighed by the benefits of the care. Antommaria Decl. ¶ 56; Karasic Decl. ¶¶ 12, 38, 52-53; Olson-Kennedy Decl. ¶¶ 40-50, 53-63, 65-67, 76-77; Shumer Decl. ¶¶ 83-84. Indeed, the existing treatment protocols carefully address potential risks through a robust informed consent process that is tailored to the maturity of the adolescent and requires consent by the adolescent's parents or guardian. Antommaria Decl. ¶ 45; Karasic Decl. ¶¶ 45,53; Olson-Kennedy Decl. ¶ 68.

What is clear, however, is that transgender adolescents are severely and irreparably harmed when they are denied access to medically necessary gender-affirming care. Karasic Decl. ¶¶ 12, 67-69; Olson-Kennedy Decl. ¶ 78. The denial of gender-affirming medical care to transgender people when medically indicated "not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality," as well as "directly contribut[ing] to poorer mental health outcomes." Karasic Decl. ¶ 67. Prohibiting this care would require transgender adolescents to undergo endogenous puberty, causing potentially severe or life-threatening distress, and in many cases irreversible changes to the body.

Simply put, gender-affirming medical care greatly improves the health and wellbeing of adolescent patients with gender dysphoria. It does not harm them. Rather, it allows them to thrive. "Without evidence that the treatments are ineffective to treat gender dysphoria, Defendants cannot

meet their burden to show that the risks substantially outweigh the benefits so as to justify their sex- and transgender-based policy." *Kadel*, 620 F.Supp.3d at 380. Because the State provides no credible justification explanation for why gender-affirming care should be treated differently from all other medical treatment, much less a "exceedingly persuasive" justification, H 4624 cannot survive heightened scrutiny review.

Even if the Healthcare Ban was intended to prevent some demonstrated medical harm to children, heightened scrutiny requires that the Ban be "substantially related to that end." *Kadel*, 100 F.4th at 156*; see also, Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017) ("[A] close means-end fit [is] required to survive heightened scrutiny."). Here, the treatments that are banned for transgender adolescents are *not* banned for other adolescents, thus the ends of protecting children from purported medical harm are not achieved by means of the Healthcare Ban. The statute expressly allows for similar procedures to be conducted in the cases of "precocious puberty, prostate cancer, breast cancer, endometriosis … or a medically verifiable disorder of sexual development," § 44-42-310, and many of the banned treatments are routinely used to treat these and other conditions. Shumer Decl. ¶¶ 64, 68-69, 78, 80, 85; Antommaria Decl. ¶¶ 38, 49, 74. Furthermore, the complaints commonly leveled against these treatments—for, example, that they are based on "low" quality, observation evidence—can be leveled against other treatments not targeted by the Healthcare Ban, such as pediatric obesity and congenital adrenal hyperplasia. Antommaria Decl. ¶ 36. Therefore, the Ban is insufficiently tailored to the harm it purports to address. *Morales-Santana*. 582 U.S. at 49 (Statute did not pass heightened scrutiny because "the gender-based means scarcely serve the posited end.").

20

II.    **Parent Plaintiffs Are Likely to Succeed on the Merits of their Due Process Claim**

The Healthcare Ban separately violates the Due Process Clause because it burdens parents' fundamental right "in the care, custody, and control of their children ... perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

The Healthcare Ban thus triggers strict scrutiny because it burdens the fundamental rights of parents to seek medical care that they and their medical providers have determined is appropriate for their minor children. As discussed above, H 4624 cannot survive any level of constitutional scrutiny, let alone the most stringent review required for intrusions into fundamental rights. Accordingly, the Parent Plaintiffs are likely to succeed on the merits of their substantive due process claim. *Brandt*, 551 F. Supp. 3d at 892 (holding that plaintiffs' parents were likely to succeed on similar claims because they "have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary"), *aff'd*, 47 F.4th 661 (8th Cir. 2022).

A.    **The Ban Infringes Upon the Fundamental Rights of Parents to Direct the Medical Care of Their Minor Children**

Parents have a fundamental right to direct their children's healthcare, *Brandt*, 551 F.Supp.3d at 892-93, a right anchored in the well-established liberty interest that parents hold in the "care, custody, and control of their children." *See Troxel*, 530 U.S. at 65 (tracing the long history of parents' due process rights to make decisions for their children); *see also*, *Parham v. J.R.,* 442 U.S. 584, 602 (1979) (parents have a right to "seek and follow medical advice" for their children). Where a medical treatment is recommended to a minor, parents are entrusted with the responsibility to weigh the risks and benefits of treatment—and in enacting the Healthcare Ban,

South Carolina strips parents of that role. *See, e.g.*, *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 507–09 (6th Cir.) (White, J., dissenting) (collecting cases).

