IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
**Charleston Division**

| | |
|---|---|
| STERLING MISANIN, et al.,<br><br>        *Plaintiffs*,<br><br>v.<br><br>ALAN WILSON, in his official capacity as the Attorney General of South Carolina, et al.,<br><br>        *Defendants*. | Case No. _____ |

**DECLARATION OF NANCY NOE**

I, Nancy Noe, pursuant to 28 U.S.C. §1746, declare as follows:

    1.    My name is Nancy Noe.[1] I am a Plaintiff in this action. I offer this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in this Declaration and could and would testify competently to those facts if called as a witness.

    2.    I am 46 years old. I am the parent of Nina Noe, my 15-year-old daughter, and Nina's three siblings: her twin brother, her older brother, and her older sister. Although I was born in Alabama, I have lived in South Carolina my entire life.

    3.    I am a medical assistant in a pediatrics office.

---

[1] Nancy Noe is a pseudonym. My family is proceeding under pseudonym to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

1

4. My daughter, Nina, was a happy and energetic child. She was creative, sensitive, and confident, and she often enjoyed theatrics and a stage at home and at school. Today, she continues to be outspoken, and loves art and music, and is a great young woman.

5. Nina is transgender. She was assigned a male sex at birth, but I knew from a very early age that she was different from her twin brother. Everything about her screamed that she was not a boy. For example, from as early as when she was two or three years old, she often snuck into my room to borrow my makeup and put on my heels. I remember how excited she was when the Maleficent movie came out, and how she was always more interested in the female protagonists in storybooks and movies. At that time, Nina had a teenage sister, and she wanted to do everything with her sister, including shopping for clothing and dressing like her.

6. When Nina was seven years old, she began telling me that she had a "girl brain" and a "boy body." Nina would also firmly tell me that she wanted to "be a mommy" one day. At that time, she began going by "she" and "her" pronouns, wore dresses, and felt comfortable living as a girl at home. Nina had not yet socially transitioned at school at that age because she was worried about being bullied by her classmates. I saw that this was causing her distress, toggling between being comfortable and herself at home, and not fully herself at school.

7. When Nina was 8 years old and in the third grade, I noticed that her mental health was declining. She was acting out at school and refusing to do schoolwork, which was abnormal for her. She would often say that she could not sleep, and she was embarrassed to wear "boy clothes" outside of our home. I wanted to get her the support she needed as she navigated her feelings around her gender. At the recommendation of a colleague in my office, I took Nina to see an endocrinologist who is knowledgeable in care for transgender children, and to explore medical treatment options to address the distress associated with her gender dysphoria.

8. I took Nina to see a pediatric endocrinologist on July 10, 2017, when she was eight years old. We met with a team of doctors who were able to explain how puberty delaying medications and hormone replacement therapy work, and who thoroughly explained the risks and benefits associated with both medications in transgender adolescents. They were very clear with us that Nina was not yet in puberty, and there was no medical treatment necessary or available to Nina until she hit puberty, except for whatever mental health support she needed. The care team recommended that I take Nina to see a mental health provider in the interim, and Nina met with a therapist on July 31, 2017. Nina's therapist diagnosed her with gender dysphoria.

9. Given that Nina was not yet in puberty, we had more time to make a decision with respect to pursuing medical care for Nina and it gave Nina some comfort knowing that she had a few years before she would experience the physical effects of male puberty. We did not feel rushed at any step of this process, and doing the best thing for my daughter has always been my guiding principle as a parent.

10. During the spring of her third grade, Nina began dressing how she dressed at home and started going by "she" and "her" pronouns at school. By the time Nina started sixth grade, she started going by "Nina" at school, and one of her favorite teachers was able to help her communicate her new name to other school staff and her peers.

11. When Nina was acknowledged as a girl at home and at school, I noticed a large decrease in her stress and anxiety levels. It was a "night and day" different in her mood, and her interest in art and music came back. However, in 2021, when Nina was in the seventh grade, she started showing signs of male puberty, including pubic hair, hardening facial features, and cracking in her voice. This had a harmful impact on Nina, who was terrified of physical changes

such as growing facial hair and having a deeper voice. Nina lived as a girl in every aspect of her life, and having a body that did not match her sense of self as a girl—and that other people would see as male—terrified her. At that point, we knew that medical care was the only way for Nina to feel safe in her body.

12. In September of 2021, I took Nina back to see her pediatric endocrinologist, and he conducted lab work that verified that Nina had reached puberty. Based on her age (12) and stage of puberty (Tanner Stage 2), it was medically appropriate for her to start hormone treatment. We were advised as to the risks and benefits related to hormone treatment, and Nina and I, with support from Nina's provider, decided that medical care was the appropriate next step for her.

13. That same month, Nina began hormone treatment. Nina started on a very low dose of estrogen that increased incrementally over a six-month period so that she would not have a lot of discomfort with the changes in her body. When Nina began noticing physical changes such as the development of breast tissue, she was elated.

14. Nina is insured through her father's Medicaid plan. I am able to fill her prescriptions at a local pharmacy and have her care covered fully through her insurance. Without that coverage, our family would experience an unfathomable financial burden in affording her medication.

15. Nina has been receiving hormone therapy for three years now, and I am so relieved to see Nina's improved mental health. Nina is outgoing, she is witty, she is confident, and she is visibly happier. My relationship with my daughter is as strong as can be, and I know that this medication has saved her life.

16. Now, the state I have called home for over forty years has banned the life-saving health care that allows my child to be who she is. When I first learned about H 4624, I was devastated that my daughter would go back to the dark place she was in before starting treatment. Our only option is to leave the state to get Nina the care that is medically necessary for her. However, this will not be easy. Before H 4624, Nina's gender affirming medical treatment was covered through Medicaid, and that coverage made it possible for our family to access care for her. Without insurance coverage, this care is incredibly expensive. Leaving the state to access it will add additional travel and accommodation costs, in addition to loss of pay for missed work, that, in totality, will put an immense financial strain on our family.

17. The most important thing to me is the health and safety of my children. I have watched my daughter bloom into the happy and confident young woman that she is, and I know that it is in large part due to the health care that allows her to live as her authentic self. I do not want to see my daughter, or any other transgender adolescent in our state, lose access to the care that helps them be who they are. I cannot and will not allow Nina to go back to that dark place.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 27, 2024                                    Nancy Noe