Although "the State must play its part as parents patriae" in promoting the wellbeing of minors, *Schall v. Martin*, 467 U.S. 253, 265 (1984), no such interest is implicated here. When parents, their children, and their children's medical providers align on a particular course of care— care that has been recognized by every major medical association as safe, effective, and necessary—that decision should be protected against state interference. That is the context here: parents or legal guardians are the medical decision-makers, advised by healthcare providers and their adolescent child's informed assent. *See* Antommaria Decl. ¶ 45; Olson-Kennedy Decl. ¶ 64. H 4624 substitutes the judgment of the State for that of the parent. *See Brandt*, 551 F. Supp. 3d at 892 (finding that Arkansas' healthcare ban infringed "right to seek medical care for their children . . . in conjunction with their adolescent child's consent and their doctor's recommendation"); *cf. Santosky v. Kramer*, 455 U.S. 745, 760–61 (1982) (Heightened evidentiary standards are required where the "vital interest" of the parent and child in preserving their relationship "coincide.").

### B.    H 4624 Cannot Survive Strict Scrutiny

As discussed above, H 4624, which intrudes upon the fundamental rights bestowed on Parent Plaintiffs, cannot survive any level of review, let alone strict scrutiny. South Carolina's ban on gender-affirming care for minors is nowhere near the "least restrictive" means to address any purported interest. *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984). In fact, the law is not narrowly tailored to ***any*** interest—compelling or not. Without any findings or justifications for legislation that impedes upon the fundamental right of parent to care for their child, "the State could not withstand either heightened scrutiny or rational basis review." *Brandt*, 551 F.Supp.3d at 893.

### III.    Plaintiffs Are Likely to Succeed on Their ACA Claim

"The Affordable Care Act's anti-discrimination mandate provides that, '[e]xcept as other-wise provided ... an individual shall not, on the grounds prohibited under Title VI of the Civil Rights Act ... [and] Title IX ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.'" *Kadel*, 100 F.4th at 163-64 (quoting 42 U.S.C. § 18116(a)). The State cannot credibly dispute that South Carolina's public health insurance plans, including Medicaid and PEBA, receive financial assistance from the federal government. *See* Complaint (ECF 1) at ¶¶ 21, 24, 26, 29, 232-34, 261.

Because H 4624's Coverage Restrictions deny transgender individuals reliant on public insurance coverage, such as plaintiffs Jane Doe, Jill Ray, and Nina Noe, benefits on the basis of sex, the law thus violates Section 1557 of the ACA. Under the binding law of this Circuit, denial of benefits to a transgender person by a state Medicaid program qualifies as sex discrimination under Title IX, and thereby violates Section 1557 of the ACA, if the public insurance programs provide those same benefits to the state's non-transgender citizens. *Kadel*, 100 F.4th at 163-64. On the face of Section 340, transgender individuals insured by public health insurers will be denied coverage for procedures that are otherwise covered for other beneficiaries. *See* S.C. Code Ann. § 44-42-340. Further examination of South Carolina's public healthcare plans reveals many proce-dures which are available to the majority of those enrolled, but that are now unavailable to transgender individuals. *See, e.g.*, South Carolina Department of Health and Human Services, "Physicians Services Provider Manual," available at https://provider.scdhhs.gov/internet/pdf/man-uals/Physicians/Manual.pdf. H 4624 is therefore facially discriminatory on the basis of sex and violates Section 1557 of the ACA.

23

IV.     **Plaintiffs Are Likely to Succeed on Their Medicaid Act Claim**

The Coverage Restrictions violate the Medicaid Act's guarantees that programs receiving federal funding (1) not "arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition," *Kadel*, 100 F.4th at 161 (quoting 42 C.F.R. § 440.230(c)), referred to as the "availability requirement," and (2) "ensure that services available to any categorically needy individual are equal in amount, duration, and scope for all beneficiaries within the group," known as the "comparability requirement," *id.* at 162 (quoting 42 C.F.R. § 440.240(b)(1)) (internal quotations omitted).

A.     **H 4624's Categorical Prohibition on Gender-Affirming Medical Care Violates the Medicaid Act's Availability Requirement**

The Coverage Restrictions violate the Medicaid Act's requirement that South Carolina cover both mandatory and optional services in sufficient "amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b). While the State may place "appropriate limits on a service based on such criteria as medical necessity or utilization control procedures," 42 C.F.R. § 440.230(d), it must do so based on "reasonable standards" that are "consistent with the objectives" of the Medicaid Act, 42 U.S.C. § 1396a(a)(17), and may not "arbitrarily deny ... a required service ... to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). Because gender-affirming medical treatments (1) fall within a category of mandatory or optional medical services that the State has elected to provide; and (2) are medically necessary, the Coverage Restrictions' blanket prohibition on such care for those diagnosed with gender dysphoria violates this requirement by denying medical care to those who cannot afford it themselves. *See Alvarez v. Betlach*, 572 F. App'x 519, 520–21 (9th Cir. 2014) (The Medicaid Act "prohibits states from denying coverage of 'medically necessary'

24

services that fall under a category covered in their Medicaid plans."); *Bontrager v. Indiana Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 608 (7th Cir. 2012) (States are "required to provide Medicaid coverage for medically necessary treatments in those service areas that the State opts to provide such coverage[.]"); *Beal v. Doe*, 432 U.S. 438, 444 (1977).

There is no question that South Carolina is either required to or chooses to cover the procedures required by Plaintiffs—indeed, the Coverage Restrictions explicitly state that public funding will be denied for treatments only when those treatments are provided or performed as gender-affirming care. *See* S.C. Code Ann. §§ 44-42-310(5)-(6), -340, -350. These restrictions prevent those diagnosed with gender dysphoria from receiving medically necessary gender-affirming care. *See* Statement of Facts §III, *supra*. As recognized by the Fourth Circuit in *Kadel*, this categorical denial of coverage for "specific, medically necessary procedure[s]" required to address gender dysphoria "is not a reasonable standard consistent with the objectives of the Act." *Kadel*, F.4th at 162 (quoting *Hern v. Beye*, 57 F.3d 906, 911 (10th Cir. 1995)); *see also Pinneke v. Preisser*, 623 F.2d 546, 549 (8th Cir. 1980) (A policy establishing an "irrebuttable presumption that the procedure of sex reassignment surgery can never be medically necessary" violates Medicaid's availability requirement).

Further, by prohibiting coverage of various procedures only when they are "performed for the purposes of assisting an individual with a physical gender transition," § 44-42-310(6), the Coverage Restrictions facially bar coverage for medically necessary procedures "based on [a gender dysphoria] diagnosis alone," *cf. supra* Statement of Facts § IV, and thus violates the availability requirement. *Kadel*, 100 F.4th at 162.

25

### B.   The Coverage Restrictions' Prohibition on Gender-Affirming Care Violates the Medicaid Act's Comparability Requirement

The Coverage Restrictions violate the comparability requirement by failing to ensure transgender individuals receive services "equal in amount, duration, and scope" with other Medicaid beneficiaries. *Kadel*, 100 F.4th at 162 (citing 42 C.F.R. § 440.240(b)(1)-(2)). As discussed in Section I.A, *supra*, these restrictions prohibit funding for care to transgender individuals that Medicaid would otherwise provide. Because South Carolina "cannot get around the comparability requirement by defining the relevant services as services aimed at treating only some medical conditions (i.e., non-gender dysphoria conditions) any more than it can get around the Equal Protection Clause by doing so," this restriction violates the Medicaid Act's comparability requirement. *Kadel*, 100 F.4th at 162–63; *see also White v. Beal,* 555 F.2d 1146, 1151 (3d Cir. 1977) ("[N]othing in the federal statute [] permits discrimination based upon etiology rather than need for the service.").

## V.   A Preliminary Injunction is Necessary

### A.   Plaintiffs Suffer Immediate and Irreparable Harm While H 4624 is in Effect

If permitted to remain in effect, H 4624 will continue to inflict severe and irreparable harm on Plaintiffs and members of the putative Plaintiff Classes for which no adequate remedy at law exists. As discussed above, the law violates the constitutional rights of transgender South Carolinians and their families, which is itself irreparable harm. "Because there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

But the harm of the statute goes much further. By enforcing H 4624, Defendants deprive patients of vitally important medical care by either preventing the initiation of treatment or cutting patients off from necessary treatment; force families to watch their children suffer or incur the significant expense of regular travel or relocation out-of-state to access care; and compel medical

26

providers to abandon their patients while also threatening their medical licenses. The irreversible harm to transgender adolescents who imminently may be forced to undergo endogenous puberty clearly outweighs any potential state interest in immediate enforcement of the Ban. The Coverage Restrictions similarly prevent adult South Carolinians that rely on public insurance for their healthcare coverage —and those receiving their care from public hospitals—from receiving medically necessary gender-affirming care.

Defendants' denial of this care not only results in the prolonging and intensification of gender dysphoria; the medical consensus is that it causes additional distress and poses other health risks, including depression, posttraumatic stress disorder, and suicidality. Karasic Decl. ¶¶ 65-66 (citing the recommendations of the American Medical Association, American Psychiatric Association, and American College of Obstetricians and Gynecologists). "[I]f left untreated," gender dysphoria diagnoses such as those received by Plaintiffs "can lead to self-mutilation and suicide." *Kadel*, 620 F. Supp. 3d at 380 (M.D.N.C. 2022).

Plaintiffs have suffered—and will continue to suffer—severe and irreparable harm as a result of H 4624, including the deprivation of medically necessary care, the denial of insurance coverage for necessary (and long scheduled) procedures, and the inability to access necessary care from the medical professionals who are best positioned to provide Plaintiffs with safe, effective care.

### 1.    Plaintiffs Cannot Access Medically Necessary Care

***Plaintiff Nancy Noe*** and her 15-year-old daughter, ***Nina Noe*** live in South Carolina. Nancy Noe Decl. ¶ 2. Nina is transgender. Nancy Noe Decl. ¶ 5. Nina was assigned the male sex at birth, but she and her mother understood at a very young age that Nina was not a boy. Nancy Noe Decl. ¶ 5; Nina Noe Decl. ¶ 4. At age seven, Nina told her mother that she had a "girl brain and a

boy body." Nancy Noe Decl. ¶ 6; Nina Noe Decl. ¶ 5. Nina was later diagnosed with gender dys-phoria. Nancy Noe Decl. ¶ 8. After consulting with physicians Nina and Nancy decided to start Nina on HRT as medically necessary treatment for her gender dysphoria. Nancy Noe Decl. ¶ 12. Nina has been on hormone treatment for several years now and is "elated" with the physical changes she has seen, which have helped relieve her gender dysphoria and brought her greater confidence. Nancy Noe Decl. ¶ 13; Nina Noe Decl. ¶ 13. Nina receives healthcare coverage through a Medicaid plan, and up until now Medicaid has covered her hormone therapy. Nancy Noe Decl. ¶ 14. Nina and Nancy are now deeply concerned that they will not be able to find care for Nina in South Carolina, and that they will not receive any coverage under Medicaid for treat-ment obtained elsewhere. Nancy Noe Decl. ¶ 16. Nina is deeply distressed over the prospect of losing access to gender-affirming care, and her mother is worried about her daughter's future and mental health. Nina Noe Decl. ¶ 14. Nancy is also worried about the financial future of her family should they be forced to pay for Nina's care out of pocket. Nancy Noe Decl. ¶ 16.

*Plaintiff Gary Goe* and his seventeen-year-old son *Grant Goe* live in Anderson County, South Carolina. Gary Goe Decl. ¶ 3; Grant Goe Decl.¶ 3. Grant is transgender. Grant Goe Decl. ¶ 4. He has known since a very young age that his gender identity did not match his sex assigned at birth, and he has lived as the boy he is for nearly four years. Grant Goe Decl. ¶¶ 5, 7-8. After careful consideration by Gary, his wife, Grant, and Grant's medical team, Gary and his wife de-cided to start Grant on HRT as medically necessary treatment for his gender dysphoria. Gary Goe Decl. ¶¶ 10-17. Grant has been on HRT for the last four months and has experienced signifi-cant positive improvement, which his family has witnessed. Gary Goe Decl. ¶¶ 19, 22; Grant Goe Decl. ¶¶ 16-17. Grant is terrified at the possibility of not being able to access the care that has greatly improved his life because of the Healthcare Ban. Grant Goe Decl. ¶¶ 18-21. Gary and his

wife are so worried about the impact on Grant's health and life from stopping HRT that they have been forced to consider uprooting their family to go to a state that allows Grant to continue accessing this life-saving care. Gary Goe Decl. ¶ 27.

### 2.    Plaintiffs Are Denied Insurance Coverage for Medically Necessary Care

***Plaintiff Jane Doe*** is a transgender woman living in Charleston, South Carolina. Doe Decl. ¶ 3. She is scheduled for surgery on November 11, 2024 that will not go forward absent a preliminary injunction. Doe Decl. ¶ 10. She is a physician employed by the state of South Carolina and has been living in the state with her wife since 2020. Doe Decl. ¶ 4. Doe has experienced feelings of gender dysphoria from a young age, but did not feel that she had the space to come out as transgender. Doe Decl. ¶¶ 3, 6. Doe was able to safely live as herself in 2020, when she moved to South Carolina, and was formally diagnosed with gender dysphoria the next year. Doe Decl. ¶¶ 7, 8. After consulting with her physicians, Doe began hormone treatment. Doe Decl. ¶ 8. This treatment has dramatically relieved Doe's symptoms of dysphoria and her overall well-being. Doe Decl. ¶ 9. After further consultation with physicians, Doe had hoped to receive surgery this year as the next step in her treatment plan. Doe Decl. ¶ 4. Doe is insured through a state healthcare plan administered by PEBA. Doe Decl. ¶ 11. Doe had hoped to have her surgery completed before the end of the year so that she could be fully recovered before her wife gives birth in February of next year. Doe Decl. ¶ 10. However, she was informed in July of 2024 that PEBA is required to adhere to state law, thereby indicating to her that they would no longer cover her gender-affirming surgery. Doe Decl. ¶ 12. Doe and her family were devastated to receive this news, especially because she and her wife have already taken on a great financial burden to welcome a baby next year. Doe Decl. ¶ 14. Although she has scheduled her surgical procedure for November 11, 2024, she will not be able to access this care without insurance coverage due to the cost. Doe Decl. ¶ 10. Doe

needs this medically necessary healthcare to be the best version of herself, for her family and for her patients at South Carolina hospitals. Doe Decl. ¶¶ 14, 16. She is disappointed that the state has interfered in a decision best left to patients and doctors, concerned about the financial effect it will have on her family, and terrified that she will not be able to access this care before the birth of her child. Doe Decl. ¶¶ 14, 16.

*Plaintiff Jill Ray* is a transgender woman living in South Carolina. Ray Decl. ¶¶ 3, 8. Ray has been receiving gender-affirming care for her gender dysphoria for almost four years. Ray Decl. ¶¶ 9-11. Before she began receiving gender-affirming care, Ray was so depressed and anxious she could not even leave her home. Ray Decl. ¶ 10. Gender-affirming care has given Ray her life back. It has brought her closer to her spouse and enabled her to build a loving and happy community. Ray Decl. ¶¶ 17, 18. Ray plans to undergo gender-affirming surgery, which her doctors have referred her for as medically necessary treatment for her gender dysphoria, to bring her body into alignment with who she is. Ray Decl. ¶¶ 19, 20. Without gender-affirming surgery, she will experience pain and harm because without it she cannot be her true self. Ray Decl. ¶ 20. Ray cannot pay the exorbitant cost of gender-affirming surgery out-of-pocket. Ray Decl. ¶¶ 14, 23. Without the PEBA coverage she receives through her spouse, Ray will not be able to get her medically necessary procedure. Ray Decl. ¶¶ 16, 22. Worrying about not being able to get the care she needs is stressful and debilitating for Ray, who is forced to contemplate feeling unsafe in her own body. Ray Decl. ¶ 25.

3.    **Plaintiffs Cannot Access Necessary Care from the Medical Professionals Well-Suited to Provide Them with Safe and Effective Care**

*Plaintiff Sterling Misanin* is a transgender man living in Charleston, South Carolina. Misanin Decl. ¶ 3. Misanin has experienced feelings of gender dysphoria since he was a young child,

but first received a diagnosis of gender dysphoria in March of 2022. Misanin Decl. ¶¶ 6, 13. After consulting with physicians, Misanin began hormone therapy that year, and after further consultation, was able to undergo chest masculinization surgery. Misanin Decl. ¶¶ 13, 17. Misanin's gender affirming care has greatly improved his day-to-day life. Misanin Decl. ¶¶ 16-18, 28. After speaking with his primary care provider and other members of his care team at MUSC, Misanin determined that the next step in his treatment plan would be to receive a hysterectomy, and so Misanin scheduled a procedure with MUSC for June 28, 2024. Misanin Decl. ¶¶ 12, 19, 20. MUSC subsequently informed him, just a few days before surgery, that due to the passage of H 4624 they would no longer be able to provide gender affirming care. Misanin Decl. ¶ 23. The Public Funds Restriction not only has delayed his access to medically necessary care for months as he goes through the arduous process of finding another provider and receiving new preauthorization form his insurer, Misanin Decl. ¶¶ 25, 26, it continues to deprive him of the ability to access future care, including additional surgeries to alleviate his dysphoria, from his care team at MUSC. Misanin Decl. ¶¶ 12, 19, 23. Being turned away from MUSC has forced Misanin to seek care at clinics which are less able to protect his medical privacy. Misanin Decl. ¶¶ 19, 25.

B.    **The Balance of Equities Favors Plaintiffs and a Preliminary Injunction is in the Public Interest**

The balance of equities weighs heavily in favor of Plaintiffs. The harms inflicted by H 4624 far outweigh any potential harms that Defendants might face if preliminary injunctive relief is granted, as Defendants would only temporarily lose the ability to *disrupt* the *status quo*— a *status quo* grounded in years of established medical practice—with a new law that does not advance any legitimate state interest and is likely to be held unconstitutional. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) ("[The Fourth Circuit has] defined the status quo for this purpose to be the last uncontested status between the parties which preceded the

31

controversy . . . [I]t is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo ante."). "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citations omitted).

Similarly, granting an injunction in this case will undoubtedly serve the public interest. As the Fourth Circuit has made clear, "it is well-established that the public interest favors protecting constitutional rights." *Id.*; *see also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

These harms—including the deprivation of medically necessary care, the denial of insurance coverage for necessary procedures, and the inability to access necessary care from the medical professionals who are well-suited to provide safe and effective care—are similarly being experienced by members of the proposed Plaintiff Classes all across the State of South Carolina.

## VI. A Classwide Injunction Is Necessary to Protect the Classes

As discussed in Section V of the Complaint and in the Motion for Class Certification, the Class Representatives and the members of the Classes they represent have identical claims for injunctive relief, and the Class members have suffered the same injury as the Class Representatives. Courts have recognized that "the lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons." *Rodriguez v. Providence Comty. Corrs., Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015); *see also J.O.P. v. U.S. Dep't of Homeland Security*, 409 F. Supp. 3d 367, 376 (D. Md. 2019) ("[C]ourts may enter class-wide injunctive relief before certification of a class.");

*Brandon v. Marshall*, No. 2:24-CV-00265, 2024 WL 2834014 (S.D. W. Va. June 4, 2024) (grant-ing a preliminary injunction to a putative, pre-certification class); Newberg on Class Actions § 4:30 (5th ed. 2013) ("[A] court may issue a preliminary injunction in class suits prior to a ruling on the merits."). Because the Healthcare Ban is directed against South Carolinian transgender mi-nors and their parents and the Public Funds Restriction is directed against transgender South Car-olinians who rely on state-funded health insurance and healthcare, the Court should grant a pre-liminary injunction enjoining enforcement of the harmful provisions of H 4624 against the respec-tive putative Classes.

Plaintiffs' and the Classes' entitlement to classwide relief is especially strong in light of the prima facie case for class certification set forth in Plaintiffs' pending motion. Plaintiffs' sought-after relief—the enjoinment of the Healthcare Ban as to the members of the Minor Class and the Parent Class, Compl. at 60 (Request for Relief § B), and the enjoinment of the Public Funds Re-striction as to the members of the Insurance Class and the MUSC Class, *id.*—is necessary to pre-vent irreparable harm against the members of each Class.

## CONCLUSION

Plaintiffs respectfully request that the Court enjoin Defendants from enforcing H 4624 against the Plaintiffs and members of the putative Classes during the pendency of this litigation.

Date: August 30, 2024

Respectfully submitted,

/s/ Meredith McPhail
Allen Chaney (Fed. Id. No. 13181)
Meredith McPhail (Fed. Id. No. 13500)
**ACLU OF SOUTH CAROLINA**
P.O. Box 1668
Columbia, SC 29202
T: 864-372-6881
achaney@aclusc.org
mmcphail@aclusc.org


/s/ Sruti Swaminathan
Sruti Swaminathan*
Harper Seldin*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., Fl 18
New York, NY 10004
T: 212-549-2500
hseldin@aclu.org
sswaminathan@aclu.org


/s/ Julie Singer
David S. Flugman*
Corey Stoughton*
Julie Singer*
**SELENDY GAY PLLC**
1290 Avenue of the Americas
New York, NY  10104
T: 212-390-9000
dflugman@selendygay.com
cstoughton@selendygay.com
jsinger@selendygay.com


*Application for Admission Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*