# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

STERLING MISANIN, et al., )
)
Plaintiffs, )
)
vs. ) Case No.
) 2:24-cv-04734-BHH
ALAN WILSON, in his official )
capacity as the Attorney )
General of South Carolina, )
et al., )
)
Defendants. )
____________________________ )

VIDEOTAPED DEPOSITION OF JOHANNA OLSON-KENNEDY, M.D., taken on behalf of Plaintiffs, at ACLU of Southern California, 1313 West Eighth Street, Suite 200, Los Angeles, California 90017, beginning at 9:43 a.m., and ending at 1:31 p.m., on Monday, October 7, 2024, before Marceline F. Noble, RPR, CRR, Certified Shorthand Reporter No. 3024.

Magna Legal Services
866-624-6221
www.MagnaLS.com

Reported by:
Marceline F. Noble
CSR No. 3024

Job No. 1213502



APPEARANCES:

For Plaintiffs:

AMERICAN CIVIL LIBERTIES UNION
LGBTQ & HIV PROJECT
HARPER SELDIN, ESQ.
SRUTI SWAMINATHAN, ESQ.
125 Broad Street
New York, New York 10004
212.549.2500
hseldin@aclu.org
sswaminathan@aclu.org

-and-

SELENDY GAY PLLC
AINE CAROLAN, ESQ.
JULIE SINGER, ESQ.
1290 Avenue of the Americas
New York, New York 10104
212.390.9000
212.390.9399 Fax
acarolan@selendygay.com
jsinger@selendygay.com

For Defendants:

COOPER & KIRK, ESQ.
JOHN D. RAMER, ESQ. (Pro Hac Vice)
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 Fax
jramer@cooperkirk.com

-and-

OFFICE OF THE ATTORNEY GENERAL
EMORY SMITH, ESQ.
(Via Zoom videoconference)
P.O. Box 11549
Columbia, South Carolina 29211
803-734-4127
emorysmith@scag.gov

///

APPEARANCES: (continued)

Also Present:

BRIAN KIELHACK, Videographer
(Via Zoom videoconference:)
BEN McGRAY, South Carolina Office of the Attorney General

ABBY TABACHINI
GARREN MORTON
JUSTIN TERRANOVA

INDEX

| WITNESS | EXAMINATION |
|---|---|
| JOHANNA OLSON-KENNEDY, M.D. | |
| By Mr. Ramer | 8 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Declaration of Dr. Olson-Kennedy | 9 |
| 2 | Deposition Transcript of Dr. Olson-Kennedy, Noe vs. Parson | 13 |
| 3 | Errata Sheet from Transcript of Dr. Olson-Kennedy, Noe vs. Parson | 13 |
| 4 | Copy of Deposition of Dr. Olson-Kennedy, Voe vs. Mansfield | 14 |
| 5 | Errata Sheet from Transcript of Dr. Olson-Kennedy, Voe vs. Mansfield | 15 |
| 6 | Amicus Brief, United States vs. Skrmetti | 15 |
| 7 | DMS-5-TR Cover and Chapter re Gender Dysphoria | 23 |
| 8 | British Medical Journal Report | 46 |
| 9 | Clinical Consent Forms | 49 |
| 10 | National Institutes of Health Grant Application (submitted 2014) | 71 |

///

EXHIBITS (continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 11 | A Taylor Systematic Review | 101 |
| 12 | New York Times Article entitled "Biden Administration Opposes Surgery for Transgender Minors" | 116 |
| 13 | Transcript from Dr. Turban's Podcast | 121 |
| 14 | Expert Declaration of Dr. Olson-Kennedy in Dekker vs. Marstiller | 130 |

INSTRUCTION NOT TO ANSWER
(None)



LOS ANGELES, CALIFORNIA
MONDAY, OCTOBER 7, 2024
9:43 a.m. - 1:31 p.m.

THE VIDEOGRAPHER: Ready to go?
MR. RAMER: Yes.
THE VIDEOGRAPHER: We are now on the record. This begins videotape No. 1 in the deposition of Dr. Johanna Olson-Kennedy, in the matter of Sterling Misanin versus Alan Wilson, in the United States District Court, for the District of South Carolina, Charleston Division.
Case No. 2:24-cv-4734[sic]-BHH.
Today is October 7th, 2024, and the time is 9:43 a.m.
This deposition is being taken at ACLU of Southern California in Los Angeles, California 90017.
My name is Brian Kielhack of Magna Legal Services, and I will be your videographer for today.
Our court reporter is Marceline Noble.
Counsel, at this time I ask that you introduce yourselves, starting with our noticing attorney.
MR. RAMER: I am John Ramer of Cooper & Kirk, on behalf of defendants.

MR. SELDIN: Harper Seldin of the ACLU, on behalf of plaintiffs.
MS. CAROLAN: Aine Carolan of Selendy Gay, also on behalf of plaintiffs.
THE VIDEOGRAPHER: May counsel via Zoom -- go ahead.
THE WITNESS: I'm --
Sorry.
THE VIDEOGRAPHER: No. Go ahead.
MR. SMITH: I'm Emory Smith online, counsel for the defendants, with the South Carolina Attorney General's office.
And my understanding is, without objection, I have three interns with me, Abby Tabachini, Garren Morton, and Justin Terranova. They will be observing part of the deposition.
MR. McGRAY: My name is Ben McGray with the South Carolina's Attorney General's office. I'm not counsel of record.
I'm awaiting bar results, but I'm listening in by Zoom.
MS. SWAMINATHAN: Hi, there. My name is Sruti Swaminathan, counsel for plaintiffs, from the ACLU.
THE REPORTER: Who is Julie Singer?

MR. SELDIN: Julie Singer is for -- counsel with plaintiffs, with Selendy Gay.

JOHANNA OLSON-KENNEDY, M.D., having been first duly sworn, was examined and testified as follows:

THE REPORTER: Thank you.

EXAMINATION

BY MR. RAMER:
Q. Good morning, Dr. Olson-Kennedy.
A. Good morning.
Q. I know you've been deposed before, so this will be the same drill as usual. We'll try not to talk over one another.
I'll ask questions. If you don't understand my questions, just let me know.
And I know you're familiar with this, but according to the local rules, I'm supposed to instruct you that you should ask me rather than your own counsel for clarifications, definitions or explanations of any words, questions or documents presented during the course of the deposition.
Do you understand that?

A. I do.
Q. I'm going to aim to take breaks around the hour, but if you ever need a break at any point, just let me know. My only request is that you'd answer any pending questions.
Does that make sense?
A. Yes.
MR. RAMER: And we'll just start with some housekeeping. I'm going to hand the court reporter a document to be marked Olson-Kennedy Exhibit 1.
(Deposition Exhibit 1 was marked for identification by the court reporter.)
MR. SELDIN: And, Mr. Ramer, before we get into it, I just wanted to note for the record that I believe we have left unresolved whether this deposition time cuts into a total of seven hours for Dr. Olson-Kennedy or separate and apart. That's fine. The parties will sort it out later.
I just wanted to note that for the record.
MR. RAMER: And, yes. Defendants agree with your understanding.
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy 1; correct?
A. Yes.
Q. And is this the declaration that you





submitted in this case?
A. Yes.
Q. And do you have any corrections or updates to it?
A. There are a handful of additional seminars and lectures that I've given, as well as two additional manuscripts that should be added to this.
I can provide that later.
Q. What are the topics of the manuscripts?
A. So the first one is a protocol for another study that I am a co-investigator on, that is about younger pre-pubertal trans and gender diverse youth, children.
And then the second one is another manuscript that comes from -- oh, no. That one's on here.
Hold on a second. Let me try and remember it.
I don't remember what the other one is, but I can get that one as well.
Q. And the first one you mentioned regarding the protocol for gender incongruence in children, can you explain a little bit more what that's about.
A. So this is another multisite study that I'm a part of. And that study is a prospective

longitudinal study looking at children who are prepubertal and their mental health over time and also their trajectories over time.
Q. When you say "trajectory," what do you mean by that?
A. Just how they grow up, what happens to them as they move into adolescence.
Q. And specifically do you mean their -- the gender identity trajectory?
A. Yes. Their gender expression, their gender identity, their mental health.
Q. And when you're measuring their mental health outcomes over time, are you measuring that in light of any particular intervention?
A. No.
Q. Do you consider social transition an intervention?
MR. SELDIN: Object to form.
THE WITNESS: I don't know the answer to that in this case. I think that in general, social transition is an intervention.
BY MR. RAMER:
Q. And when you say you don't know the answer to that in this case, what do you mean by that?
A. I am not certain if everybody who started

was socially transitioned at the beginning. And so as an intervention that happens over the course of time, I don't -- I just don't know.
Q. And so, in other words, in the study that we're discussing, that is not a variable that's counted for; is that right?
MR. SELDIN: Objection. Misstates testimony.
THE WITNESS: It's an observational study, so it's not an intervention study.
BY MR. RAMER:
Q. As part of this study, are you recording whether the subjects were socially transitioned?
A. Yes.
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And has that protocol been published?
A. That's the protocol paper that I'm talking about.
Q. And so it has not been published.
A. It has been published. It's missing off my C.V.
Q. Understood. Thank you.
And sticking with Exhibit 1, going to

page 4, paragraph 18.
The first case listed here is Noe v Parson in Missouri state court; correct?
A. Yes.
MR. RAMER: I'm handing the court reporter a document I'll ask to be marked as Olson-Kennedy Exhibit 2.
(Deposition Exhibit 2 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, is this the transcript of your deposition in Noe v Parson?
A. I would have to look through the whole thing to make sure.
Would you like me to do that?
Q. Does it appear to be the deposition of your -- excuse me -- the transcript of your deposition in Noe v Parson?
A. Yes.
MR. RAMER: Now I'm handing the court reporter a document I'll ask be marked as Olson-Kennedy 3.
(Deposition Exhibit 3 was marked for identification by the court reporter.)



BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy Exhibit 3.
Is this a copy of your errata sheet for your transcript of Noe v Parson?
A. Yes.
Q. And did you give truthful testimony during this deposition?
A. I did.
Q. And you've also recently testified in a deposition in Voe versus Mansfield, a case regarding North Carolina's ban on medicalized transition for minors; correct?
A. Correct.
MR. RAMER: I'm handing the court reporter what I'll ask be marked as Olson-Kennedy Exhibit 4.
(Deposition Exhibit 4 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
MR. SELDIN: Thank you.
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, does this appear to be a copy of your deposition in Voe versus Mansfield?
A. Yes.
MR. RAMER: I'm handing the court reporter a

document that I'll ask be marked as Olson-Kennedy Exhibit 5.
(Deposition Exhibit 5 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, is this document that's been marked as Olson-Kennedy Exhibit 5, your errata sheet for your deposition in Voe versus Mansfield?
A. Yes.
MR. RAMER: I'm handing the court reporter a document and I'll ask be marked Olson-Kennedy Exhibit 6.
(Deposition Exhibit 6 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
BY MR. RAMER:
Q. I'm sorry. Before I turn to this document, did you give truthful testimony during your deposition in Voe versus Mansfield?
A. I did.
Q. And are you offering opinions in this case that are consistent with the opinions you offered in Voe versus Mansfield?

A. I am.
Q. Now, turning to the document that's been marked as Olson-Kennedy 6, is this the amicus brief that was submitted on your behalf in United States versus Skrmetti, Case No. 23-477, in the Supreme Court of the United States?
A. I don't know. I would have to look through this more.
Q. Does it appear to be the amicus brief that was submitted on your behalf in United States versus Skrmetti, Case No. 23-477, in the Supreme Court of the United States?
A. Yes.
Q. And you agree with everything stated in this amicus brief?
A. I have not read this in a long time, so I would have to look through this.
I am assuming if I signed off on it, yes. But I have not read this in a while.
Q. Did you read it before it was filed?
A. I'm not sure of the timing, but I think so.
Q. What did you do to prepare for this deposition?
A. I reread my report. I read the law that's being -- that we are talking about in South Carolina.

Q. And did you review any other documents other than your report and the law at issue?
A. No.
Q. And did you meet with --
Let me back up.
Without revealing any conversation with counsel, did you meet with anyone in preparation for today's deposition?
A. Yes.
Q. Who did you meet with?
A. These two people right here.
MR. SELDIN: I'll just note that it's Harper Seldin and Aine Carolan, counsel for plaintiffs.
THE WITNESS: And I think Sruti, too.
MR. RAMER: I'm sorry?
MR. SELDIN: And also --
Well, you testify.
THE WITNESS: And also Sruti, who's -- who's on our video call.
BY MR. RAMER:
Q. Did you meet with anybody else other than those three people to prepare for today's deposition?
A. No.
Q. All right. Sticking with Exhibit 6, which




is your amicus brief, I'd like to go to page 28 and the last paragraph on the page.
And I'll read the first two sentences and first ask if I've read them correctly.
It says:
"Instead, the review recognizes transgender identity as real and states that gender-affirming medical care is appropriate for certain transgender youth before age 18.
"For example, the review notes that, 'for some the best outcome will be transition,' while also acknowledging as the WPATH Standards of Care in the Endocrine Society Guidelines do, that gender-affirming medical interventions are not appropriate for all transgender adolescents."
Did I read that correctly?
A. Yes.
Q. And the review that's being discussed here is the Cass, C-a-s-s, Review; correct?
A. That's correct.
Q. And in this part of the brief, the brief suggests that the Cass Review says gender-affirming medical care is appropriate for certain transgender youth before age 18.
Correct?

A. Yes.
Q. Do you agree that science cannot currently identify a specific biological basis for being transgender or cisgender?
THE REPORTER: I'm sorry. Will you repeat that, please.
MR. RAMER: I'll restart.
Q. Do you agree that science cannot currently identify a specific biological basis for being transgender or cisgender?
MR. SELDIN: Object to form.
THE WITNESS: Is there a biological marker? Is that what you're asking?
BY MR. RAMER:
Q. Yes.
A. I agree.
Q. You agree with what part?
A. That there is not a biological marker that we have discovered yet that can indicate if somebody is cisgender or transgender.
Q. And relatedly, you agree that there is no medical test that can be used to predict whether someone will identify as cisgender or transgender; correct?
MR. SELDIN: Object to form.

THE WITNESS: I think that's what I was trying to say in the previous question.
BY MR. RAMER:
Q. And so you do agree there is no medical test.
A. Correct.
Q. And you agree that the etiology of gender and congruence is not fully understood; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
BY MR. RAMER:
Q. And the ratio of the patients in your clinic has shifted from 50 percent natal males and 50 percent natal females in 2015 to about two-thirds natal females now; correct?
MR. SELDIN: Object to form.
THE WITNESS: About two-thirds of my practice in our clinic, in general, are people that are designated female at birth.
BY MR. RAMER:
Q. And that is a shift that you've observed in your time as a clinician from a 50 percent patient mix; correct?
A. Correct.
Q. And was it about 2015 that you last recalled

the ratio being 50/50?
MR. SELDIN: Object to form.
THE WITNESS: I think that's when it shifted.
BY MR. RAMER:
Q. And you agree that the rise in the number of people who present with gender dysphoria is a trend that we do not fully understand scientifically; correct?
MR. SELDIN: Object to form and foundation.
THE WITNESS: I don't -- I don't necessarily know that I understand what you're asking.
I think that there are observable reasons why there are an increase in the numbers of people who are designated female at birth that identify as masculine, male.
BY MR. RAMER:
Q. And so you're talking about natal females or female assigned at birth; correct?
A. Correct.
Q. And do you agree that we have seen a rise in the number of people in that patient population who present with gender dysphoria; correct?
A. Yes.
Q. And do you agree that we do not fully





understand why that number is rising?
MR. SELDIN: Object to form.
THE WITNESS: I -- I don't know if I know how to answer your question.
There are reasons that we are seeing more people in that ratio. Are they scientifically proven?
No.
BY MR. RAMER:
Q. You agree that there can be times when an adolescent receives a diagnosis for gender dysphoria under the DSM-5, but the adolescent is not transgender; correct?
MR. SELDIN: Object to form.
THE WITNESS: I agree that that could happen, yes.
BY MR. RAMER:
Q. Do you agree that it has ever happened?
A. Yes.
Q. You agree that gender dysphoria shares symptomatology with anxiety and depression; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. You do not view the DSM-5 as authoritative

with respect to the diagnosis of gender dysphoria; correct?
MR. SELDIN: Object to form and foundation.
THE WITNESS: I would need more clarity on that. I'm not sure.
The DSM is an authoritative text, and it does have criteria for the diagnosis of gender dysphoria.
BY MR. RAMER:
Q. Do you think that everything the DSM-5 says about the diagnosis of gender dysphoria is accurate?
MR. SELDIN: Object to form.
THE WITNESS: I think that there are three criteria in the DSM that are -- I have skepticism about, because they have to do with very stereotypical things that are not necessarily applicable to humans in 2024.
MR. RAMER: I'm going to hand the court reporter a document that I'll ask to be marked as Olson-Kennedy Exhibit 7.
(Deposition Exhibit 7 was marked for identification by the court reporter.)
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy Exhibit 7.

And I will represent to you that this exhibit is the cover of the DSM-5.
And then do you agree that part of it is what appears to be the chapter from the DSM-5 regarding gender dysphoria?
A. Yes.
Q. And I'd like to go to the page that has 516 on it. It's about the fifth page into the exhibit.
Do you see that?
A. I do.
Q. And toward the bottom, there's a paragraph that has percentages in it.
Do you see that?
A. I do.
Q. And the last sentence of that paragraph -- I'll read it and ask if I read it correctly.
It says:
"Early social transition may also be a factor in persistence of gender dysphoria in adolescence."
Did I read that correctly?
A. You did.
Q. And you disagree with the DSM-5 on that issue; correct?
MR. SELDIN: Object to form. Foundation.

THE WITNESS: I think that the assumption of the causality, the way that people talk about this sentence is incorrect.
Do I think that social transition is a factor?
Yes, I do.
BY MR. RAMER:
Q. During your deposition in Voe versus Mansfield, when you were asked whether you agree with that statement I just read, you said you do not; correct?
A. The statement if its meaning early social transition causes gender dysphoria in adolescence, I do not agree with that.
Do I agree that it's a factor?
I do.
Q. What is the difference between something being a factor and something being part of a cause?
A. I don't think that social transition in childhood leads to a transgender identity in adolescence.
I think that for the most part -- and again, this is -- there's a lot of ways that social transition is described historically and contemporaneously -- I don't think that social

MAGNA
LEGAL SERVICES

transition in childhood leads to a continued identity as a cause of it.

I think that people who are socially transitioned in childhood, the majority of them are trans. And then that is why they continue to assert a transgender identity in adolescence.

Q. And just to confirm -- because I'm -- I'm not sure I heard an answer to this precise question.

But during your deposition in Voe versus Mansfield, when you were asked whether you agree with this statement, you said you do not; correct?

MR. SELDIN: I object to form. Foundation.

THE WITNESS: I think that the way the -- the -- there's -- the way that this is -- this sentence is perceived and it's the way that it's exactly written.

So the way the sentence is written is the flavor of it is that early social transition may be a cause in the persistence of gender dysphoria in adolescence.

I agree that it's a factor, in that it is related. But is it a cause of persistence? I think that that is the flavor of what this document is saying, and that I do not agree with.

///

BY MR. RAMER:

Q. And can you go to Olson-Kennedy Exhibit 4, which is your deposition transcript from Voe versus Mansfield. And specifically go to page 62.

A. 62 is like the little numbers?

Q. Correct.

A. Okay.

Q. And beginning at line 8 --

A. Yes.

Q. -- you see you were asked about this particular sentence. And at line 13, you are asked, do you agree with that statement?

And at line 14, you answered "I do not."

Correct?

A. Correct.

Q. And, Dr. Olson-Kennedy, you are not aware of any study that looks at the desistance rate among adolescence who do not receive puberty blockers; correct?

MR. SELDIN: Object to form.

THE WITNESS: Oh, my gosh. Can you -- that's a lot of things in that sentence.

Can we go back? Could you say it slower?

BY MR. RAMER:

Q. Absolutely.

You were not aware of any study that looks at the desistance rate among adolescents who do not receive puberty blockers; correct?

A. Correct.

MR. SELDIN: Object to form.

THE WITNESS: Correct.

BY MR. RAMER:

Q. And have any studies demonstrated that gender affirmation in childhood does not lead to a child being transgender who otherwise might not have been transgender?

MR. SELDIN: Object to form.

THE WITNESS: One more time.

BY MR. RAMER:

Q. Have any studies demonstrated that gender affirmation in childhood does not lead to a child being transgender who otherwise might not have been transgender?

MR. SELDIN: Same objection.

THE WITNESS: Can you describe what you mean by "gender affirmation" here?

BY MR. RAMER:

Q. Social transition.

A. So complete social transition or a partial social transition?

Q. Can you explain the distinction you're drawing?

A. Sure.

So when social transition first started being described in the Netherlands, they made a distinction between a partial and a complete social transition.

So, in other words, children who changed things like their hair and their clothing were considered to be partially socially transitioned. And children who had changed their name, their pronouns and their clothing and potentially other things, like their hair and things like that, were complete -- considered to be completely socially transitioned.

Q. Let's take any understanding of social transition along the lines you just described.

Have any studies demonstrated that social transition in childhood does not lead to a child being transgender who otherwise might not have been?

MR. SELDIN: Object to form.

THE WITNESS: The -- no. I think -- I think that I understand all of the --

What I can tell you is that there are people who are socially transitioned in childhood who do not



continue to have a transgender identity, both personally in my clinic and also from the work by Christina Olson.

But I think specifically what you're talking about, I don't think I've seen a study like that.

BY MR. RAMER:

Q. And I think you've already touched on this, but you think that some of the diagnostic criteria in the DSM-5 are outdated.

Correct?

MR. SELDIN: Object to form. Foundation.

THE WITNESS: Just for clarity, do you mean the diagnosis in adolescence? In adulthood or in childhood?

BY MR. RAMER:

Q. Let's start with childhood.

A. Yes.

Q. And so let's return to Olson-Kennedy Exhibit 7.

And on -- the third page of the document has a 512 number, is the beginning of the diagnostic criteria for gender dysphoria in children; correct?

A. Yes.

Q. And starting with A-6 on this page, you agree that this criterion is outdated; correct?

MR. SELDIN: Object to form. Foundation.

THE WITNESS: I do.

BY MR. RAMER:

Q. And it's outdated because it requires stereotyping, clothing, toys and games by gender; correct?

MR. SELDIN: Object to form.

THE WITNESS: Yes.

BY MR. RAMER:

Q. And criterion A-2, that also requires stereotyping clothing; correct?

A. It does.

Q. And criterion A-3 requires stereotyping roles in make-believe or fantasy play; correct?

MR. SELDIN: Object to form.

THE WITNESS: Yes.

BY MR. RAMER:

Q. And criterion A-4 requires stereotyping toys, games and activities; correct?

MR. SELDIN: Object to form.

THE WITNESS: Yes. But at least that's written in the actual sentence. Yes.

BY MR. RAMER:

Q. When you say "it," you're referring to the word stereotypically?

A. Correct.

Q. And so these criteria we just discussed are outdated as well; correct?

MR. SELDIN: Object to form.

THE WITNESS: Yes.

BY MR. RAMER:

Q. And as part of your practice, you sometimes diagnose gender dysphoria in children; correct?

A. Not usually. In prepubertal children, I will most often use a different diagnostic code than gender dysphoria.

Q. What diagnostic code do you use?

A. I use gender identity uncertainty. Sometimes I will use a code that is called "Worried Well." So that means a family comes in with a lot of questions, but there's -- there's not really anything medically concerning with that young person.

So in most children, they're prepubertal, that is the diagnosis I use.

Q. And did you say worried well as in W-o-r-r-i-e-d Well?

A. W-e-l-l, yes.

Q. Thank you.

Have you ever diagnosed a patient with gender dysphoria in childhood?

A. I have.

Q. And to do that, you are required to stereotype at least some clothing, toys or activities; correct?

MR. SELDIN: Object to form.

THE WITNESS: That's correct.

I would like to give some context to that. I started doing this work 18 years ago, and it was before I had really started thinking a lot about these things that are in the diagnostic criteria in a very critical way or thinking about the stereotyping, because over the last 18 years, it's changed a lot.

I think we see, for example, like, Target, there's much less division of clothes. There's much less division of toys. And I think that's been a shift over time in our society.

I think 18 years ago, there was a lot of distinction here.

So I would say that my utilizing this code over time has changed.

BY MR. RAMER:

Q. When you say "Target," are you referring to the store?

A. I am referring to the store.

Q. And what do you think the diagnostic



criteria should be?
MR. SELDIN: Object to form.
THE WITNESS: I think that the diagnostic criteria should be gender incongruence. That's the first part.
I think that the utility of a diagnosis of gender dysphoria in prepubertal children is not necessary, necessarily.
I have not spent a lot of time thinking about that because that is a very small number of people that I see in my practice.
BY MR. RAMER:
Q. And the diagnostic criteria for gender incongruence does not require the presence of distress; correct?
MR. SELDIN: Object to form.
THE WITNESS: That's correct. That's my understanding of it. We don't use that in the United States.
BY MR. RAMER:
Q. But you think that should be the diagnosis that is used for children; correct?
MR. SELDIN: Object to form.
THE WITNESS: I think this is more complicated. I have thought sometimes that there

shouldn't be this diagnosis at all in children.
I think that there are some children that experience distress.
But my observation has been that young -- young children who are talking about their gender, who have their gender acknowledged and have gender affirmation, depending -- well, what we talked about a spectrum, oh, you can wear dresses at home or you can wear them outside or you can use a different name.
It is the case that a lot of people no longer experience that distress after those things have happened. And their distress reemerges when they start puberty.
So I -- I don't know what you call that. You call that a functioning person who maybe uses a different name and pronouns. But I don't -- I don't know that these criteria are necessary or necessarily relevant during that time.
I think that there should be -- ideally, there should be a code that says somebody has a gender that's different than their assigned sex at birth.
And that medical code then translates to any potential interventions, but it also derails the

coupling of medical procedures that have to do with body parts.
For example, if somebody changes -- if somebody is assigned female at birth and they change their gender marker to male, and then they go for cervical screening, the insurance may not cover that because the gender marker is different from the body part, if that makes sense.
That's how I think it should be.
BY MR. RAMER:
Q. Is the answer the same for adolescents who are gender incongruent?
MR. SELDIN: Object to form.
THE WITNESS: No.
BY MR. RAMER:
Q. Why is it different?
A. The criteria for gender dysphoria in -- in adolescence is much more about bodies. And this is one of the reasons you only have to meet two of the criteria in adolescence and adulthood. Because that diagnosis is primarily concerned with what you might do for medical intervention.
Q. Do you think that the presence of distress should be required?
MR. SELDIN: Object to form.

THE WITNESS: For a diagnosis of gender dysphoria?
BY MR. RAMER:
Q. In adolescence. Correct.
A. Yes. Yes, I do.
Q. And why?
A. Because "dysphoria" means distress. And so if you just are trans and you don't have gender dysphoria, that's what I'm talking about. You need -- there needs to be a medical code that allows you to continue care with somebody even if they aren't experiencing distress anymore.
And usually people who are not experiencing stress are not coming for medical interventions. They're coming for medical interventions because of their distress, for the most part.
Q. And so in that answer you said "usually" and "for the most part."
And so is it accurate to say that it is not always the case that those seeking medical interventions are suffering from distress?
MR. SELDIN: Object to form.
THE WITNESS: I think it largely depends how you describe distress.
Do I think that there are people who are



coming for medical interventions for no reason whatsoever? No.

They're coming because there is a missing or a misalignment between their gender and their physicality. That's why they're coming.

That tension in and of itself is distressing for people.

Does it cause functional impairment? I don't think we ever know, because we don't know what it would have been like for them to be cisgender. So we don't really know how they would function otherwise.

My own interpretation is that -- and I -- the reason I say this is I know there are trans people who do not have gender dysphoria. But the people coming to see me for medical intervention have distress.

BY MR. RAMER:

Q. And so there could never be a patient who is gender incongruent but is not suffering from distress as the DSM-5 discusses it; correct?

MR. SELDIN: Object to form. Foundation. Misstates testimony.

THE WITNESS: I think the problem with the DSM is that clinically significant distress is not

defined.

And so, yes, there's a possibility that anybody could come -- there's infinite possibilities in medicine. There -- always there are as many possibilities as there are humans.

I think the challenge is that clinically significant distress is not really defined in the DSM.

BY MR. RAMER:

Q. So is the requirement of clinically significant stress superfluous then?

MR. SELDIN: Object to form. Misstates testimony.

THE WITNESS: No. It's not superfluous. It's just not defined.

BY MR. RAMER:

Q. But you agree that somebody can be --

Let me back up.

You agree that being gender incongruent, in and of itself, is distressful; correct?

MR. SELDIN: Object to form. Misstates testimony.

THE WITNESS: I think there are people who are gender incongruent who are not distressed.

///

BY MR. RAMER:

Q. And those people --

Let me back up.

For that category of patients, it would be inappropriate to give them any form of medical intervention; correct?

MR. SELDIN: Object to form. Foundation.

THE WITNESS: I think that if people are not -- I think that if people are seeking medical intervention, they have distress.

BY MR. RAMER:

Q. And so nobody who is gender incongruent but not distressed within the meaning of DSM-5, would ever seek a medical intervention.

Is that what you're saying?

MR. SELDIN: Object to form. Foundation. Misstates testimony.

THE WITNESS: And this goes back to what I was saying, is that: What does "clinically significantly distressed" mean? What is clinical -- significantly clinically depressed? I mean distressed.

I don't know that clinically significant stress or impairment is not defined in the DSM. This is a very commonly used phrase across the entire DSM,

and it's not defined.

BY MR. RAMER:

Q. How do you make a diagnosis under the DSM if you don't know what it means?

MR. SELDIN: Object to form. Misstates testimony.

THE WITNESS: I know what distress means.

But as it's defined here, "clinically significant," the DSM does not define that. The people that I see have distress. That's how I define it.

And when people have distress, they meet the criteria.

BY MR. RAMER:

Q. And you know they have distress because they are seeking medical intervention; is that right?

MR. SELDIN: Object to form. Misstates testimony.

THE WITNESS: No.

I know that they have distress because I have long conversations with people.

BY MR. RAMER:

Q. And what is the product of those long conversations?

MR. SELDIN: Object to form.



THE WITNESS: Sometimes the product of those long conversations is -- well, all the time actually, is understanding the areas that are distressful for people.

Sometimes the conversation is what is it that you're seeking from medical intervention?

Will medical intervention get you there? Will it not do the things that you are seeking?

On the conversation span, a whole range of topics.

The product of a conversation is information.

BY MR. RAMER:

Q. If a patient has an embodiment goal -- e-m-b-o-d-i-m-e-n-t -- and their body is not presently aligned with that embodiment goal, is that patient necessarily distressed?

MR. SELDIN: Object to form.

THE WITNESS: I think so, yes.

BY MR. RAMER:

Q. Switching gears just a little bit to international consensus.

Do you agree that the policies on gender-affirming care in England, Sweden, Finland, Australia and New Zealand, are more and more out of

step with the WPATH Standards of Care 8? Correct?

MR. SELDIN: Object to form. Foundation.

THE WITNESS: I think that -- I can't answer about New Zealand and Australia. I'm not very familiar with those protocols.

But the things that I have read, and I think it's really important to distinguish this, that the providers of care are not the same people as those people who are publishing their thoughts and feelings and recommendations about the care.

I think that there is a separation of those two entities, and that's really important. Because when you talk about consensus, are we talking about clinician consensus? Or are we talking about report consensus?

BY MR. RAMER:

Q. During your deposition in Voe versus Mansfield, when you were asked whether the policies on gender-affirming care in England, Sweden, Finland, Australia and New Zealand, are more and more out of step with WPATH Standards of Care 8, you said yes; correct?

MR. SELDIN: Object to form. Foundation.

THE WITNESS: Yes.

MR. RAMER: The policies. I just want to

have real clarity about that.

Q. And you do not know whether any adolescents with gender dysphoria in Sweden are currently obtaining gender-affirming care through a research protocol; correct?

MR. SELDIN: Object to form.

THE WITNESS: Correct.

BY MR. RAMER:

Q. You agree that the United Kingdom has in fact banned the use of puberty blockers; correct?

MR. SELDIN: Object to form.

THE WITNESS: I do believe that I know that now.

BY MR. RAMER:

Q. And going to Olson-Kennedy Exhibit 6, which is your amicus brief, I'd like to go to page 9.

A. I just want to go back to this and say I've never seen it in this format before. But I recognize this is the paper that we wrote about the Cass Review, yes.

Q. Just to confirm, this is not just a copy-and-paste from your paper; correct?

A. No. There's additional -- there's additional information. Yes.

But I recognize these words.

Q. And just so we're all on the same page, let's go to page 5 of this brief first and look at footnote 3.

And that footnote explains that there's additional information in your paper that is not in this brief; correct?

A. Correct.

Q. Okay. Now, going to page 9. And the very last paragraph that carries over onto page 10, if you could just take a moment to read that, and let me know when you've read it.

MR. SELDIN: Mr. Ramer, are you talking about the paragraph that starts, "Notably the Cass Review"?

MR. RAMER: That's correct.

(Reporter clarification.)

MR. RAMER: Counsel -- counsel was confirming with me whether the paragraph that I've asked Dr. Olson-Kennedy to read is the one that begins with the phrase "Notably the Cass Review."

And I said yes.

THE WITNESS: Yes. I'm done reading that.

BY MR. RAMER:

Q. And on page 10, in the final sentence of that paragraph, the brief states that the

MAGNA
LEGAL SERVICES

British Medical Association has called for a pause on the U.K. ban on puberty blockers; correct?
A. Yes.
Q. And that sentence is no longer accurate, is it?
MR. SELDIN: Object to form. Foundation.
THE WITNESS: I don't know.
MR. RAMER: I'm handing the court reporter what I'll ask to be marked as Olson-Kennedy Exhibit 8.
(Deposition Exhibit 8 was marked for identification by the court reporter.)
THE WITNESS: I think this is the wrong thing. It's just that single page.
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy Exhibit 8; is that correct?
A. Yes.
Q. And this appears to be a report published in the BMJ; correct?
MR. SELDIN: Mr. Ramer, I would just like to note that I don't believe that this was one of the exhibits that you had noted in our correspondence you intended to use.

So if we could just have a moment to read. We don't need to leave the room, but it would be helpful.
MR. RAMER: We'll go off the record.
MR. SELDIN: Thank you.
THE VIDEOGRAPHER: The time now is 10:36 a.m.
We are off the record.
(Off record.)
MR. RAMER: We'll go back on.
THE VIDEOGRAPHER: The time is 10:37 a.m.
We are back on the record.
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, the document that's been marked as Olson-Kennedy Exhibit 8 is a report published in the British Medical Journal; correct?
MR. SELDIN: Object to form.
THE WITNESS: That is what it looks like.
BY MR. RAMER:
Q. And the first sentence of this document, I'll read it and ask if I read it correctly, says:
"The BMA has retracted its call for the U.K. government to lift the ban on prescribing puberty blockers to under 18s with gender dysphoria while the association conducts an evaluation of the Cass

Review's recommendations."
Did I read that correctly?
A. Yes.
Q. And so returning to Exhibit 6, which is your amicus brief, and page 10 in the final sentence of the carry-over paragraph from page 9.
According to the report that we just read, that sentence is incorrect; right?
MR. SELDIN: Object to form.
THE WITNESS: I guess I'm not understanding the question at the time that this was prepared, that is correct.
That has the BMA retracted, that's called, yes.
BY MR. RAMER:
Q. And was this deposition the first that you became aware of the BMA retracting that call?
A. Yes.
Q. And do you think that you should correct the statement made on your behalf to the Supreme Court of the United States?
MR. SELDIN: Object to form.
THE WITNESS: I don't know the answer to that.
Yes. I mean, we want it to be accurate, of

course.
MR. RAMER: And I'm at a point where it's kind of a good stopping point.
If this works for you, I'll take a short little break. Does that work for you?
THE WITNESS: Sure. Yeah.
MR. RAMER: Go off.
THE VIDEOGRAPHER: The time now is 10:39 a.m.
We're now off the record.
(Short recess.)
MR. RAMER: Ready.
THE VIDEOGRAPHER: One moment, please.
The time is 10:52 a.m., and we're back on the record.
BY MR. RAMER:
Q. Welcome back, Doctor.
A. Thank you.
MR. RAMER: I'm going to hand the court reporter what I'll ask to be marked as Olson-Kennedy Exhibit 9.
(Deposition Exhibit 9 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
///




BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy Exhibit 9.
And these are the Informed Consent forms used for patients receiving treatment at Children's Hospital of Los Angeles; correct?
A. The first part of these are a consent and assent forms for participating in a study.
The second part of this packet has consent forms for medical interventions.
Q. And when you say "the second part of the packet," can you direct me to what page you're talking about?
A. The first one is the Informed Consent for -- form for feminizing medications. That's the beginning of the clinical consent form.
These are not part of the study.
Q. Thank you.
And beginning with these Clinical Consent forms, these are either the forms that you're using today or are extremely close to what you're using today; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
///

BY MR. RAMER:
Q. And this first one, which is labeled "Informed Consent Form for Feminizing Medications," parenthesis, "(transfeminine individuals on GnRH Analogs)," this form would be used for natal males who either had their endogenous -- e-n-d-o-g-e-n-o-u-s -- puberty blocked or who had not yet experienced male pubertal development; correct?
A. Or were in their -- we would not be giving hormones to somebody who had not yet started puberty but if they were in early puberty.
Q. And so the answer to the question was yes, and also for those who have not had a significant amount of male pubertal development; is that right?
MR. SELDIN: Object to form. Misstates testimony.
THE WITNESS: This form is for people who either had GnRH analogs that were started in early puberty or people who are starting hormones who have not yet experienced a lot of their puberty.
BY MR. RAMER:
Q. Thank you.
And to your knowledge, this consent form is accurate in its description of the risks of feminizing medications; correct?

A. Yes.
Q. And so on this page down at No. 5, you agree that a person who begins taking puberty blockers in early puberty and then proceeds to feminizing hormones will be infertile; correct?
MR. SELDIN: Object to form.
THE WITNESS: This is why the word "likely" is in there.
BY MR. RAMER:
Q. And so is the answer yes?
A. They are likely to be infertile.
Q. And you agree that if a person is on puberty blockers in early puberty and they stay on feminizing hormones, they will not make mature sperm; correct?
A. Yes. If they stay on those interventions.
Q. Thank you.
Going to the next page, No. 6, you agree that feminizing medications increase the risk of blood clots; correct?
MR. SELDIN: Object to form.
THE WITNESS: Minimally, yes.
BY MR. RAMER:
Q. And you agree that feminizing medications increase the risk of a pulmonary embolism; correct?
MR. SELDIN: Object to form.

THE WITNESS: Yes.
BY MR. RAMER:
Q. And a pulmonary embolism is a blood clot to the lungs; correct?
A. That's correct.
Q. And a pulmonary embolism can cause permanent lung damage or death; correct?
A. Correct.
Q. And then second bullet under 6, you agree that feminizing medications increase the risk of stroke; correct?
MR. SELDIN: Object to form.
THE WITNESS: These are the potential things that can happen when somebody gets a blood clot.
MR. SELDIN: Mr. Ramer, I apologize for interrupting.
The screen that has the Zoom appears to be off. I wasn't sure --
MR. RAMER: It's -- want to go off?
MR. SELDIN: Yeah.
THE WITNESS: Oh, yeah.
THE VIDEOGRAPHER: The time is 10:58 a.m. We're off the record.
(Off record.)
THE VIDEOGRAPHER: Let me know when you're



ready.
MR. SELDIN: Doctor, are you ready?
THE WITNESS: Yes. I'm ready.
THE VIDEOGRAPHER: The time is 11:03 a.m., and we are back on the record.
BY MR. RAMER:
Q. Okay. Doctor, we are on Olson-Kennedy Exhibit 9. And we were looking at the second page of the Informed Consent form for feminizing medications for transfeminine individuals on GnRH analogs.
And we were looking at No. 6 on page 2 of that form. And we were on, I believe, the second bullet.
And my question is: You agree that feminizing medications increase the risk of stroke; correct?
MR. SELDIN: Object to form.
THE WITNESS: Estrogen increases the risk of blood clots. I have never seen a study that looked at the incidence of any of these things, pulmonary emboli, stroke, heart attack or chronic leg vein problems.
BY MR. RAMER:
Q. You agree that blood clots can result in stroke; correct?

A. Yes.
Q. And you agree that a stroke may cause permanent brain damage or death; correct?
A. Yes.
Q. And next bullet, you agree that feminizing medications increase the risk of heart attack; correct?
MR. SELDIN: Object to form.
THE WITNESS: Feminizing hormones increase the risk of blood clots, which could potentially lead to a heart attack, yes.
BY MR. RAMER:
Q. And the next bullet, you agree that feminizing medications increase the risk of chronic leg vein problems; correct?
MR. SELDIN: Object to form.
THE WITNESS: Same issue. That estrogen specifically -- and I think this is important -- increases the risk of blood clots minimally which can lead to chronic leg vein problems.
BY MR. RAMER:
Q. Is it fair to say that a pulmonary embolism, a stroke or a heart attack is detrimental to people's physical health?
A. Yes.

Q. And same page, No. 7, further down the page, the second bullet under No. 7. You agree that feminizing medications can lead to increased blood pressure; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And next bullet, you agree that feminizing medications can lead to increased risk of gallstones; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And next bullet, you agree that feminizing medications can lead to nausea and vomiting; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And next bullet, you agree that feminizing medications can lead to headaches and migraines; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
BY MR. RAMER:
Q. Same page, No. 8. You agree that feminizing

medications can cause tumors of the pituitary gland; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
BY MR. RAMER:
Q. And those tumors can damage vision and cause headaches; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
BY MR. RAMER:
Q. And so let's go two pages forward in Olson-Kennedy Exhibit 9.
And at the top, it says "Informed Consent Form for Feminizing Medications"; correct?
A. Correct.
Q. And this is the Informed Consent Form for Feminizing Medications when used with natal males who either are well into male puberty or have gone through male puberty; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
Sorry.
MR. SELDIN: I object to form.
You can answer.
THE WITNESS: Correct.



BY MR. RAMER:
Q. And does this form accurately -- excuse me.
Does this form accurately describe the risks of feminizing medication?
A. I have to go through it again, but yes, basically.
We've changed some of our recommendations based on our findings, particularly around prolactinomas, which is bullet number --
9. It's No. 9, not bullet point.
Q. And what have you changed?
A. We haven't changed it on our form yet. But they're -- we have not seen that. And there have been a couple of studies I think that have demonstrated that this is no longer a finding.
Q. What are those studies?
A. I can't remember them offhand. One of them came from our team, the one that -- I think it's the last one on my CV.
Q. Apart from the number about prolactinomas, does, this form accurately describe the risks of feminizing medication?
A. Yes.
Q. And after this form, there's a form with the title "Pubertal Blockers for Minors in Early

Adolescence."
Do you see that?
A. I do.
Q. And this is the form you would use for people starting puberty blockers in early adolescence; correct?
A. This is the form that we would use for anybody going on to puberty blockers at any point in their development.
Q. And in what scenario would you give somebody who is not in early adolescence, puberty blockers?
MR. SELDIN: Object to form. Misstates testimony.
THE WITNESS: Sometimes puberty blockers are used for just halting further development.
So, for example, if somebody was in maybe Tanner Stage 4 and they didn't want to get additional breast development and they wanted to stop having a period, that they could go on puberty blockers for those purposes.
BY MR. RAMER:
Q. So why would you not just use the cross-sex hormone for somebody at Tanner Stage 4?
A. That's -- they're not at that place where they want that yet. That's not what they need in

that moment. They want to take a pause and not have additional development. But they're not necessarily wanting or ready for moving forward, or their parents not -- might not be ready.
Q. And when you say "that's not what they need," that need is based on the patient's embodiment goals; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
BY MR. RAMER:
Q. Sticking with this form, next page, down below the bold "Risks of Puberty Blockers," do you see that?
A. I do.
Q. And looking at the first bullet, you agree that the side effects and safety of puberty blockers are not completely understood; correct?
A. That's correct.
Q. And you do not know whether delaying puberty in an adolescent changes the adolescent's brain development; correct?
MR. SELDIN: Object to form.
THE WITNESS: That's correct.
BY MR. RAMER:
Q. And you agree that we do not have scientific

evidence about how pubertal suppression affects young people's judgment in decision-making; correct?
MR. SELDIN: Object to form.
THE WITNESS: Only clinical experience.
BY MR. RAMER:
Q. And so we do not have scientific evidence about how puberty suppression affects young people's judgment in decision-making; correct?
MR. SELDIN: Object to form. Asked and answered.
THE WITNESS: That's correct.
BY MR. RAMER:
Q. And going forward three pages, there's a form with the title "Informed Consent Form for Testosterone Therapy."
Do you see that?
A. Yes.
Q. And on this page, No. 3, the first sentence says: "It is not known what the effects of testosterone are on fertility"; correct?
A. Yes.
Q. And if a natal female begins taking masculinizing hormones and later stops them, we don't know whether that person will regain the ability to be fertile; correct?



MR. SELDIN: Object to form.
THE WITNESS: We don't know that. But I think it's important to add that we didn't really know their fertility status before they started.
And we also know that there are a lot of people who have stopped testosterone and carried pregnancies or harvested eggs.
BY MR. RAMER:
Q. When you say we don't know their fertility status before we started, what do you mean by that?
A. That person could have not had the capacity to get fertile. I mean, they -- we don't know what their capacity would've been to get pregnant at all.
Q. Is that something that you assess in your patients?
A. No.
Q. And sticking with this page -- I'm sorry -- next page, under "Risks of Testosterone," the first bullet under that, you agree that masculinizing medications can increase the risk of heart disease; correct?
A. Yes.
Q. And on this page after that bullet, there are three bullets. Then there's a paragraph, and then there's another bullet that begins with the

phrase "Increase the red blood cells."
Do you see that?
A. I do.
Q. And you agree that masculinizing medications increase the risk of stroke and heart attack; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And next bullet, you agree that masculinizing hormones increase the risk of diabetes; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And next bullet, you agree that masculinizing hormones can risk the HIV; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And next bullet, you agree that masculinizing hormones can cause headaches or migraines; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.

BY MR. RAMER:
Q. And next bullet, you agree that masculinizing hormones can lead to increased anger; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. Is it fair to say that heart disease, diabetes and HIV are detrimental to people's physical health?
A. Yes.
Q. And two pages later, there's a document entitled "Informed Consent Form for Testosterone Therapy," parenthesis, "(for Youth on GnRH Analogs)."
Do you see that?
A. Yes.
Q. And this form is used for young people who have not been through endogenous female puberty; correct?
A. Correct.
Q. And on the next page, there's the bold, entitled "Risks of Testosterone."
Do you see that?
A. Yes.
Q. And do you agree that this form is accurate

in describing the effects and risks of testosterone therapy for this population?
A. Similar to the Prolactin, that first bullet point about liver damage, there have also been -- and I can't tell you the exact papers -- but there -- that particular thing has been put to rest about liver disease.
Q. And just so I understand your -- what you're saying, you're saying that Prolactinomas and liver disease have been --
Let me back up.
You're saying that masculinizing hormones in this context have been proven to not increase the risk of liver disease; is that right?
A. There have been several manuscripts that have said testosterone does not lead to increasing liver enzymes.
Q. And you're confident enough in those studies that you're going to be removing that from your Informed Consent forms?
A. In my clinical practice, yes.
Q. And apart from liver disease with this form, is the form accurate in describing the effects and risks of testosterone therapy for this population?
A. Yes.



Q. And given all the risks that we just discussed, you would agree that these medications are not safe; correct?
MR. SELDIN: Object to form. Misstates testimony.
THE WITNESS: No.
BY MR. RAMER:
Q. But we discussed that these side effects are detrimental to people's physical health; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
BY MR. RAMER:
Q. And when you were deposed in Voe versus Mansfield, you explained that when you say medications are safe, you mean that they are not detrimental to people's physical health; correct?
A. All medications have potential side effects. They happen to be listed more explicitly in these consent forms.
Q. In your deposition in Voe versus Mansfield, when you were asked what you meant by saying that these interventions were safe, you said it means that they have not been demonstrated to be detrimental to people's physical health; correct?
MR. SELDIN: Objection. Foundation.

THE WITNESS: Correct.
BY MR. RAMER:
Q. And here, we've just discussed all these increased risks of conditions that are detrimental to people's physical health; correct?
A. Correct.
Q. And so using your definition of what it means for medications to be safe, these medications are not safe; correct?
MR. SELDIN: Object to form. Misstates testimony. Asked and answered.
THE WITNESS: Same answer as before.
BY MR. RAMER:
Q. Which was what?
A. These medications are safe. These are all potential side effects.
Q. What does that mean, a "potential side effect"?
A. Let's take Tylenol for an example. Okay? Tylenol can be very damaging to your liver.
Is Tylenol considered a safe medication? Yes, it is.
And so like all medications, there are potential side effects. Does that mean we see them happening a lot? No. In fact, the majority of

cases, we don't see that at all.
I've never seen these things in my patients, nor have they been reported on. In fact, for example, there was a study that looked at heart disease in transgender men who had been taking testosterone.
What we tell patients is that their risk for testosterone is higher than if they didn't take testosterone, but it is not higher than cisgender men. It's actually just slightly lower.
That's what I mean. All medications have potential side effects.
BY MR. RAMER:
Q. I'd like to go to Olson-Kennedy Exhibit 4, which is your deposition in Voe versus Mansfield. I'd like to go to page 151.
And beginning at line 12 on 151 and carrying over to line 5 on page 152, here you are asked what you mean when you say that gender-affirming medical care as treatment for gender dysphoria, has been shown to be safe.
And at page 152, line 3, you say:
"I mean that the use of these medications is -- has not been demonstrated to be detrimental to people's physical health."

Correct?
MR. SELDIN: I'll just object to the testimony on page 151, line 22. The prompt was "gender-affirming medical care as treatment" --
(Reporter clarification.)
MR. SELDIN: "Gender-affirming medical care as treatment for gender dysphoria, has been shown to be safe and effective and is not experimental or investigational."
BY MR. RAMER:
Q. And my question for you, Doctor, is: When you were asked what you meant by saying the medications were safe, page 152, line 3, you say:
"I mean that the use of these medications is -- has not been demonstrated to be detrimental to people's physical health."
Correct?
MR. SELDIN: And I'll just object again, the question in this deposition is more than just safe.
But you can answer if you understand.
THE WITNESS: Yes. I understand, and that's correct.
BY MR. RAMER:
Q. You began using puberty blockers to treat gender dysphoria back in 2007; correct?



A. Correct.
Q. And was it around the same time that you first began using cross-sex hormones to treat gender dysphoria in minors?
MR. SELDIN: Object to form.
THE WITNESS: Do you mean me personally? Or at our clinic?
BY MR. RAMER:
Q. You personally.
A. 2006.
Q. And what about at your clinic?
A. 1991.
Q. And you would agree that when you personally began using puberty blockers and cross-sex hormones to treat gender dysphoria in adolescence, that practice was based on very limited data; correct?
MR. SELDIN: Object to form.
THE WITNESS: The limited data was in their use among people with gender dysphoria. Yes.
BY MR. RAMER:
Q. And so when you began using them with adolescents to treat gender dysphoria, that practice was based on very limited data; correct?
MR. SELDIN: Object to form.
THE WITNESS: In puberty blockers, yes. Not

gender-affirming hormones.
BY MR. RAMER:
Q. For adolescents?
A. Correct.
Q. You think that there was more than limited data to use cross-sex hormones to treat gender dysphoria in adolescents in 2006?
A. I think there was a lot of clinical evidence and experience.
Q. When you say "clinical evidence," what are you referring to?
A. I mean that in our center, we'd been utilizing gender-affirming hormones for 15 years at that point.
MR. RAMER: I'm going to hand what's a very large document to the court reporter to be marked as Olson -- Olson-Kennedy Exhibit -- 10, I believe.
(Deposition Exhibit 10 was marked for identification by the court reporter.)
MR. RAMER: And for counsel, I did not print out the entire document. I printed out the cover and then the one page that I'm going to be asking about, to save paper.
THE WITNESS: Thank you.
MR. SELDIN: We appreciate that. As I

believe does the witness.
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, this is a grant application that you submitted to the National Institutes of Health for our R 01, which is entitled "The Impact of Early Medical Treatment in Transgender Youth."
Correct?
A. Correct.
Q. And you submitted this in 2014; correct?
A. Yes.
Q. And I'd like to go to the page that is numbered 163 at the bottom.
And let me know when you're at that page.
A. Yes, I'm there.
Q. And that page has a bold and all caps "SPECIFIC AIMS" at the top; correct?
A. Correct.
Q. And the second paragraph -- I'll just read the full paragraph into the record and ask if I read it correctly.
"Current clinical practice guidelines aim to decrease gender dysphoria and ameliorate potential negative health outcomes. Treatment recommendations vary depending on the age and developmental stage of

youth with gender dysphoria.
"For those youth in the earliest stages of puberty technical development, Tanner 233, treatment with gonadotropin releasing hormone GRH agonists is recommended in order to suppress endogenous puberty and avoid the development of undesired secondary sex characteristics.
"In older adolescents in the later stages of pubertal development, Tanner 4 through 5, treatment with cross-sex hormones is recommended to induce desired masculine or feminine features.
"While these guidelines have been used at academic and community centers across the U.S., they are based on very limited data.
"Furthermore, there are no available data examining the physiologic and metabolic consequences of cross-sex hormone treatment in youth. This represents a critical gap in knowledge that has significant implications for clinical practice across the U.S.
"In 2011 a report of the Institute of Medicine called for the development of rigorous research aimed at understanding the health implications of hormone use and other transgender-specific issues."



Leaving aside mispronunciations, did I read that correctly?
A. Yes.
Q. And in the third and fourth sentences of this paragraph, you are discussing using puberty blockers and cross-sex hormones to treat gender dysphoria in adolescents; correct?
A. Yes.
Q. And the next sentence says:
"While these guidelines have been used at academic and community centers across the U.S., they are based on very limited data."
Correct?
A. Correct.
Q. And you personally wrote that sentence; correct?
A. I did.
Q. And the next sentence says:
"Furthermore, there are no available data examining the physiologic and metabolic consequences of cross-sex hormone treatment in youth."
Correct?
A. Correct.
Q. And you personally wrote that sentence; correct?

A. I did.
Q. So by the time that you told NIH that these interventions were based on very limited data, you had already been providing them for the better part of a decade; correct?
MR. SELDIN: Object to form.
THE WITNESS: Thirteen years.
BY MR. RAMER:
Q. What is 13 years?
A. We started in 1991 doing clinical care for transgender youth. This was written in 2014.
Q. And you first began giving puberty blockers to patients to treat gender dysphoria in 2007; correct?
A. Correct.
Q. And you first began using cross-sex hormones to treat gender dysphoria in adolescents in 2006; correct?
A. Personally, yes.
Q. And so then it's seven to eight years later that you are telling NIH that these interventions were based on very limited data; correct?
MR. SELDIN: Object to form.
THE WITNESS: The were based -- the guidelines were based on little empirical data.

Clinical experience is a whole different thing that's considered in the provision of care.
BY MR. RAMER:
Q. And so by the time that you told -- you told NIH that these interventions were based on very limited empirical data, you had already been providing them for the better part of a decade; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
BY MR. RAMER:
Q. Do you think that was ethical?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. Why?
A. I think that clinical experience is a really important part of making care decisions. So what we knew in 2007, the Dutch protocol had come out. And the Dutch had been using puberty blockers for gender dysphoria since, I want to say, 1989, possibly earlier.
When they came out with this protocol because the use of puberty blockers had been demonstrated to be safe in even a much younger

population, and that they were demonstrated to be helpful in youth with gender dysphoria and we had been using gender-affirming hormones since 1991, it was ethical to offer this as an opportunity for young people.
BY MR. RAMER:
Q. And that's true even if there's very limited empirical data to support the use of those interventions?
MR. SELDIN: Object to the form.
THE WITNESS: That is true with all areas of medicine, clinical practice outpaces empirical data.
BY MR. RAMER:
Q. And so in your view, all you really needed to know whether these interventions were safe and effective, was the Dutch studies; is that right?
MR. SELDIN: Object to form. Misstates testimony.
THE WITNESS: The Dutch experience.
BY MR. RAMER:
Q. And so every piece of evidence that we've obtained after 2006 and 2007, is just icing on a cake already frosted; is that right?
MR. SELDIN: Object to form. To the wind-up, misstates testimony.



THE WITNESS: I think that's a mischaracterization of how all of medicine works. All of medicine starts with clinical practice. And when clinical practice, we have patients that we can -- that are going to consent to studies and enough people to make conclusions, then we add empirical data.
This is true across the entire field of medicine. This is absolutely not different at all.
BY MR. RAMER:
Q. And so how about the very first patients who receive these interventions as part of clinical practice with no empirical data, is that ethical?
MR. SELDIN: Object to form. Foundation.
THE WITNESS: Are you asking me to make a judgment about the Netherlands?
BY MR. RAMER:
Q. I'm asking you to make a judgment about your practice.
A. Not unethical. We did have empirical data, and they had clinical experience. Not without those things.
Q. And the empirical data is exclusively the data coming from the Dutch researchers; is that correct?

MR. SELDIN: Object to form. Misstates testimony.
THE WITNESS: That's correct.
BY MR. RAMER:
Q. And that was sufficient for you to feel justified in giving these interventions to patients; correct?
MR. SELDIN: Object to form.
THE WITNESS: That experience, that empirical data, and what we knew about the use of central blockers in precocious puberty and other indications.
For example, endometriosis in adolescence and other things that I talk about in my report where GnRH analogs are utilized for other reasons.
BY MR. RAMER:
Q. And do you treat precocious puberty?
A. I have treated precocious puberty twice because there happened to be overlap with two patients with gender dysphoria.
Q. And those patients were also seeing an endocrinologist; correct?
A. That is correct.
Q. Do you diagnosis precocious puberty?
A. Not routinely. But all you need for that

diagnosis is that somebody has started puberty before a certain age.
Q. And so, in other words, it's just a physical -- it's a diagnosis that's based on physical observation; is that right?
MR. SELDIN: Object to form.
THE WITNESS: There are also blood tests that go along with that and sometimes bone age studies that go along with that.
BY MR. RAMER:
Q. And for a patient who is being treated for central precocious puberty exclusively, the treatment for that condition eventually calls for that patient to cease taking puberty blockers and then proceed through endogenous puberty; correct?
MR. SELDIN: Object to form. Foundation.
THE WITNESS: Correct.
BY MR. RAMER:
Q. You do not consider yourself an expert in medical ethics; correct?
A. That's correct.
Q. And looking at your practice generally, you have patients who range in age from four years old to 25 years old; correct?
A. Yes. Occasionally I will see someone older

than that if they have not been able to establish care somewhere.
Q. Because it's --
Let me back up.
Generally your practice is that at age 25, your patients will transition to adult care; correct?
A. That's correct.
Q. And about 90 to 95 percent of your practice is focused on treating children and adolescents with gender dysphoria; correct?
A. That's correct.
But I'd like to add context, because it's not always about giving people medical interventions. There are pieces of it that are about psychoeducation. There are pieces of it about consultations. I'm just providing information.
For example, I have seen parents with children younger than four, but I don't necessarily see the kid. It really is discussion with parents.
Q. And when you say "psychoeducation," what do you mean by that?
A. Talking to them about trajectories of development, talking to them or working with them around questions that they have about their child.
Q. Do you do psychoeducation with the minor



Page 82

patients as well?
A. Yes.
Q. And what does that entail?
A. Same thing.
So people are accessing services at all different points in time relative to their understanding of medical interventions or other interventions that are available. And so that conversation doesn't look the same for everybody, but it's really about providing information. And that's pretty similar across all of adolescent medicine.
Q. And what does the other very small percentage of your practice involve?
A. Abnormal uterine bleeding, eating disorders, intentional overdose, unintentional overdose, pelvic problems, all things adolescent that adolescents may experience from a medical perspective.
Q. And for --
Or let me back up.
What percentage of patients are in your research protocols?
A. Very small percentage.
Q. Less than 3 percent? I know you're -- this is an estimate, but I'm just -- just to get a ballpark.

Page 83

A. Maybe 8 percent to 10 percent.
I don't know the exact numbers right now but around that.
Are you talking about the NIH research or are you talking about all research across the whole Center For Transyouth Health and Development?
Q. I was referring to your research protocols.
A. Yeah. Probably about 8 to 9 percent, or something like that.
Q. And of the patients that you're seeing for gender dysphoria, upwards of 90 percent of those patients are on some form of hormonal intervention; correct?
A. So for clarity, everybody that accesses services is not on medical interventions.
But people that are being seen over time, right -- because if somebody comes in on one occasion, we have a conversation and they never return, I'm not seeing them frequently, or maybe I'm seeing them less frequently.
But for people that I'm seeing on a routine basis, yes, they are undergoing interventions.
Q. I guess what -- my question was about the percentage of the patients you're seeing on an ongoing basis for gender dysphoria.

Page 84

A. Mm-hmm.
Q. And the question is: What percentage of those patients are on some form of hormonal intervention?
A. Probably about 90 percent.
Q. And for your transmasculine patients who did not have their puberty suppressed, nearly all of them end up getting chest surgery; correct?
MR. SELDIN: Object to form.
THE WITNESS: I don't know the exact number, but it's most of them.
BY MR. RAMER:
Q. In your deposition in Voe versus Mansfield, when you were asked what proportion roughly of your transmasculine patients end up getting chest surgery, you said nearly all of them who were not blocked in early puberty; correct?
A. Yes.
Q. And as recently as last year, you referred someone under the age of 18 for a genital surgery; correct?
A. I have to look at the timing. I'm not sure if it's within the last year. It might have been slightly before that.
The timing is -- I don't know.

Page 85

Q. What time frame are you thinking of?
A. Well, I've only referred one person, and I can't remember when I referred her, if it was more than a year ago or less than a year ago. It was very close to a year ago.
Q. And do you recall specifically what kind of surgery that was?
A. It was for vulvovaginoplasty.
Q. And can you explain what that is?
A. That is the creation of a vulva and a vaginal canal.
Q. And what tissue is used to create the vulva and the vaginal canal?
A. There are several different procedures. I can't remember which one this patient had, but I can go through them.
Q. Just give me a sense of generally what these procedures -- not this particular patient, but these procedures in general, what tissue is used for the procedure?
A. So largely dependence on how much puberty that person has experienced. So if somebody has gone all the way through or mostly through endogenous puberty, most frequently a procedure called an inversion procedure is used, and they use the skin of



the shaft of the penis.

If somebody was blocked earlier, they use different skin. And it's largely dependent upon the patient. Sometimes they use the lining of the peritoneal cavity. And sometimes they use skin of the scrotum. And sometimes they use skin from the outside lower groin.

And probably other things. I'm not a surgeon, but...

Q. That's fair.

And in your practice, you think there can be times where it's appropriate to prescribe cross-sex hormones at the patient's first visit to your clinic; correct?

MR. SELDIN: Object to form.

THE WITNESS: It can be. But that would be -- based on them either having had a complete workup already, including their assessment and their preliminary labs, that would be the only time that I would find that appropriate.

BY MR. RAMER:

Q. And it's possible that you have personally prescribed cross-sex hormones on a patient's second visit; correct?

A. Correct.

Q. And similarly, it's possible that you have personally prescribed puberty blockers for a patient as early as the second visit; correct?

A. It's possible. Again, similar to what I talked about previously.

Q. And there might be situations where someone will be prescribed puberty blockers during their first visit to your clinic; correct?

MR. SELDIN: Object to form.

THE WITNESS: Similar to what I said before, they would've had to have had the majority of their workup done in another place or for a variety of reasons.

BY MR. RAMER:

Q. And we were discussing this a little bit before, but you --

Let me back up.

The general practice in your clinic is to follow patients until they are 25 years old and then transition to adult care; correct?

A. Correct.

Q. And at that point, unless those patients are in your research protocols, you do not follow patients from age 25 onward; correct?

A. Correct.

Q. And so you do not have clinical experience related to your patient outcomes after 25 years of age; correct?

MR. SELDIN: Object to form.

THE WITNESS: That's correct.

BY MR. RAMER:

Q. When you prescribe a patient puberty blockers, you do not expect an increase in body satisfaction; correct?

A. It's not the same for every patient. Some people have improvement and some people don't.

If you look at the overarching response, at least what our data is demonstrating, it's pretty much neutral.

That doesn't capture the variability in each individual.

Q. And so when you say that puberty blockers are effective, all you mean by that is that they halt endogenous puberty; correct?

MR. SELDIN: Object to form. Misstates testimony.

THE WITNESS: Well, like I said, it's an individual thing. So there are some people that experience a lot of distress about going through puberty or the idea of going through puberty. And

for those patients, their anxiety and stress diminishes because they don't have to think about that anymore.

There are some people who go on puberty blockers who experience a lot of anxiety about the fact that they are not going through the puberty that aligns with their gender. So for them, they might have increased anxiety.

That's why I'm saying there's variability between individuals.

BY MR. RAMER:

Q. But the purpose of prescribing the puberty blockers as part of the sequence of gender-affirming care, is not to decrease anxiety and distress; correct?

MR. SELDIN: Object to form.

THE WITNESS: Correct. It's to stop the progress of their endogenous puberty.

BY MR. RAMER:

Q. And there is no instrument for measuring gender dysphoria; correct?

MR. SELDIN: Object to form.

THE WITNESS: There are a handful of scales that attempt to do that and, for example -- but I think the earliest ones that we see, the Utrecht



gender dysphoria scale does not.
I think that there are other scales that I've talked about before -- I can't remember the exact name. I will in a minute -- that have been proposed and have been modified over time.
BY MR. RAMER:
Q. But you do not in your practice or research, use an instrument that specifically measures gender dysphoria; correct?
A. We use a combination of instruments for that.
Q. What combination?
A. Well, we have not put this together formally yet, but we utilize -- transgender congruence is one of the most common scales that actually measures both acceptance and appearance, which helps us understand about the gap between someone's physicality and their gender, which is the purpose of utilizing gender-affirming hormones.
Does that capture all of gender dysphoria? No. But it does capture this idea of minimizing this gap to the best of our ability.
Q. And there is no instrument that you're aware of that would fully minimize that gap; correct?
A. Well, the instrument that captures the gap

and the gap closing, is the transgender congruence scale, appearance subscale. And that's why --
(Reporter clarification.)
THE WITNESS: The transgender congruence scale, specifically the appearance congruence subscale.
BY MR. RAMER:
Q. And when you were discussing the transgender congruence scale, you measure -- excuse me -- you mentioned both acceptance and appearance; correct?
A. Correct.
Q. And can you explain what you mean by "acceptance"?
A. So the transgender congruence scale has these two subscales. So the acceptance piece is about --
I didn't know if you needed a minute.
Q. No. I'm sorry.
A. -- the pieces about self-acceptance.
Q. Self-acceptance of what?
A. Transexperience, transgender experience.
Q. And what is appearance measuring?
A. Appearance congruence? It's measuring how aligned somebody's physicality is with their gender.
Q. And I think we've discussed this, but I want

to make sure, that for any particular patient, the gender-affirming medical intervention that is indicated, is driven by the patient's embodiment goals; correct?
A. That's correct.
Q. And you think that gender-affirming care includes a natal female receiving implants to have larger breasts; correct?
MR. SELDIN: Object to form.
THE WITNESS: I think you might have said that backwards.
Somebody who is designated female at birth doesn't -- probably doesn't want or need implants.
BY MR. RAMER:
Q. During your deposition in Noe versus Parson, you were asked if a natal female identifies as female, but naturally has a very small chest and wants a breast augmentation to better align her body with her conception of her gender as female, would that also be gender-affirming in your terminology, and you answered "yes"; correct?
A. Yes.
Q. And so you think gender-affirming care includes a natal female receiving implants to have larger breasts; correct?

MR. SELDIN: Object to form.
THE WITNESS: Correct.
MR. RAMER: And I'm at a decent stopping point.
THE WITNESS: Thank you.
MR. RAMER: Let's go off the record.
THE VIDEOGRAPHER: The time is 11:51 a.m. We are off the record.
(Lunch recess.)
MR. SELDIN: Ready to go.
THE VIDEOGRAPHER: One moment, please. The time is 12:34 p.m. We are back on the record.
BY MR. RAMER:
Q. Dr. Olson-Kennedy, welcome back.
A. Thank you.
Q. I'd like to return to Olson-Kennedy Exhibit 6, which is your amicus brief.
And I'd like to go to page 20.
And under the bold No. 1, there's a paragraph where the brief is talking about using the GRADE, all caps, "METHODOLOGY FOR ASSESSING EVIDENCE QUALITY."
Correct?
A. Yes.

MAGNA LEGAL SERVICES




Q. And you have never used the GRADE methodology; correct?
A. That's correct.
Q. And you do not know how the GRADE methodology considers expert opinion versus other types of evidence; correct?
A. I have heard people assert that over the last handful of months.
Q. Apart from those assertions, you do not have an understanding of how the GRADE methodology distinguishes between expert opinion and other types of evidence; correct?
A. That's correct.
Q. And sticking with this brief, like to go to page 4.
And first full paragraph on the page, there's a sentence that begins with "First." Then there's a citation, and then there's a sentence that begins with "These reviews."
Do you see that?
A. Yes.
Q. And I'll first just ask -- I'll first read it and ask if I read it correctly.
It says:
"These reviews are billed as systematic

reviews, a rigorous type of literature search considered to be the gold standard for assessing the quality of medical evidence, and were conducted by authors affiliated with the University of York," parenthesis, "the York SRs."
Did I read that correctly?
A. Yes.
Q. And do you agree that systematic reviews are the gold standard for assessing medical?
A. I guess.
Q. What do you mean you guess?
A. I -- I mean, I'm not -- this is not my field of study. This is what is said in the general world.
But my concern is that systematic reviews are very biased.
Q. Biased in --
A. Essentially very biased.
Q. Biased in what way?
A. So I think as we talk about in -- in this report that we published, the criterion for consideration in the review is subjective, so people pick it. Right? That's a human being on the other end of it that's picking the criteria.
So is it leaving out a lot of studies? Yeah, like as witnessed by the York systematic

reviews. They left out a lot of studies. And they left them out for reasons like, they -- they considered under 18 and 18 and older, so they were disqualified. Right?
Or they didn't measure this specific outcome that we identified as important. Right? That's -- that's a significant issue with systematic reviews.
Q. And is that an issue with systematic reviews generally or specifically with the systematic reviews associated with the Cass Review?
A. Generally they all are subjective in that way.
Q. And so do you consult systematic reviews as part of your practice?
A. Possibly in the past. Not that I can recall specifically.
Q. And you've never conducted a systematic review; correct?
A. That's correct.
Q. In your opinion, should a systematic review look at the safety of the interventions under study?
MR. SELDIN: Object to form.
THE WITNESS: I think that depends on what the systematic review is doing.
///

BY MR. RAMER:
Q. Can you explain what you mean by that?
A. So if a systematic review is undertaking -- again, broadly conceptualizing what the purpose of the systematic review is, is a really important part of that question.
So if the systematic review overall is saying, we want to look at all of the evidence, well, what if it's not an intervention that's related to safety? Right?
What if it's an intervention that is completely unrelated? Then that wouldn't be an important thing, necessarily.
But if they're looking at the -- they're looking at the results of intervention specifically related to medications or surgical things, then safety is an important part of it.
Q. How many systematic reviews have you read that assess the quality of the evidence for using medical interventions to treat gender dysphoria in minors?
A. Probably five or six. I don't know the exact number.
Q. And do you recall which ones you read?
A. I have read the York systematic reviews,



which I think -- well, I don't know if we call the one that -- this is an exact example. Right? It's analyzing standards of care. Right? I don't think they were analyzing for the safety of the standards of care development. That one.

There were two about blockers. There was one about social transition. There was the one that was from the Johns Hopkins group for the standards of care development.

There's another one. I can't remember the author. I'd have to look back, 'cause I think it he's in my bibliography.

So, yeah, six or -- six or seven, something like that.

Q. And do you recall generally what the conclusions were of the systematic reviews that you have read that assess the quality of evidence for using medical interventions to treat gender dysphoria in minors?

A. Well, it depends on the review. So I think, like, this is another thing that was -- was unexplained in the Cass report, that both of the Taylor reviews, they actually found a moderate and high quality evidence for the interventions. But that wasn't really talked about very much in the

Cass Review.

Other reviews have also come to the conclusion that there needs to be more data. And it depends on the specific thing that they're looking at.

Q. And are you able to name a single study demonstrating that any form of medical transition reduces the rate of completed suicide among any population of minors?

MR. SELDIN: Object to form. Foundation.

THE WITNESS: I really don't know how a study would look at rate of completed suicides and their reasons. I just don't think that's possible.

BY MR. RAMER:

Q. And so you would say it's pointless to even try to review literature on the connection between a form of medical transition and death by suicide; correct?

MR. SELDIN: Object to form. Misstates testimony.

THE WITNESS: I am open to somebody proposing how such a study would be done. But I have never seen that, nor can I conceptualize how that would be done.

///

BY MR. RAMER:

Q. And during your deposition in Noe versus Parson, you were asked whether you were saying that it would be pointless to even try to review literature on the connection between a form of medical transition and death by suicide.

And your answer was "Correct, yes."

Correct?

A. Yes.

Q. And sticking with Exhibit 6, which is your amicus brief, going to page 18.

And in the first paragraph -- excuse me -- in the first paragraph, about halfway down, you're criticizing the Cass Review's use of the Newcastle Ottawa scale; correct?

A. Correct.

Q. And you have never used the Newcastle Ottawa scale; correct?

A. That's correct.

Q. And going to page 24, the same exhibit, the first full sentence on this page says:

"Indeed the GRADE authors state explicitly that technically low quality evidence can and does support strong recommendations for clinical care."

Did I read that correctly?

A. Yes.

Q. You are not familiar with the paradigmatic examples in which the GRADE system says one can make a strong recommendation based on low quality evidence; correct?

MR. SELDIN: Object to form.

THE WITNESS: I'm not sure I know what that means.

BY MR. RAMER:

Q. And in your deposition in Noe versus Parson, you were asked:

"Are you familiar with the developers of the GRADE system providing the paradigm under which you can make a strong recommendation based on low quality evidence?"

And your answer was "no"; correct?

A. Correct.

THE REPORTER: 11.

(Deposition Exhibit 11 was marked for identification by the court reporter.)

BY MR. RAMER:

Q. And, Dr. Olson-Kennedy, you've been handed what's been marked Olson-Kennedy Exhibit 11; correct?

A. Correct.

Q. And is this one of the Taylor systematic



reviews you were referencing earlier?
A. Yes.
Q. And on the first page under the aim, you can see that this was a systematic review conducted to examine the quality and development of published guidelines or clinical guidance containing recommendations for managing gender dysphoria/incongruence in children and/or adolescence age zero to 18.
Correct?
A. Yes.
Q. And if you go to the second page of this document, and the right column, under the blue quality appraisal, there's a sentence, and then there's a sentence that begins with "We used."
Do you see that?
A. I do.
Q. It says:
"We used the Appraisal of Guidelines for REsearch & Evaluation (AGREE) II instrument to assess quality"; correct?
A. Correct.
Q. And you're not familiar with the AGREE II scale; correct?
A. I am not.

Q. And sticking with this exhibit, I'd like to go to page 5 and specifically Table 1.
And do you see there is a column entitled "Rigor of Development"?
A. Yes.
Q. And in that column, the highest scoring guidelines for rigor of development are the guidelines from the Swedish National Board of Health & Welfare, 2022; correct?
A. Yes.
Q. You are not familiar with those guidelines, are you?
A. I am not.
Q. And returning to Exhibit 6, which is your amicus brief.
I'd like to go to page 21.
And second full paragraph, first two sentences, I'll read them and ask if I read them correctly.
It says:
"There are also ethical barriers to RCTs. If participation in a research study is the only way to access medically affirming interventions that have substantial evidence demonstrating their effectiveness, the result is coercion, which is

condemned by medical and scientific ethical rules."
Did I read that correctly?
A. Yes.
Q. And this is a point that is made in your paper that's referenced in footnote 3 of this brief; correct?
A. I'm sorry. You're going to have to walk me back again. Which paper? This one?
Q. The paper that this brief is adapted from.
A. Oh, oh, oh. Okay.
Q. And my question is just this point that I just read, that's something that's also made in your paper; correct?
A. Yes.
Q. And that's a part of the paper that you wrote; correct?
A. Correct.
Q. And would you agree that the point you make in this paragraph assumes that medically affirming interventions have substantial evidence demonstrating their effectiveness?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And so if the purpose of the RCT is to

determine whether there is evidence of effectiveness, there would not be an ethical barrier; correct?
MR. SELDIN: Object to form.
THE WITNESS: The ethical barrier is what's recommended in --
The ethical barrier is twofold. The first one is, you can't randomize someone to no treatment when there is existing treatment. That has been demonstrated both empirically and clinically to be effective. That's the first piece.
The second piece that -- what you see here, is talking about only making access available to someone who participates in research because that's coercion.
BY MR. RAMER:
Q. And it's only coercion, though, if the intervention at issue has substantial evidence of effectiveness; correct?
A. No. I don't think you can ever say to someone, you can only access this if you're in a research protocol. That's not how medicine works.
Going back to what I said before, is that clinical care far outpaces empirical evidence. It -- there's more of an abundance of it. And it also has to be a predecessor to scientific investigation.



So I don't really know how you would say to someone, you can only have this access if you're in a research trial.

Maybe in the case of cancer or something like that, but I'm not familiar with that domain of medicine.

But as far as I know, requiring people to be in research is coercion.

Q. And that point applies not just to gender-affirming medical interventions, but to all medical interventions; correct?

A. I can't speak for every single medical intervention. But in general, not allowing people access to care except through a research protocol is a problem.

Q. And I just -- to make sure we're not quibbling over the word "care," when you use the word "care," are you -- does the word "care" in your view carry with it some sort of sense of established evidence showing effectiveness?

A. As opposed to?

Q. A medical intervention where we don't know whether it's effective or not.

A. I don't know. I haven't lived in the world. I think the only place where that happens is like

experimental drugs and cancer treatment, where they have, like, okay, we can try this, but we're not guaranteeing it's going to work, or something like that.

But that's not my field of expertise.

Q. Well, in the context of an experimental drug where they're saying, we can try this, and it might work, but it might not, do you think that limiting the use of that experimental drug to research trials is coercive?

MR. SELDIN: Object to form.

THE WITNESS: I don't know. I'd have to think about that for a longer period of time.

BY MR. RAMER:

Q. What would you need to think about?

A. I'd have to think about a scenario in which that happened, which I don't know of any. And so that makes it hard for me to form an opinion about.

Q. And so if it were the case that gender-affirming medical interventions did not have substantial evidence demonstrating their effectiveness, you could not say that limiting the use of those interventions to a research trial is coercive; correct?

MR. SELDIN: Object to form.

THE WITNESS: That was a long sentence.

I -- so, for example, I have no idea if when, for example, the Dutch started using blockers for youth with gender dysphoria, if everyone was enrolled in a study.

My guess is probably what happened was that they collected data routinely and then went back and looked at it. In other words --

I don't know this for sure, but a lot of times what happens is people are collecting data in the course of their clinical care, and then they go back and analyze it. And they don't say, we're prospectively enrolling people and we're going to watch what happens to them.

It's, we're -- we're doing this clinical care, and we utilize these tools at different time points.

I don't know if that's what they did or not.

I think that, again, the situation in these countries that have a national health system, are very different than the ones in the United States.

BY MR. RAMER:

Q. And so you think it's possible that the Dutch researchers began --

Let me back up.

You think it's possible that the Dutch clinicians began prescribing puberty blockers as a treatment for gender dysphoria before they began studying it as part of a research trial?

Is that correct?

MR. SELDIN: Object to form.

THE WITNESS: I know that the first thing that the Dutch ever published was a case review, and that's not a prospective trial. That's the situation of one individual.

So I can't answer whether they did or not, but I do know that their first publication about this was not a prospective longitudinal trial.

BY MR. RAMER:

Q. Do you think it would be unethical to conduct a research trial with two arms, where one arm --

Let me back up.

In the context of adolescents with gender dysphoria, do you think it would be ethical to perform a research trial where there are two arms to the trial. One arm is referring to psychotherapy; one arm is receiving psychotherapy and medical interventions?

A. Well, there have been studies like that that

MAGNA LEGAL SERVICES

have looked at exactly those comparisons.
But are you talking about like you never giving me medical intervention and -- or over time, you're going to get medical intervention?
I don't think it's ethical to say, you're not going to get any medical intervention ever. And it's not only unethical, it's not feasible.
Q. What's not feasible?
A. To enroll people into a mental health only arm.
Q. Why is that not feasible?
A. Because they wouldn't want to do it.
Q. And when you say there have been studies conducting that type of research, are you referring to anything other than the Costa study?
A. I think that -- I have to look through the study specifically. But I think Van Der Miesen did this also.
Q. And -- so you say it would -- just to back up and answer -- the question is: That type of question is ethical; correct?
A. The one -- the Costa study? C-o-s-t-a?
Q. If the Costa study is a study like the one that I described of two arms, one arm receiving psychotherapy, another receiving psychotherapy and

medical interventions, that study is ethical; correct?
MR. SELDIN: Object to form.
THE WITNESS: I don't remember if the follow-up with the psychotherapy-only arm was intended to get treated. I don't remember that. I have to go back to the paper.
If it was never intended to get care, I would not think that was ethical actually.
BY MR. RAMER:
Q. What if the study was designed that they would receive care when they turn 18?
A. Maybe.
Q. Maybe what?
A. Maybe that could be ethical. I'd have to see it to -- to make that determination.
Q. Because what gives you concern about that type of study?
A. I think a type of study that does not allow people access to care when they first engage in care, is really problematic for people. We know that untreated gender dysphoria is really harmful.
And so what we're talking about is over, you know, a hundred years or more, psychotherapy is the sole intervention, as monotherapy is not effective.

There have never been studies demonstrating that. It is not effective in eradicating or significantly decreasing gender dysphoria.
So now you're talking about randomizing an arm of the study into something that we know is harmful, which is gender dysphoria, with a treatment that has never been proven to be successful.
Q. So to break that down, for one, you could conduct a study, like the one I'm describing, without randomizing patients; correct?
A. Yes, you could.
Q. And did I understand in your answer -- did you say something that there have been studies for a century saying that psychotherapy doesn't work for gender dysphoria?
A. There have been -- the predominant issue, when gender dysphoria, transgender experience moved into the world of medicine and science, people thought that psychotherapy was what would make people not be trans anymore. And that's never been demonstrated to be true.
It did not talk about gender dysphoria in the way that we're talking about it today.
But because being gender incongruent was considered psychopathological, the efforts were aimed

at therapy, psychiatry, mental health therapy, sexology. All of those things.
And over that time, there has never been a study demonstrating that psychotherapy alone manages gender dysphoria.
Q. Do you agree that there's a distinction between psychotherapy with the purpose of making someone not transgender and psychotherapy with the purpose of resolving somebody's distress associated with gender dysphoria?
A. Yes, there's a difference between those things.
Q. And I'm talking about the latter category, the psychotherapy that is done for the purpose of resolving distress associated with gender dysphoria.
And my question is: Do you think that qualifies as care for gender dysphoria?
A. Not by itself. I think that psychotherapy can help people manage their distress. But I don't think it is eliminating the consternation that they feel about the misalignment.
Q. What's the basis for that opinion that you just gave?
A. A hundred years of people trying to do that. And when medications became available, people used



them to close that gap. And have been for 90 years, 80, 90 years.
Q. And so, just to make sure I understand. Your opinion is that psychotherapy to help resolve distress associated with gender dysphoria is ineffective based on studies from the last 80 to 90 years; is that right?
MR. SELDIN: Object to form.
THE WITNESS: The lack of studies that demonstrate that.
And there's not -- in the world of clinical care, even people that this was their whole life's work actually have not --
They -- maybe there's one example or two examples, but there is not even scant evidence of that.
BY MR. RAMER:
Q. Scant evidence of what?
A. Of psychotherapy resolving gender dysphoria.
Q. Then why do we do it?
A. Because it's partnered with medical interventions. Because you can help move that gap to a closer place and help people manage their anxiety related to it.
Those things can go hand-in-hand, and they

do, especially with youth care. They go hand-in-hand. The -- it's -- it is not -- it's not -- it's never been shown that psychotherapy alone manages gender dysphoria.
Q. And your opinion is that it has been demonstrated that it does not; is that right?
A. Yes. That's correct.
Q. And is it your opinion that the --
Just backing up.
If -- is it your opinion that medical interventions are necessary in every patient to treat gender dysphoria?
MR. SELDIN: Object to form.
THE WITNESS: I -- I can't possibly answer that because I haven't met everybody with gender dysphoria.
The people in my practice, they needed medical interventions.
BY MR. RAMER:
Q. All of them?
A. The people with gender dysphoria, yeah.
Q. And I'd like to return to your declaration, which is Olson-Kennedy Exhibit 1.
And I'd like to go to page 9 and paragraph 34.

And there you say:
"Under the WPATH SOC and other well-accepted clinical practice guidelines for the treatment of gender dysphoria, care should be provided using an individualized approach."
Did I read that correctly?
A. Yes.
Q. And can you explain what it means to use an individualized approach to providing care?
A. That the needs of each person are not identical to the needs of each -- of other people; that the recommendations that we make have to be specific for the individual that's in front of us.
Q. And so basically no two patients are the same; is that right?
A. That's correct.
Q. And every patient has to be evaluated as an individual based on the patient's history, comorbidities and relationships, among many other variables; correct?
MR. SELDIN: Object to form.
THE WITNESS: Correct.
THE REPORTER: Exhibit 12.
(Deposition Exhibit 12 was marked for identification by the court reporter.)

BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy Exhibit 12; correct?
A. That's correct.
MR. SELDIN: And, Mr. Ramer, I'm just going to interrupt for a moment.
This appears to be something not included on the list you recently disclosed. I would just ask that we have a couple minutes to review it.
MR. RAMER: I'm fine with allowing you to review it. This was used as an exhibit during Dr. Olson-Kennedy's Noe v Parson deposition, which is included in the documents we identified.
But happy to go off the record and allow a chance to review it.
MR. SELDIN: No, I appreciate that clarification. Thank you.
A minute would be fine, then.
MR. RAMER: Go off.
THE VIDEOGRAPHER: The time is 1:05 p.m.
We are off the record.
(Off record.)
MR. SELDIN: We're fine now.
THE VIDEOGRAPHER: One moment, please.



The time is 1:06 p.m.
We are back on the record.
BY MR. RAMER:
Q. Dr. Olson-Kennedy, the document marked as Olson-Kennedy Exhibit 12 is a New York Times article entitled "Biden Administration Opposes Surgery for Transgender Minors"; correct?
A. Yes.
Q. And you've seen this article before; correct?
A. I have.
Q. And the first sentence below the you had been granted access, starts with "the Biden Administration."
Do you see that?
A. I do.
Q. And I'm going to read that sentence first and ask whether I read it correctly.
It says:
"The Biden Administration said this week that it opposed gender-affirming surgery for minors, the most explicit statement to date on the subject from a president who has been a staunch supporter of transgender rights."
Did I read that correctly?

A. You did.
Q. And it's your understanding that this statement had come from a staffer; correct?
A. I had heard that. I have no idea who the statement came from, except from these authors at the New York Times.
Q. And where did you hear that it came from a staffer?
A. I don't remember.
I was trying to figure out where I could even see this, and I couldn't find it. And I saw a lot of speculation online, so I have no idea.
And the speculation was that it came from a staffer. I don't really actually know what it means when something comes from an administration. I think that's a very vague comment.
Q. That's a fair point.
And so the assertion that it came from a staffer, you were saying was something that you saw online; is that right?
A. Yes.
Q. Are you familiar with Dr. Jack Turban?
A. I -- I know Jack.
Q. Do you know him well?
A. I don't know about well. I mean, we're --

we're colleagues, but...
Q. Do you think he's a reliable source of information?
A. I do.
Q. And have you spoken with him before?
A. Yes.
Q. Are you familiar with Dr. Helen Webberley?
A. Yes.
Q. Who is she?
A. Helen Webberley was a -- is. I shouldn't say "was." She's still alive.
She is a doctor in the U.K., who was practicing gender-affirming care outside of the NHS.
Q. And have you spoken with her before?
A. Mm-hmm.
Q. And --
A. Yes.
Q. Sorry.
Go ahead.
A. Yes, I have.
Q. And do you think that she's a reliable source of information?
A. I don't really know Helen that well. I think that my understanding generally of her, is that she is a fine person. I really can't comment further

than that.
Q. Do you respect her as a medical professional?
A. Yes.
THE REPORTER: Exhibit 13.
(Deposition Exhibit 13 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy Exhibit 13, which you can see at the top is from genderGP.com.
Do you see that?
A. I do.
Q. Have you seen this document before?
A. I have not.
Q. I'll represent to you that it's a transcript from a podcast that Dr. Turban did with Dr. Webberley and another individual.
And my questions relate to page 11 of this document.
MR. SELDIN: And, Mr. Ramer, has this been previously marked at a deposition?
MR. RAMER: It had -- not to my knowledge.
MR. SELDIN: Okay.



BY MR. RAMER:
Q. And on page 11, toward the bottom of the page, you see there's a paragraph that begins "Dr. Helen Webberley."
Do you see that?
A. Yes.
Q. And the second sentence starts with "I'd love to talk to you."
Do you see that?
A. Yes.
Q. And it says:
"I'd love to talk to you all day, but we haven't got all day, but Marianne and Abby and I went over to Los Angeles to listen to Johanna Olson-Kennedy, and Aiden and Darlene Tando to talk."
Did I read that correctly?
A. Yes.
Q. And who is Aiden?
A. I'm assuming that she's talking about my husband.
Q. And who is Darlene Tando?
A. She is a therapist in San Diego that works with transgender young people and their families.
Q. And what event is it that Dr. Helen Webberley would have attended where you, Aiden and

Darlene Tando were speaking?
A. Well, we speak together frequently. We do trainings together.
Q. Do you recall Dr. Helen Webberley attending one of your trainings?
A. Not really.
Q. And continuing with this paragraph, it says:
"In jest, I've said it before, I say it again. So inspirational, you know, absolutely.
"And so you said a couple of things, but if I was wanting to, if I was rewriting the rule book for transgender care, I think, you know, they've coined it, and you've added to it today.
"And basically Johanna has just said, look, if your kid -- if your kid tells you that they're trans, they most likely are. Just believe it."
Did I read that correctly?
A. You did.
Q. Is that something you said?
A. It could've been something I said. I don't remember this time specifically, but yes.
Q. That's something you believe, though?
A. Yes.
Q. And next paragraph below that, there's an answer from Dr. Jack Turban. And I'll just read the

first two sentences of that. It says:
"Yeah, I was really talking around it and not naming names, but that model does exist in the U.S., right? So Dr. Olson, that's her model."
Did I read that correctly?
A. You did.
Q. In an Informed Consent model of care, so long as the patient provides Informed Consent for an intervention, the provider will provide that intervention; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And in a gatekeeping model, there may be times where a patient can provide Informed Consent, but the provider will determine that the patient is not a good candidate for a particular intervention; correct?
MR. SELDIN: Object to form.
THE WITNESS: I actually think that can happen in an Informed Consent model, too.
BY MR. RAMER:
Q. Can you explain how that's possible?
A. Well, I -- I think that there's this binary of -- there's these two models, Informed Consent and

gatekeeping.
But I don't think that's true because I don't follow either of those models.
I think that there is a model where an assessment happens, and recommendations are made based on that assessment.
So I think that -- I think of a gatekeeper model more as like the mental health provider that you're working with can keep somebody from getting care.
That feels really different to me than, oh, you're assessing somebody, and then you're making a recommendation based on what you've gleaned from that assessment.
Assessment, assessments, that's, in my -- in my model, that's what we utilize.
Q. What's a situation where a patient could provide Informed Consent or informed ascent, but you would deny the intervention based on the assessment?
MR. SELDIN: Object to form.
THE WITNESS: I think this goes back to what I was saying before, that if somebody thinks, for example, like, oh, I'm going to take medication and it's going to change "X," and -- and I say, well, no, it's not actually. This is not a good idea for you.



Then that would be an example.
BY MR. RAMER:
Q. But a person who misunderstands what the intervention actually does is not capable of providing Informed Consent; right?
A. Well, I think it's important here to remember that Informed Consent models are really about adult care. There aren't adolescent Informed Consent models, 'cause they can't legally provide Informed Consent related to gender care.
Their parent or guardian has to do that. They also sign the consent form, but that's not legal.
Q. When you say "that's not legal," you mean that doesn't establish legal consent. Is that what you're saying?
A. Correct.
Q. And is there ever a situation where a minor could provide informed ascent, the parent or caretaker could provide Informed Consent, but you would deny the intervention based on an assessment?
A. Yes.
Q. And what examples can you give me?
A. It's rare. Let me try to see if I can think of some examples.

Somebody could, for example, have a preexisting condition that might make the decision to take hormones problematic.
I think that there are some times when people cannot tolerate all the mechanisms of -- any of the mechanisms of delivery, might be really problematic.
I think sometimes people can't afford the interventions if they're not covered by their insurance.
There's probably others.
Q. In the context of somebody with a preexisting condition that would have a negative interaction with hormones --
A. Mm-hmm.
Q. -- for example, what if the patient said, I completely understand all of this, but the distress I'm experiencing from my gender incongruence is so severe, that to me it is worth the risk, would you still deny the intervention?
MR. SELDIN: Object to form.
THE WITNESS: I think it depends on what the risk is.
BY MR. RAMER:
Q. What's an example of a risk where you would

deny the intervention?
A. Like if somebody had a -- for example, a clotting disorder. Let's say they had a hypercoagulable situation where they had the experience of blood clots, and they wanted to take estrogen. This has been a time when we've denied care.
Q. So how do you treat that person?
A. Well, usually what we would do is put them maybe on an antiandrogen, something that would still, for example, support their bone density but wouldn't necessarily feminize their bodies.
There's been a -- there was a situation with a patient that I had with androgen insensitivity syndrome.
Well, would -- how are we going to masculinize that person? We just can't, because they have no androgen receptors. Testosterone is going to be ineffective in their body. And so we would not give them interventions.
Those are just a few examples.
For people with coagu- -- coagulation issues, we work with the hematologist to figure out if there are ways. Maybe that person goes on Heparin or some kind of other blood thinner that minimizes

their risk of blood clots.
But there are some situations where medically you either have to sort things out first, or you -- there's nothing you can do.
BY MR. RAMER:
Q. You can't provide them psychotherapy?
A. Well, you can, but almost everybody gets psychotherapy anyway.
Q. And --
A. Does that resolve their gender dysphoria? No.
Q. What happens to them if they cannot obtain medical interventions but receive psychotherapy?
A. Well, it's only happened once in my clinic.
One time with somebody with androgen sensitivity syndrome. And I never saw them after the first visit, because medical interventions were off the table for them. That person could go on to get chest surgery, and that would probably significantly help their gender dysphoria, at least to have a flat chest.
Q. So what do you think Dr. Turban is talking about when he says to Dr. Olson, "That's her model"?
A. I -- I have no idea what he's talking about.
Q. And are you familiar with the gender clinic



Page 130

at Brown University?
A. Very minimally.
Q. Do you have an understanding of what their clinical model is?
A. Well, Brown's clinic, my understanding is it's a clinic for adults. And so there are several clinics around the country for adult care that act on an Informed Consent model.
Q. And so if Dr. Turban were saying that you operate on an Informed Consent model, that would be incorrect; is that right?
A. Yes.
MR. SELDIN: Object to form.
THE WITNESS: Oh, sorry.
Yes.
THE REPORTER: Exhibit 14.
(Deposition Exhibit 14 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
MR. RAMER: And, Counsel, I'll represent that the top of your copy was cut off, but that the witness -- the exhibit has the case number at the top.
MR. SELDIN: Okay. Thank you.
///

Page 131

BY MR. RAMER:
Q. And, Dr. Olson-Kennedy, you've been handed what's been marked as Olson-Kennedy Exhibit 14; correct?
A. Yes.
Q. And this is an expert declaration that you submitted in the case, Dekker v Marstiller; correct?
A. Yes.
Q. And I'd like to go to page 12 and the carryover paragraph at the top, the first full sentence. I'll read it first and ask if I read it correctly.
It says:
"The WPATH SOC have been endorsed and cited as authoritative by most major medical associations in the United States, including the American Medical Association, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the Pediatric Endocrine Society, the American College of Physicians and the American Academy of Family Physicians, among others."
Did I read that correctly?
A. Yes.
Q. And going back to your declaration in this case, Exhibit 1, on page 9, paragraph 32, I'll read

Page 132

that and ask if I read it correctly.
It says:
"The WPATH SOC have been cited as authoritative by the major medical associations in the United States, including the American Academy of Pediatrics, the American Medical Association, the American Psychiatric Association, the American Psychological Association, The Endocrine Society, the Pediatric Endocrine Society, the American College of Physicians, and the American Academy of Family Physicians."
Did I read that correctly?
A. Yes.
Q. And so in Dekker, you said that all of these organizations had endorsed the WPATH SOC, but you do not say that in your declaration in this case; correct?
A. Correct.
Q. And why did you remove the assertion that the WPATH SOC were endorsed by these major medical associations?
MR. SELDIN: Object to form.
THE WITNESS: Well, what happened was that I think that in the process of one of these depositions or something, it was brought to my attention that

Page 133

endorsement is a technical -- actually has rather than, like, oh, yeah, I endorse that, meaning I agree with it. Because it is a technical word, I wasn't sure if they had, this is our endorsement of these guidelines.
And so I took it out.
BY MR. RAMER:
Q. And so do you agree that it was wrong in Dekker to say that those organizations endorsed the WPATH SOC?
MR. SELDIN: Object to form.
THE WITNESS: Just depends on how you're using the word.
BY MR. RAMER:
Q. If you think it could be used correctly, why did you take it out of your declaration in this case?
MR. SELDIN: Object to form.
THE WITNESS: I just didn't want to confuse anyone. There's not -- like I said, there's not like the stamp of endorsement on the -- the WPATH guidelines.
I use the word "endorse" as a just colloquialism for we agree with these, we think these are a good idea. That's why.
///





BY MR. RAMER:
Q. And so it's your opinion that these medical organizations have endorsed the WPATH SOC; is that right?
A. With the colloquial meaning of "endorse," yes.
Q. And you're a member of the American Academy of Pediatrics; correct?
A. I am.
Q. Were you involved with AAP's review of the WPATH Standards of Care 8?
A. No.
Q. Do you know who was?
A. No.
Q. You don't know whether Jason Rafferty was involved?
A. Yes. I -- that -- I didn't know that that was the specific thing that he did.
Q. Are there any other names that were involved that you know of?
A. I didn't actually even know that happened.
What I know is that Jason wrote something about it. But I don't -- I didn't know that there was a formal process where the AA- -- that's what I mean by "endorsement."

I didn't know if there was a formal process where the AAP said, let's look through the SOC 8 and do whatever the word was that you described it.
MR. SELDIN: And, Mr. Ramer, I'm sorry to interrupt.
I'll just note for the record that these two lists are slightly different in terms of what's included and what's not.
I know you read them out, but just --
(Reporter clarification.)
MR. SELDIN: I apologize.
I'm just noting for the record that Mr. Ramer read out the different lists of medical organizations across the declarations. I don't believe they're exactly identical.
THE WITNESS: I think it might just be in just a different order.
MR. SELDIN: American Academy of Pediatrics.
MR. RAMER: Got it. Thank you.
MR. SELDIN: Not to be that guy, but...
MR. RAMER: We're lawyers, we all have to be.
Q. And do you know Jason Rafferty?
A. I do.
Q. Have you worked with him?

A. I have not.
Q. Have you ever discussed the use of puberty blockers as a treatment for gender dysphoria with a representative from a pharmaceutical company?
A. Yes.
MR. SELDIN: Object to --
THE WITNESS: Oh.
MR. SELDIN: Object to form.
You can answer.
THE WITNESS: Yes, I have.
BY MR. RAMER:
Q. Which company?
A. Endo Pharmaceuticals.
Q. And what was the context of that discussion?
A. Endo Pharmaceuticals asked me to come and give a presentation to their reps. I actually don't remember who the audience was, but it was educational.
Q. Did you get paid for that?
A. I did.
Q. Do you recall how much?
A. No. It's a really long time ago.
Q. And do you know Dr. Kara Connelly?
A. I do.
Q. Was she at that event?

A. I have no memory of that.
Q. And what was the substance of your presentation?
A. Transgender Care 101.
Q. And Endo Pharmaceuticals develops drugs that are used as puberty blockers; correct?
A. Yes.
Q. And apart from the presentation that you gave, you have never spoken about the use of puberty blockers as a treatment for gender dysphoria with any other representative of the pharmaceutical company; is that correct?
MR. SELDIN: Object to form.
THE WITNESS: Many years ago, I discussed the possibility of Endo Pharmaceuticals sponsoring a study so that we could get FDA approval specifically for gender dysphoria.
That's the only contact I've had with them.
BY MR. RAMER:
Q. What about any other pharmaceutical companies?
A. I don't think so. Not that I can remember offhand.
Q. And what was the result of the attempt to get Endo to sponsor the study for FDA approval?



A. They did not want to sponsor a study for the FDA approval.
Q. Do you recall why?
A. They said that they did not want to tolerate the bad press.
Q. Do you think that is a good reason for not sponsoring a study?
MR. SELDIN: Object to form.
THE WITNESS: A hundred percent no.
BY MR. RAMER:
Q. And have you tried to persuade Endo Pharmaceuticals since then, or any other pharmaceutical company, to sponsor a study to get FDA approval for puberty blockers?
A. No, not that I recall.
Q. Going from puberty blockers to cross-sex hormones, have you ever discussed the use of cross-sex hormones as a treatment for gender dysphoria in minors with a representative from a pharmaceutical company?
A. The same thing that I just talked about, Endo Pharmaceuticals.
Q. The presentation and then the attempt to get the study; is that right?
A. Mm-hmm. But the attempt to get the study

was not about gender-forming hormones. It was just about blockers.
Q. And, Dr. Olson-Kennedy, I think that's all the questions that I have for now.
And so I'll turn it over to pass the witness.
MR. SELDIN: Thank you.
I suspect that I have nothing, but if you'll give me five minutes.
MR. RAMER: Absolutely.
THE VIDEOGRAPHER: Off the record then?
MR. RAMER: Yes.
THE VIDEOGRAPHER: The time is 1:30 p.m.
We are now off the record.
(Off record.)
THE VIDEOGRAPHER: One moment, please.
The time is 1:32 [sic] p.m.
We are back on the record.
MR. SELDIN: Counsel for plaintiffs does not have any questions for Dr. Olson-Kennedy, but we will read and sign.
MR. RAMER: And thank you very much for your time today, Dr. Olson-Kennedy.
THE WITNESS: You're welcome.
THE VIDEOGRAPHER: One moment, please, and

I'll take us off the record.
This concludes today's videotaped deposition of Johanna Olson-Kennedy.
The time is 1:31 p.m.
We are now off the record.
THE REPORTER: Mr. Seldin, are you ordering a copy of the transcript?
MR. SELDIN: Yes. Thank you.
THE VIDEOGRAPHER: And will you need video?
MR. SELDIN: Yes, please. I'll have what he's having.
THE REPORTER: Just to be clear, you want it expedited also?
MR. SELDIN: Yes. Whenever they're getting theirs, I would like it as well.
Thank you.

DECLARATION UNDER PENALTY OF PERJURY

I, JOHANNA OLSON-KENNEDY, M.D., do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on October 7, 2024; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this _____ day of ________________, 20___, at _______________________ , California.

JOHANNA OLSON-KENNEDY, M.D.




REPORTER'S CERTIFICATION

I, Marceline F. Noble, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 13th day of October, 2024.

_______________________________

Marceline F. Noble, CSR No. 3024

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change:_______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change:_______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: ______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: ______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change:_______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: ______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: _____________________________

SIGNATURE:______________________DATE_____________

JOHANNA OLSON-KENNEDY, M.D.

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change:_______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change:_______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: ______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: ______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change:_______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: ______________________________

Page No._____Line No._____Change to:_______________

______________________________________________

Reason for change: _____________________________

SIGNATURE:______________________DATE_____________

JOHANNA OLSON-KENNEDY, M.D.





**A**

**A-2**
31:10
**A-3**
31:13
**A-4**
31:18
**A-6**
30:24
**a.m**
1:16 6:3,15 47:7,11
    49:9,14 53:22 54:4
    93:7
**AA-**
134:24
**AAP**
135:2
**AAP's**
134:10
**Abby**
3:7 7:14 122:13
**ability**
61:24 90:22
**able**
81:1 99:6
**Abnormal**
82:14
**absolutely**
27:25 78:9 123:9
    139:10
**abundance**
105:24
**academic**
73:13 74:11
**Academy**
131:21 132:5,10
    134:7 135:18
**acarolan@selendy...**
2:12
**acceptance**
90:16 91:10,13,15
**access**
103:23 105:12,20
    106:2,14 111:20
    118:13

**accesses**
83:14
**accessing**
82:5
**accurate**
23:11 37:19 46:4
    48:25 51:24 64:25
    65:23
**accurately**
58:2,3,21
**acknowledged**
35:6
**acknowledging**
18:12
**ACLU**
1:14 6:16 7:1,24
**act**
130:7
**activities**
31:19 33:4
**actual**
31:22
**adapted**
104:9
**add**
62:3 78:6 81:12
**added**
10:7 123:13
**additional**
10:5,7 44:23,24 45:5
    59:17 60:2
**administration**
5:4 118:6,14,20
    119:15
**adolescence**
11:7 24:20 25:13,21
    26:6,20 27:18 30:13
    36:18,20 37:4 59:1
    59:6,11 70:15 79:13
    102:8
**adolescent**
22:11,12 60:20 82:11
    82:16 126:8
**adolescent's**
60:20
**adolescents**

18:15 28:2 36:11
    44:2 70:22 71:3,7
    73:8 74:7 75:17
    81:9 82:16 109:19
**adult**
81:6 87:20 126:8
    130:7
**adulthood**
30:13 36:20
**adults**
130:6
**affiliated**
95:4
**affirmation**
28:9,16,21 35:7
**affirming**
103:23 104:19
**afford**
127:8
**age**
18:9,24 72:25 80:2,8
    80:23 81:5 84:20
    87:24 88:3 102:9
**ago**
33:8,17 85:4,4,5
    136:22 137:14
**agonists**
73:4
**agree**
9:20 16:14 19:2,8,16
    19:17,21 20:4,7
    21:6,21,25 22:10,15
    22:18,20 24:3 25:9
    25:14,15 26:10,21
    26:24 27:12 30:25
    39:17,19 42:23 44:9
    52:2,12,17,23 53:9
    54:14,24 55:2,5,13
    56:2,8,14,19,25
    60:15,25 62:19 63:4
    63:10,16,21 64:2,25
    66:2 70:13 95:8
    102:20,23 104:18
    113:6 133:2,8,23
**ahead**
7:6,9 120:19

**Aiden**
122:15,18,25
**aim**
9:2 72:22 102:3
**aimed**
73:23 112:25
**AIMS**
72:17
**Aine**
2:9 7:3 17:13
**al**
1:5,9
**Alan**
1:8 6:10
**align**
92:18
**aligned**
42:16 91:24
**aligns**
89:7
**alive**
120:11
**allow**
111:19 117:15
**allowing**
106:13 117:11
**allows**
37:10
**ameliorate**
72:23
**American**
2:3 131:16,17,18,20
    131:20 132:5,6,7,7
    132:9,10 134:7
    135:18
**Americas**
2:10
**amicus**
4:18 16:3,9,15 18:1
    44:16 48:5 93:18
    100:11 103:15
**amount**
51:14
**analogs**
51:5,18 54:10 64:14
    79:15



**analyze**
108:12
**analyzing**
98:3,4
**and-**
2:8,19
**and/or**
102:8
**androgen**
128:14,18 129:15
**Angeles**
1:15 6:1,17 50:6 122:14
**anger**
64:3
**answer**
5:13 9:4 11:19,23 22:4 26:8 36:11 37:17 43:3 48:23 51:12 52:10 57:24 67:12 69:20 100:7 101:16 109:11 110:20 112:12 115:14 123:25 136:9
**answered**
27:13 61:10 67:11 92:21
**antiandrogen**
128:10
**anxiety**
22:21 89:1,5,8,14 114:23
**anybody**
17:22 39:3 59:8
**anymore**
37:12 89:3 112:20
**anyway**
129:8
**apart**
9:17 58:20 65:22 94:9 137:8
**apologize**
53:15 135:11
**appear**
13:17 14:22 16:9 141:8
**appearance**
90:16 91:2,5,10,22 91:23
**APPEARANCES**
2:1 3:1
**appears**
24:4 46:20 53:17 117:8
**applicable**
23:17
**application**
4:23 72:4
**applies**
106:9
**appraisal**
102:14,19
**appreciate**
71:25 117:17
**approach**
116:5,9
**appropriate**
18:8,15,23 86:12,20
**approval**
137:16,25 138:2,14
**areas**
42:3 77:11
**arm**
109:17,22,23 110:10 110:24 111:5 112:5
**arms**
109:16,21 110:24
**article**
5:4 118:5,9
**ascent**
125:18 126:19
**aside**
74:1
**asked**
25:9 26:10 27:10,11 43:18 45:19 61:9 66:21 67:11 68:18 69:12 84:14 92:16 100:3 101:11 136:15
**asking**
19:13 21:12 71:22 78:15,18
**assent**
50:8
**assert**
26:5 94:7
**assertion**
119:18 132:19
**assertions**
94:9
**assess**
62:14 97:19 98:17 102:20
**assessing**
93:22 95:2,9 125:12
**assessment**
86:18 125:5,6,14,15 125:19 126:21
**assessments**
125:15
**assigned**
21:19 35:22 36:4
**associated**
96:10 113:9,15 114:5
**association**
46:1 47:25 131:17,17 131:18 132:6,7,8
**associations**
131:15 132:4,21
**assumes**
104:19
**assuming**
16:18 122:19
**assumption**
25:1
**attack**
54:21 55:6,11,23 63:5
**attempt**
89:24 137:24 138:23 138:25
**attended**
122:25
**attending**
123:4
**attention**
132:25
**attorney**
1:8 2:20 3:6 6:23 7:12,18
**audience**
136:17
**augmentation**
92:18
**Australia**
42:25 43:4,20
**author**
98:11
**authoritative**
22:25 23:6 131:15 132:4
**authors**
95:4 100:22 119:5
**available**
73:15 74:19 82:8 105:12 113:25
**Avenue**
2:10,16
**avoid**
73:6
**awaiting**
7:20
**aware**
27:16 28:1 48:17 90:23

**B**

**back**
17:5 27:23 39:18 40:3,18 44:17 47:10 47:12 49:14,17 54:5 65:11 69:25 81:4 82:19 87:17 93:13 93:15 98:11 104:8 105:22 108:7,12,25 109:18 110:19 111:7 118:2 125:21 131:24 139:18
**backing**
115:9
**backwards**
92:11



**bad**
138:5
**ballpark**
82:25
**ban**
14:12 46:2 47:23
**banned**
44:10
**bar**
7:20
**barrier**
105:2,4,6
**barriers**
103:21
**based**
58:8 60:6 70:16,23 73:14 74:12 75:3,22 75:24,25 76:5 80:4 86:17 101:4,14 114:6 116:18 125:6 125:13,19 126:21
**basically**
58:6 116:14 123:14
**basis**
19:3,9 83:22,25 113:22
**began**
69:24 70:3,14,21 75:12,16 108:24 109:2,3
**beginning**
1:15 12:1 27:8 30:21 50:16,19 68:17
**begins**
6:8 45:20 52:3 61:22 62:25 94:17,19 102:15 122:3
**behalf**
1:14 6:25 7:2,4 16:4 16:10 48:20
**believe**
9:15 44:12 46:23 54:12 71:17 72:1 123:16,22 135:15
**Ben**
3:6 7:17
**best**
18:11 90:22
**better**
75:4 76:7 92:18
**biased**
95:15,16,17,18
**bibliography**
98:12
**Biden**
5:4 118:6,13,20
**billed**
94:25
**binary**
124:24
**biological**
19:3,9,12,18
**birth**
20:19 21:15,19 35:23 36:4 92:12
**bit**
10:23 42:21 87:15
**bleeding**
82:14
**blocked**
51:7 84:16 86:2
**blockers**
27:18 28:3 44:10 46:2 47:24 52:3,13 58:25 59:5,8,11,14 59:19 60:12,16 69:24 70:14,25 74:6 75:12 76:20,24 79:11 80:14 87:2,7 88:8,17 89:5,13 98:6 108:3 109:2 136:3 137:6,10 138:14,16 139:2
**blood**
52:19 53:3,14 54:19 54:24 55:10,19 56:3 63:1 80:7 128:5,25 129:1
**blue**
102:13
**BMA**
47:22 48:13,17
**BMJ**
46:21
**Board**
103:8
**bodies**
36:18 128:12
**body**
36:2,7 42:15 88:8 92:18 128:19
**bold**
60:12 64:21 72:16 93:20
**bone**
80:8 128:11
**book**
123:11
**bottom**
24:11 72:13 122:2
**Box**
2:21
**brain**
55:3 60:20
**break**
9:3 49:5 112:8
**breaks**
9:2
**breast**
59:18 92:18
**breasts**
92:8,25
**Brian**
3:4 6:18
**brief**
4:18 16:3,9,15 18:1 18:21,21 44:16 45:2 45:6,25 48:5 93:18 93:21 94:14 100:11 103:15 104:5,9
**British**
4:21 46:1 47:16
**Broad**
2:5
**broadly**
97:4
**brought**
132:25
**Brown**
130:1
**Brown's**
130:5
**bullet**
53:9 54:13 55:5,13 56:2,8,14,19 58:9 58:10 60:15 62:19 62:23,25 63:10,16 63:21 64:2 65:3
**bullets**
62:24

**C**

**C-a-s-s**
18:19
**C-o-s-t-a**
110:22
**C.V**
12:23
**cake**
77:22
**California**
1:15,15 6:1,17,17 141:13 142:5
**call**
17:20 35:15,16 47:22 48:17 98:1
**called**
32:14 46:1 48:13 73:22 85:24
**calls**
80:13
**canal**
85:11,13
**cancer**
106:4 107:1
**candidate**
124:17
**capable**
126:4
**capacity**
1:8 62:11,13
**caps**
72:16 93:22
**capture**



88:15 90:20,21
**captures**
90:25
**care**
18:8,12,23 37:11
42:24 43:1,8,10,19
43:21 44:4 68:20
69:4,6 75:10 76:2
76:18 81:2,6 87:20
89:14 92:6,23 98:3
98:5,9 100:24
105:23 106:14,17
106:18,18 108:11
108:16 111:8,12,20
111:20 113:17
114:12 115:1 116:4
116:9 120:13
123:12 124:7
125:10 126:8,10
128:7 130:7 134:11
137:4
**caretaker**
126:20
**Carolan**
2:9 7:3,3 17:13
**Carolina**
1:2,9 2:22 3:6 6:12
7:11 16:25
**Carolina's**
7:18 14:12
**carried**
62:6
**carries**
45:9
**carry**
106:19
**carry-over**
48:6
**carrying**
68:17
**carryover**
131:10
**case**
1:7 6:13 10:1 11:20
11:24 13:2 14:11
15:23 16:5,11 35:11

37:20 106:4 107:19
109:8 130:22 131:7
131:25 132:16
133:16
**cases**
68:1
**Cass**
18:19,22 44:20 45:13
45:20 47:25 96:10
98:22 99:1 100:14
**category**
40:4 113:13
**causality**
25:2
**cause**
25:18 26:2,19,22
38:8 53:6 55:2 57:1
57:6 63:22 98:11
126:9
**causes**
25:13
**cavity**
86:5
**cease**
80:14
**cells**
63:1
**center**
71:12 83:6
**centers**
73:13 74:11
**central**
79:11 80:12
**century**
112:14
**certain**
11:25 18:8,23 80:2
**CERTIFICATION**
142:2
**Certified**
1:17 142:4
**certify**
141:5 142:6
**cervical**
36:6
**challenge**

39:6
**chance**
117:16
**change**
36:4 125:24 143:2,4
143:5,7,8,10,11,13
143:14,16,17,19,20
143:22 144:2,4,5,7
144:8,10,11,13,14
144:16,17,19,20,22
**changed**
29:8,11 33:12,20
58:7,11,12
**changes**
36:3 60:20
**chapter**
4:19 24:4
**characteristics**
73:7
**Charleston**
1:3 6:12
**chest**
84:8,15 92:17 129:19
129:21
**child**
28:10,16 29:19 81:24
**childhood**
25:20 26:1,4 28:9,16
29:19,25 30:14,16
32:25
**children**
10:13,22 11:1 29:8
29:11 30:22 32:8,9
32:18 34:7,22 35:1
35:2,5 81:9,18
102:8
**Children's**
50:5
**Christina**
30:3
**chronic**
54:21 55:14,20
**cisgender**
19:4,10,20,23 38:10
68:9
**citation**

94:18
**cited**
131:14 132:3
**CIVIL**
2:3
**clarification**
45:16 69:5 91:3
117:18 135:10
**clarifications**
8:22
**clarity**
23:4 30:12 44:1
83:14
**clear**
140:12
**clinic**
20:12,18 30:2 70:7
70:11 86:13 87:8,18
129:14,25 130:5,6
**clinical**
4:22 40:20 50:16,19
61:4 65:21 71:8,10
72:22 73:19 75:10
76:1,17 77:12 78:3
78:4,12,21 88:1
100:24 102:6
105:23 108:11,15
114:11 116:3 130:4
**clinically**
38:25 39:6,10 40:19
40:21,23 41:8 105:9
**clinician**
20:22 43:14
**clinicians**
109:2
**clinics**
130:7
**close**
50:21 85:5 114:1
**closer**
114:23
**closing**
91:1
**clot**
53:3,14
**clothes**



33:14
**clothing**
29:9,12 31:5,11 33:3
**clots**
52:19 54:19,24 55:10
55:19 128:5 129:1
**clotting**
128:3
**co-investigator**
10:11
**coagu-**
128:22
**coagulation**
128:22
**code**
32:10,12,14 33:19
35:21,24 37:10
**coercion**
103:25 105:14,16
106:8
**coercive**
107:10,24
**coined**
123:13
**colleagues**
120:1
**collected**
108:7
**collecting**
108:10
**College**
131:20 132:9
**colloquial**
134:5
**colloquialism**
133:23
**Columbia**
2:22
**column**
102:13 103:3,6
**combination**
90:10,12
**come**
39:3 76:19 99:2
119:3 136:15
**comes**

10:15 32:15 83:17
119:15
**coming**
37:14,15 38:1,3,5,16
78:24
**comment**
119:16 120:25
**common**
90:15
**commonly**
40:25
**community**
73:13 74:11
**comorbidities**
116:19
**companies**
137:21
**company**
136:4,12 137:11
138:13,20
**comparisons**
110:1
**complete**
28:24 29:6,14 86:17
**completed**
99:8,12
**completely**
29:14 60:17 97:12
127:17
**complicated**
34:25
**conception**
92:19
**conceptualize**
99:23
**conceptualizing**
97:4
**concern**
95:14 111:17
**concerned**
36:21
**concerning**
32:17
**concludes**
140:2
**conclusion**

99:3
**conclusions**
78:6 98:16
**condemned**
104:1
**condition**
80:13 127:2,13
**conditions**
67:4
**conduct**
109:16 112:9
**conducted**
95:3 96:17 102:4
**conducting**
110:14
**conducts**
47:25
**confident**
65:18
**confirm**
26:7 44:21
**confirming**
45:18
**confuse**
133:18
**congruence**
20:8 90:14 91:1,4,5,9
91:14,23
**connection**
99:16 100:5
**Connelly**
136:23
**consensus**
42:22 43:13,14,15
**consent**
4:22 50:4,7,9,14,16
50:19 51:3,23 54:9
57:13,16 61:14
64:13 65:20 66:19
78:5 124:7,8,15,21
124:25 125:18
126:5,7,9,10,12,15
126:20 130:8,10
**consequences**
73:16 74:20
**consider**

11:16 80:19
**consideration**
95:21
**considered**
29:10,14 67:21 76:2
95:2 96:3 112:25
**considers**
94:5
**consistent**
15:24
**consternation**
113:20
**consult**
96:13
**consultations**
81:16
**contact**
137:18
**contained**
141:9
**containing**
102:6
**contemporaneously**
25:25
**context**
33:7 65:13 81:12
107:6 109:19
127:12 136:14
**continue**
26:5 30:1 37:11
**continued**
3:1 5:1 26:1
**continuing**
123:7
**conversation**
17:6 42:5,9,11 82:9
83:18
**conversations**
41:21,24 42:2
**Cooper**
2:15 6:24
**copy**
4:14 14:4,23 130:21
140:7
**copy-and-paste**
44:22



44:22
**correct**
9:23 13:3 14:13,14 18:19,20,25 19:24 20:6,8,10,15,23,24 21:9,19,20,23 22:13 22:21 23:2 24:24 25:11 26:11 27:6,14 27:15,19 28:3,4,6 30:10,22,25 31:6,11 31:14,19 32:1,3,8 33:4,6 34:15,17,22 37:4 38:21 39:20 40:6 43:1,22 44:5,7 44:10,22 45:6,7,15 46:2,18,21 47:16 48:12,19 50:6,22 51:8,25 52:5,14,19 52:24 53:4,5,7,8,11 54:16,25 55:3,7,15 56:4,10,15,21,23 57:2,4,7,9,14,15,19 57:21,25 59:6 60:7 60:9,17,18,21,23 61:2,8,11,20,25 62:21 63:6,12,17,23 64:4,19,20 66:3,9 66:11,16,24 67:1,5 67:6,9 69:1,17,22 69:25 70:1,16,23 71:4 72:8,9,10,17 72:18 74:7,13,14,16 74:22,23,25 75:5,14 75:15,18,22 76:8,10 78:25 79:3,7,22,23 80:15,17,20,21,24 81:6,7,10,11 83:13 84:8,17,21 86:14,24 86:25 87:3,8,20,21 87:24,25 88:3,5,9 88:19 89:15,17,21 90:9,24 91:10,11 92:4,5,8,21,25 93:2 93:24 94:2,3,6,12 94:13 96:18,19 99:18 100:7,8,15,16 100:18,19 101:5,16 101:17,23,24 102:10,21,22,24 103:9 104:6,13,16 104:17 105:2,18 106:11 107:24 109:5 110:21 111:2 112:10 115:7 116:16,20,22 117:4 117:5 118:7,10 119:3 124:10,18 126:17 131:4,7 132:17,18 134:8 137:6,12 141:10
**corrected**
141:9
**corrections**
10:3 141:7
**correctly**
18:4,16 24:16,21 47:21 48:2 72:21 74:2 94:23 95:6 100:25 103:19 104:2 116:6 118:18 118:25 122:16 123:17 124:5 131:12,22 132:1,12 133:15
**correspondence**
46:24
**Costa**
110:15,22,23
**could've**
123:20
**counsel**
6:21 7:5,10,19,23 8:1 8:22 17:7,13 45:17 45:17 71:20 130:20 139:19
**counted**
12:6
**countries**
108:20
**country**
130:7
**couple**
58:14 117:10 123:10
**coupling**
36:1
**course**
8:24 12:2 49:1 108:11
**court**
1:1 6:11,20 9:9,12 13:3,5,9,21,25 14:15,18,25 15:4,12 15:16 16:6,11 23:18 23:22 46:8,12 48:20 49:19,23 71:16,19 101:20 116:25 121:7 130:18
**cover**
4:19 24:2 36:6 71:21
**covered**
127:9
**create**
85:12
**creation**
85:10
**criteria**
23:7,14 30:8,22 32:2 33:10 34:1,4,13 35:18 36:17,20 41:13 95:23
**criterion**
30:25 31:10,13,18 95:20
**critical**
33:11 73:18
**criticizing**
100:14
**cross-sex**
59:22 70:3,14 71:6 73:10,17 74:6,21 75:16 86:12,23 138:16,18
**CRR**
1:16
**CSR**
1:24 142:21
**Current**
72:22
**currently**
19:2,8 44:3
**cut**
130:21
**cuts**
9:16
**CV**
58:19

**D**

**D**
2:15
**D.C**
2:16
**damage**
53:7 55:3 57:6 65:4
**damaging**
67:20
**Darlene**
122:15,21 123:1
**data**
70:16,18,23 71:6 73:14,15 74:12,19 75:3,22,25 76:6 77:8,12 78:7,13,20 78:23,24 79:10 88:13 99:3 108:7,10
**date**
118:22 143:24 144:24
**DATED**
141:12
**day**
122:12,13 141:12 142:17
**death**
53:7 55:3 99:17 100:6
**decade**
75:5 76:7
**decent**
93:3
**decision**
127:2
**decision-making**
61:2,8



**decisions**
76:18
**declaration**
4:10 5:7 9:25 115:22
    131:6,24 132:16
    133:16 141:2
**declarations**
135:14
**decrease**
72:23 89:14
**decreasing**
112:3
**defendants**
1:10 2:14 6:25 7:11
    9:20
**define**
41:9,10
**defined**
39:1,7,15 40:24 41:1
    41:8
**definition**
67:7
**definitions**
8:22
**Dekker**
5:8 131:7 132:14
    133:9
**delaying**
60:19
**delivery**
127:6
**demonstrate**
114:10
**demonstrated**
28:8,15 29:18 58:15
    66:23 68:24 69:15
    76:25 77:1 105:9
    112:21 115:6
**demonstrating**
88:13 99:7 103:24
    104:20 107:21
    112:1 113:4
**denied**
128:6
**density**
128:11

**deny**
125:19 126:21
    127:20 128:1
**dependence**
85:21
**dependent**
86:3
**depending**
35:7 72:25
**depends**
37:23 96:23 98:20
    99:4 127:22 133:12
**deposed**
8:14 66:13
**deposition**
1:14 4:11,14 6:9,16
    7:16 8:24 9:11,16
    13:8,13,17,19,24
    14:8,11,17,23 15:3
    15:9,15,21 16:23
    17:8,23 23:21 25:8
    26:9 27:3 43:17
    46:11 48:16 49:22
    66:20 68:15 69:19
    71:18 84:13 92:15
    100:2 101:10,19
    116:24 117:13
    121:6,23 130:17
    140:2 141:6 142:9
    143:1 144:1
**depositions**
132:24
**depressed**
40:21
**depression**
22:21
**Der**
110:17
**derails**
35:25
**describe**
28:20 37:24 58:3,21
**described**
25:24 29:5,17 110:24
    135:3
**describing**

65:1,23 112:9
**description**
4:9 5:2 51:24
**designated**
20:19 21:15 92:12
**designed**
111:11
**desired**
73:11
**desistance**
27:17 28:2
**determination**
111:16
**determine**
105:1 124:16
**detrimental**
55:23 64:9 66:9,16
    66:23 67:4 68:24
    69:15
**developers**
101:12
**development**
51:8,14 59:9,15,18
    60:2,21 73:3,6,9,22
    81:23 83:6 98:5,9
    102:5 103:4,7
**developmental**
72:25
**develops**
137:5
**diabetes**
63:11 64:9
**diagnose**
32:8
**diagnosed**
32:24
**diagnosis**
22:11 23:1,7,11
    30:13 32:19 34:6,21
    35:1 36:21 37:1
    41:3 79:24 80:1,4
**diagnostic**
30:8,21 32:10,12
    33:10,25 34:3,13
**Diego**
122:22

**difference**
25:17 113:11
**different**
32:10 35:9,17,22
    36:7,16 76:1 78:9
    82:6 85:14 86:3
    108:16,21 125:11
    135:7,13,17
**diminishes**
89:2
**direct**
50:12
**direction**
142:13
**disagree**
24:23
**disclosed**
117:9
**discovered**
19:19
**discussed**
18:18 32:2 66:2,8
    67:3 91:25 136:2
    137:14 138:17
**discusses**
38:21
**discussing**
12:5 74:5 87:15 91:8
**discussion**
81:19 136:14
**disease**
62:20 64:8 65:7,10
    65:14,22 68:5
**disorder**
128:3
**disorders**
82:14
**disqualified**
96:4
**distinction**
29:1,6 33:18 113:6
**distinguish**
43:7
**distinguishes**
94:11
**distress**



34:15 35:3,12,13 36:23 37:7,12,16,21 37:24 38:17,20,25 39:7 40:10 41:7,10 41:12,15,20 88:24 89:14 113:9,15,19 114:5 127:17
**distressed**
39:24 40:13,20,22 42:17
**distressful**
39:20 42:3
**distressing**
38:6
**District**
1:1,2 6:11,11
**diverse**
10:12
**division**
1:3 6:12 33:14,15
**DMS-5-TR**
4:19
**doctor**
49:17 54:2,7 69:11 120:12
**document**
9:10 13:6,22 15:1,7 15:13,19 16:2 23:19 26:23 30:20 47:14 47:20 64:12 71:16 71:21 102:13 118:4 121:15,21
**documents**
8:23 17:1 117:14
**doing**
33:8 75:10 96:24 108:15
**domain**
106:5
**Dr**
4:10,11,13,14,16 5:6 5:8 6:9 8:12 9:17,22 13:12 14:2,22 15:7 23:24 27:16 45:19 46:16 47:14 50:2 72:3 93:15 101:22 117:2,13 118:4 119:22 120:7 121:10,18,18 122:4 122:24 123:4,25 124:4 129:22,23 130:9 131:2 136:23 139:3,20,23
**drawing**
29:2
**dresses**
35:8
**drill**
8:15
**driven**
92:3
**drug**
107:6,9
**drugs**
107:1 137:5
**DSM**
23:6,14 38:25 39:8 40:24,25 41:3,9
**DSM-5**
22:12,25 23:10 24:2 24:4,23 30:9 38:21 40:13
**duly**
8:5 142:8
**Dutch**
76:19,20 77:16,19 78:24 108:3,24 109:1,8
**dysphoria**
4:20 21:7,23 22:11 22:20 23:1,8,11 24:5,19 25:13 26:19 30:22 32:8,11,25 34:7 36:17 37:2,7,9 38:15 44:3 47:24 68:20 69:7,25 70:4 70:15,19,22 71:7 72:23 73:1 74:7 75:13,17 76:21 77:2 79:20 81:10 83:11 83:25 89:21 90:1,9 90:20 97:20 98:18 108:4 109:3,20 111:22 112:3,6,15 112:17,22 113:5,10 113:15,17 114:5,19 115:4,12,16,21 116:4 129:10,20 136:3 137:10,17 138:19
**dysphoria/incongr...**
102:8

**E**

**e-m-b-o-d-i-m-e-n-t**
42:15
**e-n-d-o-g-e-n-o-u-s**
51:7
**earlier**
76:22 86:2 102:1
**earliest**
73:2 89:25
**early**
24:18 25:12 26:18 51:11,18 52:4,13 58:25 59:5,11 72:6 84:17 87:3
**eating**
82:14
**educational**
136:18
**effect**
67:18
**effective**
69:8 77:16 88:18 105:10 106:23 111:25 112:2
**effectiveness**
103:25 104:21 105:1 105:18 106:20 107:22
**effects**
60:16 61:19 65:1,23 66:8,17 67:16,24 68:12
**efforts**
112:25
**eggs**
62:7
**eight**
75:20
**Eighth**
1:15
**either**
50:20 51:6,18 57:18 86:17 125:3 129:3
**eliminating**
113:20
**embodiment**
42:14,16 60:6 92:3
**emboli**
54:21
**embolism**
52:24 53:3,6 55:22
**Emory**
2:20 7:10
**emorysmith@scag....**
2:23
**empirical**
75:25 76:6 77:8,12 78:7,13,20,23 79:10 105:23
**empirically**
105:9
**Endo**
136:13,15 137:5,15 137:25 138:11,22
**Endocrine**
18:13 131:18,19 132:8,9
**endocrinologist**
79:22
**endogenous**
51:6 64:18 73:5 80:15 85:23 88:19 89:18
**endometriosis**
79:13
**endorse**
133:2,22 134:5
**endorsed**
131:14 132:15,20 133:9 134:3
**endorsement**



133:1,4,20 134:25
**engage**
111:20
**England**
42:24 43:19
**enroll**
110:9
**enrolled**
108:5
**enrolling**
108:13
**entail**
82:3
**entire**
40:25 71:21 78:8
**entities**
43:12
**entitled**
5:4 64:13,22 72:5
103:3 118:6
**enzymes**
65:17
**eradicating**
112:2
**errata**
4:12,16 14:4 15:9
143:1 144:1
**especially**
115:1
**ESQ**
2:4,4,9,10,15,15,20
**Essentially**
95:17
**establish**
81:1 126:15
**established**
106:19
**estimate**
82:24
**estrogen**
54:18 55:17 128:6
**et**
1:5,9
**ethical**
76:12 77:4 78:13
103:21 104:1 105:2

105:4,6 109:20
110:5,21 111:1,9,15
**ethics**
80:20
**etiology**
20:7
**evaluated**
116:17
**evaluation**
47:25 102:20
**event**
122:24 136:25
**eventually**
80:13
**everybody**
11:25 82:9 83:14
115:15 129:7
**evidence**
61:1,6 71:8,10 77:21
93:22 94:6,12 95:3
97:8,19 98:17,24
100:23 101:5,15
103:24 104:20
105:1,17,23 106:20
107:21 114:15,18
**exact**
65:5 83:2 84:10 90:4
97:23 98:2
**exactly**
26:16 110:1 135:15
**EXAMINATION**
4:2 8:10
**examine**
102:5
**examined**
8:5
**examining**
73:16 74:20
**example**
18:10 33:13 36:3
59:16 67:19 68:4
79:13 81:17 89:24
98:2 108:2,3 114:14
125:23 126:1 127:1
127:16,25 128:2,11
**examples**

101:3 114:15 126:23
126:25 128:21
**exclusively**
78:23 80:12
**excuse**
13:18 58:2 91:9
100:12
**exhibit**
9:10,11 12:25 13:7,8
13:24 14:3,16,17
15:2,3,8,14,15
17:25 23:20,21,25
24:2,8 27:2 30:19
44:15 46:10,11,17
47:15 48:4 49:21,22
50:3 54:8 57:12
68:14 71:17,18
93:18 100:10,20
101:19,23 103:1,14
115:23 116:23,24
117:3,12 118:5
121:5,6,11 130:16
130:17,22 131:3,25
**exhibits**
4:8 5:1 46:24
**exist**
124:3
**existing**
105:8
**expect**
88:8
**expedited**
140:13
**experience**
35:3,12 61:4 71:9
76:1,17 77:19 78:21
79:9 82:17 88:1,24
89:5 91:21 112:17
128:5
**experienced**
51:8,20 85:22
**experiencing**
37:12,13 127:18
**experimental**
69:8 107:1,6,9
**expert**

5:7 80:19 94:5,11
131:6
**expertise**
107:5
**explain**
10:23 29:1 85:9
91:12 97:2 116:8
124:23
**explained**
66:14
**explains**
45:4
**explanations**
8:23
**explicit**
118:22
**explicitly**
66:18 100:22
**expression**
11:10
**extremely**
50:21

**F**

**F**
1:16,23 142:4,21
**fact**
44:10 67:25 68:3
89:6
**factor**
24:19 25:5,15,18
26:21
**fair**
55:22 64:8 86:10
119:17
**familiar**
8:19 43:5 101:2,12
102:23 103:11
106:5 119:22 120:7
129:25
**families**
122:23
**family**
32:15 131:21 132:10
**fantasy**
31:14



**far**
105:23 106:7
**Fax**
2:12,17
**FDA**
137:16,25 138:2,14
**feasible**
110:7,8,11
**features**
73:11
**feel**
79:5 113:21
**feelings**
43:9
**feels**
125:11
**female**
20:19 21:15,19 36:4 61:22 64:18 92:7,12 92:16,17,19,24
**females**
20:14,15 21:18
**feminine**
73:11
**feminize**
128:12
**feminizing**
50:15 51:3,25 52:4 52:13,18,23 53:10 54:9,15 55:5,9,14 56:3,8,14,19,25 57:14,17 58:4,22
**fertile**
61:25 62:12
**fertility**
61:20 62:4,9
**field**
78:8 95:12 107:5
**fifth**
24:8
**figure**
119:10 128:23
**filed**
16:20
**final**
45:24 48:5
**find**
86:20 119:11
**finding**
58:15
**findings**
58:8
**fine**
9:18 117:11,19,24 120:25
**Finland**
42:24 43:19
**first**
8:5 10:10,21 13:2 18:3,4 29:4 34:5 45:2 47:20 48:16 50:7,14 51:2 60:15 61:18 62:18 65:3 70:3 75:12,16 78:11 86:13 87:8 94:16,17 94:22,22 100:12,13 100:21 102:3 103:17 105:6,10 109:7,12 111:20 118:12,17 124:1 129:3,17 131:10,11
**five**
97:22 139:9
**flat**
129:20
**flavor**
26:18,23
**focused**
81:9
**follow**
87:19,23 125:3
**follow-up**
111:5
**follows**
8:6
**footnote**
45:3,4 104:5
**foregoing**
141:6 142:8,13
**form**
11:18 12:15 19:11,25 20:9,16 21:2,10 22:2,14,22 23:3,12 24:25 26:12 27:20 28:5,12 29:21 30:11 31:1,7,15,20 32:4 33:5 34:2,16,23 36:13,25 37:22 38:22 39:12,21 40:5 40:7,16 41:5,17,25 42:18 43:2,23 44:6 44:11 46:6 47:17 48:9,22 50:15,16,23 51:3,5,15,17,23 52:6,20,25 53:12 54:9,12,17 55:8,16 56:5,11,16,22 57:3 57:8,14,16,20,23 58:2,3,12,21,24,24 59:4,7,12 60:8,11 60:22 61:3,9,14,14 62:1 63:7,13,18,24 64:5,13,17,25 65:22 65:23 66:4,10 67:10 70:5,17,24 75:6,23 76:9,13 77:10,17,24 78:14 79:1,8 80:6 80:16 83:12 84:3,9 86:15 87:9 88:4,20 89:16,22 92:9 93:1 96:22 99:7,10,17,19 100:5 101:6 104:22 105:3 107:11,18,25 109:6 111:3 114:8 115:13 116:21 124:11,19 125:20 126:12 127:21 130:13 132:22 133:11,17 136:8 137:13 138:8
**formal**
134:24 135:1
**formally**
90:13
**format**
44:18
**forms**
4:22 50:4,8,10,20,20 65:20 66:19
**forth**
142:10
**forward**
57:11 60:3 61:13
**found**
98:23
**foundation**
21:10 23:3 24:25 26:12 30:11 31:1 38:22 40:7,16 43:2 43:23 46:6 66:25 78:14 80:16 99:10
**four**
80:23 81:18
**fourth**
74:4
**frame**
85:1
**frequently**
83:19,20 85:24 123:2
**front**
116:13
**frosted**
77:23
**full**
72:20 94:16 100:21 103:17 131:10
**fully**
20:8 21:8,25 90:24
**function**
38:11
**functional**
38:8
**functioning**
35:16
**further**
56:1 59:15 120:25
**Furthermore**
73:15 74:19

**G**

**gallstones**
56:9
**games**
31:5,19



**gap**
73:18 90:17,22,24,25
91:1 114:1,22
**Garren**
3:8 7:14
**gatekeeper**
125:7
**gatekeeping**
124:14 125:1
**Gay**
2:9 7:3 8:2
**gears**
42:21
**gender**
4:20 10:12,22 11:9
11:10,10 20:7 21:7
21:23 22:11,20 23:1
23:7,11 24:5,19
25:13 26:19 28:9,15
28:21 30:22 31:5
32:8,11,13,25 34:4
34:7,13 35:5,6,6,22
36:5,7,12,17 37:1,8
38:4,15,20 39:19,24
40:12 44:3 47:24
68:20 69:7,25 70:3
70:15,19,22 71:6
72:23 73:1 74:6
75:13,17 76:20 77:2
79:20 81:10 83:11
83:25 89:7,21 90:1
90:8,18,20 91:24
92:19 97:20 98:18
102:7 108:4 109:3
109:19 111:22
112:3,6,15,17,22,24
113:5,10,15,17
114:5,19 115:4,12
115:15,21 116:4
126:10 127:18
129:10,20,25 136:3
137:10,17 138:18
**gender-affirming**
18:7,14,22 42:24
43:19 44:4 68:19
69:4,6 71:1,13 77:3

89:13 90:19 92:2,6
92:20,23 106:10
107:20 118:21
120:13
**gender-forming**
139:1
**genderGP.com**
121:12
**general**
1:9 2:20 3:6 11:20
20:18 85:19 87:18
95:13 106:13
**General's**
7:12,18
**generally**
80:22 81:5 85:17
96:9,11 98:15
120:24
**genital**
84:20
**getting**
84:8,15 125:9 140:14
**give**
14:7 15:20 33:7 40:5
59:10 85:17 126:23
128:20 136:16
139:9
**given**
10:6 66:1
**gives**
111:17
**giving**
51:9 75:12 79:6
81:13 110:3
**gland**
57:1
**gleaned**
125:13
**GnRH**
51:4,18 54:10 64:14
79:15
**go**
6:5 7:6,9 18:1 24:7
27:2,4,23 36:5
44:16,17 45:2 47:4
47:10 49:7 53:19

57:11 58:5 59:19
68:14,16 72:12 80:8
80:9 85:16 89:4
93:6,10,19 94:14
102:12 103:2,16
108:11 111:7
114:25 115:1,24
117:15,20 120:19
129:18 131:9
**goal**
42:14,16
**goals**
60:7 92:4
**goes**
40:18 125:21 128:24
**going**
9:2,9 12:25 23:18
44:15 45:8 49:19
52:17 59:8 61:13
65:19 71:15,22 78:5
88:24,25 89:6
100:11,20 104:7
105:22 107:3
108:13 110:4,6
117:6 118:17
125:23,24 128:16
128:18 131:24
138:16
**gold**
95:2,9
**gonadotropin**
73:4
**good**
8:12,13 49:3 124:17
125:25 133:24
138:6
**gosh**
27:21
**government**
47:23
**GRADE**
93:22 94:1,4,10
100:22 101:3,13
**grant**
4:23 72:3
**granted**

118:13
**GRH**
73:4
**groin**
86:7
**group**
98:8
**grow**
11:6
**guaranteeing**
107:3
**guardian**
126:11
**guess**
48:10 83:23 95:10,11
108:6
**guidance**
102:6
**guidelines**
18:13 72:22 73:12
74:10 75:25 102:6
102:19 103:7,8,11
116:3 133:5,21
**guy**
135:20

**H**
**Hac**
2:15
**hair**
29:9,13
**halfway**
100:13
**halt**
88:18
**halting**
59:15
**Hampshire**
2:16
**hand**
9:9 23:18 49:19
71:15
**hand-in-hand**
114:25 115:2
**handed**
9:22 14:2 23:24



46:16 50:2 101:22 117:2 121:10 131:2
**handful**
10:5 89:23 94:8
**handing**
13:5,21 14:15,25 15:12 46:8
**happen**
22:16 53:14 66:18 124:21
**happened**
22:18 35:13 79:19 107:17 108:6 129:14 132:23 134:21
**happening**
67:25
**happens**
11:6 12:2 106:25 108:10,14 125:5 129:12
**happy**
117:15
**hard**
107:18
**harmful**
111:22 112:6
**Harper**
2:4 7:1 17:13
**harvested**
62:7
**headaches**
56:20 57:7 63:22
**health**
4:23 11:2,11,13 55:24 64:10 66:9,16 66:24 67:5 68:25 69:16 72:5,24 73:23 83:6 103:9 108:20 110:9 113:1 125:8
**hear**
119:7
**heard**
26:8 94:7 119:4
**heart**
54:21 55:6,11,23 62:20 63:5 64:8 68:4
**Helen**
120:7,10,23 122:4,24 123:4
**help**
113:19 114:4,22,23 129:20
**helpful**
47:3 77:2
**helps**
90:16
**hematologist**
128:23
**Heparin**
128:24
**Hi**
7:22
**high**
98:24
**higher**
68:8,9
**highest**
103:6
**historically**
25:24
**history**
116:18
**HIV**
2:3 63:17 64:9
**Hold**
10:17
**home**
35:8
**Hopkins**
98:8
**hormonal**
83:12 84:3
**hormone**
59:23 73:4,17,24 74:21
**hormones**
51:10,19 52:5,14 55:9 61:23 63:11,17 63:22 64:3 65:12 70:3,14 71:1,6,13 73:10 74:6 75:16 77:3 86:13,23 90:19 127:3,14 138:17,18 139:1
**Hospital**
50:6
**hour**
9:3
**hours**
9:16
**housekeeping**
9:9
**hseldin@aclu.org**
2:6
**human**
95:22
**humans**
23:17 39:5
**hundred**
111:24 113:24 138:9
**husband**
122:20
**hypercoagulable**
128:4

**I**

**icing**
77:22
**idea**
88:25 90:21 108:2 119:4,12 125:25 129:24 133:24
**ideally**
35:20
**identical**
116:11 135:15
**identification**
9:12 13:9,25 14:18 15:4,16 23:22 46:12 49:23 71:19 101:20 116:25 121:7 130:18
**identified**
96:6 117:14
**identifies**
92:16
**identify**
19:3,9,23 21:15
**identity**
11:9,11 18:7 25:20 26:1,6 30:1 32:13
**II**
102:20,23
**Impact**
72:6
**impairment**
38:8 40:24
**implants**
92:7,13,24
**implications**
73:19,24
**important**
43:7,12 55:18 62:3 76:18 96:6 97:5,13 97:17 126:6
**improvement**
88:11
**inappropriate**
40:5
**incidence**
54:20
**included**
117:8,14 135:8
**includes**
92:7,24
**including**
86:18 131:16 132:5
**incongruence**
10:22 34:4,14 127:18
**incongruent**
36:12 38:20 39:19,24 40:12 112:24
**incorrect**
25:3 48:8 130:11
**increase**
21:14 52:18,24 53:10 54:15 55:6,9,14 62:20 63:1,5,11 65:13 88:8
**increased**
56:3,9 64:3 67:4 89:8
**increases**



54:18 55:19
**increasing**
65:16
**INDEX**
4:1
**indicate**
19:19
**indicated**
92:3
**indications**
79:12
**individual**
88:16,23 109:10
116:13,18 121:19
**individualized**
116:5,9
**individuals**
51:4 54:10 89:10
**induce**
73:10
**ineffective**
114:6 128:19
**infertile**
52:5,11
**infinite**
39:3
**information**
42:12 44:24 45:5
81:16 82:10 120:3
120:22
**informed**
50:4,14 51:3 54:9
57:13,16 61:14
64:13 65:20 124:7,8
124:15,21,25
125:18,18 126:5,7,9
126:10,19,20 130:8
130:10
**initialed**
141:8
**ink**
141:8
**insensitivity**
128:14
**inspirational**
123:9

**Institute**
73:21
**Institutes**
4:23 72:5
**instruct**
8:21
**INSTRUCTION**
5:13
**instrument**
89:20 90:8,23,25
102:20
**instruments**
90:10
**insurance**
36:6 127:10
**intended**
46:25 111:6,8
**intentional**
82:15
**interaction**
127:14
**international**
42:22
**interns**
7:14
**interpretation**
38:13
**interrupt**
117:7 135:5
**interrupting**
53:16
**intervention**
11:14,17,21 12:2,10
36:22 38:16 40:6,10
40:14 41:16 42:6,7
83:12 84:4 92:2
97:9,11,15 105:17
106:13,22 110:3,4,6
111:25 124:9,10,17
125:19 126:4,21
127:20 128:1
**interventions**
18:14 35:25 37:14,15
37:21 38:1 50:10
52:15 66:22 75:3,21
76:5 77:9,15 78:12

79:6 81:13 82:7,8
83:15,22 96:21
97:20 98:18,24
103:23 104:20
106:10,11 107:20
107:23 109:24
111:1 114:22
115:11,18 127:9
128:20 129:13,17
**introduce**
6:22
**inversion**
85:25
**investigation**
105:25
**investigational**
69:9
**involve**
82:13
**involved**
134:10,16,19
**issue**
17:2 24:24 55:17
96:7,8 105:17
112:16
**issues**
73:25 128:23

**J**
**Jack**
119:22,23 123:25
**Jason**
134:15,22 135:23
**jest**
123:8
**Job**
1:25
**Johanna**
1:14 4:3 6:9 8:4
122:14 123:14
140:3 141:4,17
143:25 144:25
**John**
2:15 6:24
**Johns**
98:8

**Journal**
4:21 47:16
**jramer@cooperkir...**
2:18
**jsinger@selendyga...**
2:13
**judgment**
61:2,8 78:16,18
**Julie**
2:10 7:25 8:1
**justified**
79:6
**Justin**
3:8 7:15

**K**
**Kara**
136:23
**keep**
125:9
**kid**
81:19 123:15,15
**Kielhack**
3:4 6:18
**kind**
49:3 85:6 128:25
**Kingdom**
44:9
**Kirk**
2:15 6:25
**knew**
76:19 79:10
**know**
8:14,18,19 9:4 11:19
11:23 12:3 16:7
21:12 22:3,3 35:15
35:18 38:9,9,11,14
40:23 41:4,7,15,20
44:2,12 45:11 46:7
48:23 53:25 60:19
61:24 62:2,4,5,9,12
72:14 77:15 82:23
83:2 84:10,25 91:17
94:4 97:22 98:1
99:11 101:7 106:1,7
106:22,24 107:12



107:17 108:9,18
109:7,12 111:21,24
112:5 119:14,23,24
119:25 120:23
123:9,12 134:13,15
134:17,20,21,22,23
135:1,9,23 136:23
**knowledge**
51:23 73:18 121:24
**known**
61:19

**L**

**labeled**
51:2
**labs**
86:19
**lack**
114:9
**large**
71:16
**largely**
37:23 85:21 86:3
**larger**
92:8,25
**law**
16:24 17:2
**lawyers**
135:21
**lead**
28:9,16 29:19 55:10
55:20 56:3,9,15,20
64:3 65:16
**leads**
25:20 26:1
**leave**
47:2
**leaving**
74:1 95:24
**lectures**
10:6
**left**
9:15 96:1,2
**leg**
54:21 55:15,20
**legal**

1:20 6:18 126:13,14
126:15
**legally**
126:9
**let's**
29:16 30:16,18 45:2
57:11 67:19 93:6
128:3 135:2
**LGBTQ**
2:3
**LIBERTIES**
2:3
**life's**
114:12
**lift**
47:23
**light**
11:14
**limited**
70:16,18,23 71:5
73:14 74:12 75:3,22
76:6 77:7
**limiting**
107:8,22
**line**
27:8,11,13 68:17,18
68:22 69:3,13 143:2
143:5,8,11,14,17,20
144:2,5,8,11,14,17
144:20
**lines**
29:17
**lining**
86:4
**list**
117:9
**listed**
13:2 66:18
**listen**
122:14
**listening**
7:20
**lists**
135:7,13
**literature**
95:1 99:16 100:5

**little**
10:23 27:5 42:21
49:5 75:25 87:15
**lived**
106:24
**liver**
65:4,7,9,14,17,22
67:20
**local**
8:20
**long**
16:16 41:21,23 42:2
108:1 124:8 136:22
**longer**
35:12 46:4 58:15
107:13
**longitudinal**
11:1 109:13
**look**
13:14 16:7,17 45:2
82:9 84:22 88:12
96:21 97:8 98:11
99:12 110:16
123:14 135:2
**looked**
54:19 68:4 108:8
110:1
**looking**
11:1 54:8,11 60:15
80:22 97:14,15 99:4
**looks**
27:17 28:1 47:18
**Los**
1:15 6:1,17 50:6
122:14
**lot**
25:23 27:22 32:15
33:9,12,17 34:9
35:11 51:20 62:5
67:25 71:8 88:24
89:5 95:24 96:1
108:9 119:12
**love**
122:8,12
**low**
100:23 101:4,14

**lower**
68:10 86:7
**Lunch**
93:9
**lung**
53:7
**lungs**
53:4

**M**

**M.D**
1:14 4:3 8:4 141:4,17
143:25 144:25
**Magna**
1:20 6:18
**major**
131:15 132:4,20
**majority**
26:4 67:25 87:11
**make-believe**
31:14
**making**
76:18 105:12 113:7
125:12
**male**
21:16 36:5 51:8,14
57:18,19
**males**
20:13 51:5 57:17
**manage**
113:19 114:23
**manages**
113:4 115:4
**managing**
102:7
**Mansfield**
4:15,17 14:11,23
15:10,21,25 25:9
26:10 27:4 43:18
66:14,20 68:15
84:13
**manuscript**
10:15
**manuscripts**
10:7,9 65:15
**Marceline**



1:16,23 6:20 142:4
142:21
**Marianne**
122:13
**marked**
9:10,11,23 13:6,8,22
13:24 14:3,16,17
15:1,3,8,13,15 16:3
23:19,21,25 46:9,11
46:17 47:15 49:20
49:22 50:3 71:16,18
101:19,23 116:24
117:3 118:4 121:6
121:11,23 130:17
131:3
**marker**
19:12,18 36:5,7
**Marstiller**
5:8 131:7
**masculine**
21:16 73:11
**masculinize**
128:17
**masculinizing**
61:23 62:19 63:4,11
63:17,22 64:3 65:12
**matter**
6:10
**mature**
52:14
**McGRAY**
3:6 7:17,17
**mean**
11:4,8,24 28:20
30:12 40:20,21
48:25 62:10,12
66:15 67:17,24
68:11,19,23 69:14
70:6 71:12 81:21
88:18 91:12 95:11
95:12 97:2 119:25
126:14 134:25
**meaning**
25:12 40:13 133:2
134:5
**means**

32:15 37:7 41:4,7
66:22 67:8 101:8
116:8 119:14
**meant**
66:21 69:12
**measure**
91:9 96:5
**measures**
90:8,15
**measuring**
11:12,13 89:20 91:22
91:23
**mechanisms**
127:5,6
**medical**
4:21 18:8,14,23
19:22 20:4 35:24
36:1,22 37:10,14,15
37:20 38:1,16 40:5
40:9,14 41:16 42:6
42:7 46:1 47:16
50:10 68:19 69:4,6
72:6 80:20 81:13
82:7,17 83:15 92:2
95:3,9 97:20 98:18
99:7,17 100:6 104:1
106:10,11,12,22
107:20 109:23
110:3,4,6 111:1
114:21 115:10,18
121:2 129:13,17
131:15,16 132:4,6
132:20 134:2
135:13
**medicalized**
14:12
**medically**
32:17 103:23 104:19
129:3
**medication**
58:4,22 67:21 125:23
**medications**
50:15 51:3,25 52:18
52:23 53:10 54:9,15
55:6,14 56:3,9,15
56:20 57:1,14,17

62:20 63:4 66:2,15
66:17 67:8,8,15,23
68:11,23 69:13,14
97:16 113:25
**medicine**
39:4 73:22 77:12
78:2,3,9 82:11
105:21 106:6
112:18
**meet**
17:4,7,10,22 36:19
41:12
**member**
134:7
**memory**
137:1
**men**
68:5,10
**mental**
11:2,11,12 110:9
113:1 125:8
**mentioned**
10:21 91:10
**met**
115:15
**metabolic**
73:16 74:20
**methodology**
93:22 94:2,5,10
**Miesen**
110:17
**migraines**
56:20 63:23
**minimally**
52:21 55:19 130:2
**minimize**
90:24
**minimizes**
128:25
**minimizing**
90:21
**minor**
81:25 126:18
**minors**
5:5 14:13 58:25 70:4
97:21 98:19 99:9

118:7,21 138:19
**minute**
90:4 91:17 117:19
**minutes**
117:10 139:9
**misalignment**
38:4 113:21
**Misanin**
1:5 6:10
**mischaracterization**
78:2
**mispronunciations**
74:1
**missing**
12:22 38:3
**Missouri**
13:3
**misstates**
12:7 38:23 39:12,21
40:17 41:5,17 51:15
59:12 66:4 67:10
77:17,25 79:1 88:20
99:19
**misunderstands**
126:3
**mix**
20:23
**Mm-hmm**
84:1 120:15 127:15
138:25
**model**
124:3,4,7,14,21
125:4,8,16 129:23
130:4,8,10
**models**
124:25 125:3 126:7,9
**moderate**
98:23
**modified**
90:5
**moment**
45:10 47:1 49:13
60:1 93:11 117:7,25
139:16,25
**Monday**
1:16 6:2



**monotherapy**
111:25
**months**
94:8
**morning**
8:12,13
**Morton**
3:8 7:15
**move**
11:7 114:22
**moved**
112:17
**moving**
60:3
**multisite**
10:24

**N**

**N.W**
2:16
**name**
6:18 7:17,22 29:11
35:10,17 90:4 99:6
142:16
**names**
124:3 134:19
**naming**
124:3
**natal**
20:13,14,15 21:18
51:5 57:17 61:22
92:7,16,24
**national**
4:23 72:4 103:8
108:20
**naturally**
92:17
**nausea**
56:15
**nearly**
84:7,16
**necessarily**
21:11 23:16 34:8
35:18 42:17 60:2
81:18 97:13 128:12
**necessary**

34:8 35:18 115:11
**need**
9:3 23:4 37:10 47:2
59:25 60:6,6 79:25
92:13 107:15 140:9
**needed**
77:14 91:17 115:17
**needs**
37:10 99:3 116:10,11
**negative**
72:24 127:13
**Netherlands**
29:5 78:16
**neutral**
88:14
**never**
38:19 44:18 54:19
68:2 83:18 94:1
96:17 99:23 100:17
110:2 111:8 112:1,7
112:20 113:3 115:3
129:16 137:9
**New**
2:5,5,11,11,16 5:4
42:25 43:4,20 118:5
119:6
**Newcastle**
100:14,17
**NHS**
120:13
**NIH**
75:2,21 76:5 83:4
**Noble**
1:16,23 6:20 142:4
142:21
**Noe**
4:11,13 13:2,13,19
14:5 92:15 100:3
101:10 117:13
**North**
14:12
**Notably**
45:13,20
**note**
9:14,19 17:12 46:23
135:6

**noted**
46:24 141:8
**notes**
18:10
**noticing**
6:22
**noting**
135:12
**number**
4:9 5:2 21:6,22 22:1
30:21 34:10 58:9,20
84:10 97:23 130:22
**numbered**
72:13
**numbers**
21:14 27:5 83:2

**O**

**object**
11:18 12:15 19:11,25
20:9,16 21:2,10
22:2,14,22 23:3,12
24:25 26:12 27:20
28:5,12 29:21 30:11
31:1,7,15,20 32:4
33:5 34:2,16,23
36:13,25 37:22
38:22 39:12,21 40:7
40:16 41:5,17,25
42:18 43:2,23 44:6
44:11 46:6 47:17
48:9,22 50:23 51:15
52:6,20,25 53:12
54:17 55:8,16 56:5
56:11,16,22 57:3,8
57:20,23 59:12 60:8
60:22 61:3,9 62:1
63:7,13,18,24 64:5
66:4,10 67:10 69:2
69:18 70:5,17,24
75:6,23 76:9,13
77:10,17,24 78:14
79:1,8 80:6,16 84:9
86:15 87:9 88:4,20
89:16,22 92:9 93:1
96:22 99:10,19

101:6 104:22 105:3
107:11,25 109:6
111:3 114:8 115:13
116:21 124:11,19
125:20 127:21
130:13 132:22
133:11,17 136:6,8
137:13 138:8
**objection**
7:13 12:7 28:19
66:25
**observable**
21:13
**observation**
35:4 80:5
**observational**
12:9
**observed**
20:21
**observing**
7:15
**obtain**
129:12
**obtained**
77:22
**obtaining**
44:4
**occasion**
83:18
**Occasionally**
80:25
**October**
1:16 6:2,14 141:7
142:17
**offer**
77:4
**offered**
15:24
**offering**
15:23
**offhand**
58:17 137:23
**office**
2:20 3:6 7:12,18
**official**
1:8



**oh**
10:15 27:21 35:8 53:21 104:10,10,10 125:11,23 130:14 133:2 136:7
**okay**
27:7 45:8 54:7 67:19 104:10 107:2 121:25 130:24
**old**
80:23,24 87:19
**older**
73:8 80:25 96:3
**Olson**
30:3 71:17 124:4 129:23
**Olson-Kennedy**
1:14 4:3,10,11,13,14 4:16 5:8 6:9 8:4,12 9:10,17,22,23 13:6 13:12,23 14:2,3,16 14:22 15:1,7,8,13 16:3 23:20,24,25 27:2,16 30:18 44:15 45:19 46:9,16,17 47:14,15 49:20 50:2 50:3 54:7 57:12 68:14 71:17 72:3 93:15,17 101:22,23 115:23 117:2,3 118:4,5 121:10,11 122:15 131:2,3 139:3,20,23 140:3 141:4,17 143:25 144:25
**Olson-Kennedy's**
117:13
**once**
129:14
**one's**
10:15
**ones**
89:25 97:24 108:21
**ongoing**
83:25
**online**
7:10 119:12,20
**onward**
87:24
**open**
99:21
**operate**
130:10
**opinion**
94:5,11 96:20 107:18 113:22 114:4 115:5 115:8,10 134:2
**opinions**
15:23,24
**opportunity**
77:4
**opposed**
106:21 118:21
**Opposes**
5:4 118:6
**order**
73:5 135:17
**ordering**
140:6
**organizations**
132:15 133:9 134:3 135:14
**Ottawa**
100:15,17
**outcome**
18:11 96:5
**outcomes**
11:13 72:24 88:2
**outdated**
30:9,25 31:4 32:3
**outpaces**
77:12 105:23
**outside**
35:9 86:7 120:13
**overall**
97:7
**overarching**
88:12
**overdose**
82:15,15
**overlap**
79:19

**P**

**p.m**
1:16 6:3 93:12 117:21 118:1 139:13,17 140:4
**P.O**
2:21
**packet**
50:9,12
**page**
4:9 5:2 13:1 18:1,2 24:7,8 27:4 30:20 30:24 44:16 45:1,2 45:8,9,24 46:14 48:5,6 50:12 52:2 52:17 54:8,11 56:1 56:1,25 60:11 61:18 62:17,18,23 64:21 68:16,18,22 69:3,13 71:22 72:12,14,16 93:19 94:15,16 100:11,20,21 102:3 102:12 103:2,16 115:24 121:20 122:2,3 131:9,25 143:2,5,8,11,14,17 143:20 144:2,5,8,11 144:14,17,20
**pages**
57:11 61:13 64:12
**paid**
136:19
**paper**
12:19 44:19,22 45:5 71:23 104:5,8,9,13 104:15 111:7
**papers**
65:5
**paradigm**
101:13
**paradigmatic**
101:2
**paragraph**
13:1 18:2 24:11,15 45:9,13,18,25 48:6 62:24 72:19,20 74:5 93:21 94:16 100:12 100:13 103:17 104:19 115:24 122:3 123:7,24 131:10,25
**parent**
126:11,19
**parenthesis**
51:4 64:14 95:5
**parents**
60:3 81:17,19
**Parson**
4:11,13 13:2,13,19 14:5 92:15 100:3 101:10 117:13
**part**
7:16 10:25 12:12 18:21 19:17 24:3 25:18,22 32:7 34:5 36:8 37:16,18 50:7 50:9,11,17 75:4 76:7,18 78:12 89:13 96:14 97:5,17 104:15 109:4
**partial**
28:24 29:6
**partially**
29:10
**participates**
105:13
**participating**
50:8
**participation**
103:22
**particular**
11:14 27:11 65:6 85:18 92:1 124:17
**particularly**
58:8
**parties**
9:18
**partnered**
114:21
**parts**
36:2



**pass**
139:5
**patient**
20:22 21:22 32:24 38:19 42:14,17 80:11,13 85:15,18 86:4 87:2 88:2,7,10 92:1 115:11 116:17 124:8,15,16 125:17 127:16 128:14
**patient's**
60:6 86:13,23 92:3 116:18
**patients**
20:12 40:4 50:5 62:15 68:2,7 75:13 78:4,11 79:6,20,21 80:23 81:6 82:1,20 83:10,12,24 84:3,6 84:15 87:19,22,24 89:1 112:10 116:14
**pause**
46:1 60:1
**Pediatric**
131:19 132:9
**Pediatrics**
132:6 134:8 135:18
**pelvic**
82:15
**penalty**
141:2,5
**pending**
9:5
**penis**
86:1
**people**
17:11,23 20:18 21:7 21:14,22 22:6 25:2 26:3 29:24 34:11 35:11 37:13,25 38:7 38:15,16 39:23 40:2 40:8,9 41:10,12,21 42:4 43:8,9 51:17 51:19 59:5 62:6 64:17 70:19 77:5 78:6 81:13 82:5 83:16,21 88:11,11 88:23 89:4 94:7 95:21 106:7,13 108:10,13 110:9 111:20,21 112:18 112:19 113:19,24 113:25 114:12,23 115:17,21 116:11 122:23 127:5,8 128:22
**people's**
55:23 61:2,7 64:9 66:9,16,24 67:5 68:25 69:16
**perceived**
26:15
**percent**
20:13,14,22 81:8 82:23 83:1,1,8,11 84:5 138:9
**percentage**
82:13,20,22 83:24 84:2
**percentages**
24:12
**perform**
109:21
**period**
59:19 107:13
**peritoneal**
86:5
**perjury**
141:2,5
**permanent**
53:6 55:3
**persistence**
24:19 26:19,22
**person**
32:17 35:16 52:3,12 61:24 62:11 85:2,22 116:10 120:25 126:3 128:8,17,24 129:18
**personally**
30:2 70:6,9,13 74:15 74:24 75:19 86:22 87:2
**perspective**
82:17
**persuade**
138:11
**pharmaceutical**
136:4 137:11,20 138:13,20
**Pharmaceuticals**
136:13,15 137:5,15 138:12,22
**phrase**
40:25 45:20 63:1
**physical**
55:24 64:9 66:9,16 66:24 67:5 68:25 69:16 80:4,4
**physicality**
38:5 90:17 91:24
**Physicians**
131:20,21 132:10,11
**physiologic**
73:16 74:20
**pick**
95:22
**picking**
95:23
**piece**
77:21 91:15 105:10 105:11
**pieces**
81:14,15 91:19
**pituitary**
57:1
**place**
59:24 87:12 106:25 114:23 142:10
**plaintiffs**
1:6,14 2:2 7:2,4,23 8:2 17:14 139:19
**play**
31:14
**please**
19:6 49:13 93:11 117:25 139:16,25 140:10
**PLLC**
2:9
**podcast**
5:6 121:18
**point**
9:3 49:2,3 58:10 59:8 65:4 71:14 87:22 93:4 104:4,11,18 106:9 119:17
**pointless**
99:15 100:4
**points**
82:6 108:17
**policies**
42:23 43:18,25
**population**
21:22 65:2,24 77:1 99:9
**possibilities**
39:3,5
**possibility**
39:2 137:15
**possible**
86:22 87:1,4 99:13 108:23 109:1 124:23
**possibly**
76:21 96:15 115:14
**potential**
35:25 53:13 66:17 67:16,17,24 68:12 72:23
**potentially**
29:12 55:10
**practice**
20:18 32:7 34:11 65:21 70:16,22 72:22 73:19 77:12 78:3,4,13,19 80:22 81:5,8 82:13 86:11 87:18 90:7 96:14 115:17 116:3
**practicing**
120:13
**pre-pubertal**
10:12



**precise**
26:8
**precocious**
79:11,17,18,24 80:12
**predecessor**
105:25
**predict**
19:22
**predominant**
112:16
**preexisting**
127:2,13
**pregnancies**
62:7
**pregnant**
62:13
**preliminary**
86:19
**preparation**
17:7
**prepare**
16:22 17:23
**prepared**
48:11
**prepubertal**
11:2 32:9,18 34:7
**prescribe**
86:12 88:7
**prescribed**
86:23 87:2,7
**prescribing**
47:23 89:12 109:2
**presence**
34:14 36:23
**present**
3:3 21:7,23
**presentation**
136:16 137:3,8
  138:23
**presented**
8:24
**presently**
42:16
**president**
118:23
**press**

138:5
**pressure**
56:4
**pretty**
82:11 88:13
**previous**
20:2
**previously**
87:5 121:23
**primarily**
36:21
**print**
71:20
**printed**
71:21
**Pro**
2:15
**probably**
83:8 84:5 86:8 92:13
  97:22 108:6 127:11
  129:19
**problem**
38:24 106:15
**problematic**
111:21 127:3,7
**problems**
54:22 55:15,20 82:16
**procedure**
85:20,24,25
**procedures**
36:1 85:14,18,19
**proceed**
80:14
**proceedings**
142:11,14
**proceeds**
52:4
**process**
132:24 134:24 135:1
**product**
41:23 42:1,11
**professional**
121:3
**progress**
89:18
**PROJECT**

2:3
**Prolactin**
65:3
**prolactinomas**
58:9,20 65:9
**prompt**
69:3
**pronouns**
29:12 35:17
**proportion**
84:14
**proposed**
90:5
**proposing**
99:22
**prospective**
10:25 109:9,13
**prospectively**
108:13
**protocol**
10:10,22 12:18,19
  44:5 76:19,23
  105:21 106:14
**protocols**
43:5 82:21 83:7
  87:23
**proven**
22:7 65:13 112:7
**provide**
10:8 124:9,15 125:18
  126:10,19,20 129:6
**provided**
116:4
**provider**
124:9,16 125:8
**providers**
43:8
**provides**
124:8
**providing**
75:4 76:7 81:16
  82:10 101:13 116:9
  126:5
**provision**
76:2
**Psychiatric**

131:17 132:7
**psychiatry**
113:1
**psychoeducation**
81:15,20,25
**Psychological**
131:18 132:8
**psychopathological**
112:25
**psychotherapy**
109:22,23 110:25,25
  111:24 112:14,19
  113:4,7,8,14,18
  114:4,19 115:3
  129:6,8,13
**psychotherapy-only**
111:5
**pubertal**
51:8,14 58:25 61:1
  73:9
**puberty**
27:18 28:3 35:14
  44:10 46:2 47:23
  51:7,10,11,19,20
  52:3,4,12,13 57:18
  57:19 59:5,8,11,14
  59:19 60:12,16,19
  61:7 64:18 69:24
  70:14,25 73:3,5
  74:5 75:12 76:20,24
  79:11,17,18,24 80:1
  80:12,14,15 84:7,17
  85:21,24 87:2,7
  88:7,17,19,25,25
  89:4,6,12,18 109:2
  136:2 137:6,9
  138:14,16
**publication**
109:12
**published**
12:18,21,22 46:20
  47:16 95:20 102:5
  109:8
**publishing**
43:9
**pulmonary**



52:24 53:3,6 54:20 55:22
**purpose**
89:12 90:18 97:4 104:25 113:7,9,14
**purposes**
59:20
**put**
65:6 90:13 128:9

**Q**

**qualifies**
113:17
**quality**
93:23 95:3 97:19 98:17,24 100:23 101:4,14 102:5,14 102:21
**question**
20:2 22:4 26:8 48:11 51:12 54:14 69:11 69:19 83:23 84:2 97:6 104:11 110:20 110:21 113:16
**questions**
8:17,18,23 9:5 32:16 81:24 121:20 139:4 139:20
**quibbling**
106:17

**R**

**R**
72:5
**Rafferty**
134:15 135:23
**Ramer**
2:15 4:4 6:6,24,24 8:11 9:8,13,20 11:22 12:11,17 13:5 13:11,21 14:1,15,21 14:25 15:6,12,18 17:16,21 19:7,14 20:3,11,20 21:5,17 22:9,17,24 23:9,18 23:23 25:7 27:1,24 28:7,14,22 30:6,15 31:3,9,17,23 32:6 33:21 34:12,20 36:10,15 37:3 38:18 39:9,16 40:1,11 41:2,14,22 42:13,20 43:16,25 44:8,14 45:12,15,17,23 46:8 46:15,22 47:4,10,13 47:19 48:15 49:2,7 49:12,16,19 50:1 51:1,21 52:9,22 53:2,15,19 54:6,23 55:12,21 56:7,13,18 56:24 57:5,10 58:1 59:21 60:10,24 61:5 61:12 62:8 63:9,15 63:20 64:1,7 66:7 66:12 67:2,13 68:13 69:10,23 70:8,20 71:2,15,20 72:2 75:8 76:3,11,15 77:6,13,20 78:10,17 79:4,16 80:10,18 84:12 86:21 87:14 88:6 89:11,19 90:6 91:7 92:14 93:3,6 93:14 97:1 99:14 100:1 101:9,21 104:24 105:15 107:14 108:22 109:14 111:10 114:17 115:19 117:1,6,11,20 118:3 121:9,22,24 122:1 124:13,22 126:2 127:24 129:5 130:20 131:1 133:7 133:14 134:1 135:4 135:13,19,21 136:11 137:19 138:10 139:10,12 139:22
**randomize**
105:7
**randomizing**
112:4,10
**range**
42:9 80:23
**rare**
126:24
**rate**
27:17 28:2 99:8,12
**ratio**
20:12 21:1 22:6
**RCT**
104:25
**RCTs**
103:21
**read**
16:16,19,20,24 18:3 18:4,16 24:16,16,21 25:10 43:6 45:10,11 45:19 47:1,21,21 48:2,7 72:19,20 74:1 94:22,23 95:6 97:18,24,25 98:17 100:25 103:18,18 104:2,12 116:6 118:17,18,25 122:16 123:17,25 124:5 131:11,11,22 131:25 132:1,12 135:9,13 139:21 141:5
**reading**
45:22
**ready**
6:5 49:12 54:1,2,3 60:3,4 93:10
**real**
18:7 44:1
**really**
32:16 33:9 38:11 39:7 43:7,12 62:3 76:17 77:14 81:19 82:10 97:5 98:25 99:11 106:1 111:21 111:22 119:14 120:23,25 123:6 124:2 125:11 126:7 127:6 136:22
**reason**
38:1,14 138:6 143:4 143:7,10,13,16,19 143:22 144:4,7,10 144:13,16,19,22
**reasons**
21:13 22:5 36:19 79:15 87:13 96:2 99:13
**recall**
85:6 96:15 97:24 98:15 123:4 136:21 138:3,15
**recalled**
20:25
**receive**
27:18 28:3 78:12 111:12 129:13
**receives**
22:11
**receiving**
50:5 92:7,24 109:23 110:24,25
**receptors**
128:18
**recess**
49:11 93:9
**recognize**
44:18,25
**recognizes**
18:6
**recommendation**
101:4,14 125:13
**recommendations**
43:10 48:1 58:7 72:24 100:24 102:7 116:12 125:5
**recommended**
73:5,10 105:5
**record**
6:7 7:19 9:14,19 47:4 47:8,9,12 49:10,15 53:23,24 54:5 72:20 93:6,8,13 117:15,22 117:23 118:2 135:6 135:12 139:11,14



139:15,18 140:1,5
142:13
**recording**
12:12
**red**
63:1
**reduces**
99:8
**reemerges**
35:13
**referenced**
104:5
**referencing**
102:1
**referred**
84:19 85:2,3
**referring**
31:24 33:22,24 71:11
83:7 109:22 110:14
**regain**
61:24
**regarding**
10:21 14:11 24:5
**relate**
121:20
**related**
26:22 88:2 97:9,16
114:24 126:10
**relatedly**
19:21
**relationships**
116:19
**relative**
82:6
**releasing**
73:4
**relevant**
35:19
**reliable**
120:2,21
**remember**
10:17,19 58:17 85:3
85:15 90:3 98:10
111:4,6 119:9
123:21 126:7
136:17 137:22

**remove**
132:19
**removing**
65:19
**repeat**
19:5
**report**
4:21 16:24 17:2
43:14 46:20 47:15
48:7 73:21 79:14
95:20 98:22
**reported**
1:23 68:3 142:11
**reporter**
1:17 6:20 7:25 8:8
9:9,12 13:5,9,22,25
14:15,18,25 15:4,12
15:16 19:5 23:19,22
45:16 46:8,12 49:20
49:23 69:5 71:16,19
91:3 101:18,20
116:23,25 121:5,7
130:16,18 135:10
140:6,12 142:5
**REPORTER'S**
142:2
**represent**
24:1 121:17 130:20
**representative**
136:4 137:11 138:19
**represents**
73:18
**reps**
136:16
**request**
9:4
**require**
34:14
**required**
33:2 36:24
**requirement**
39:10
**requires**
31:4,10,13,18
**requiring**
106:7

**reread**
16:24
**research**
44:4 73:23 82:21
83:4,5,7 87:23 90:7
102:20 103:22
105:13,21 106:3,8
106:14 107:9,23
109:4,16,21 110:14
**researchers**
78:24 108:24
**resolve**
114:4 129:10
**resolving**
113:9,15 114:19
**respect**
23:1 121:2
**response**
88:12
**rest**
65:6
**restart**
19:7
**result**
54:24 103:25 137:24
**results**
7:20 97:15
**retracted**
47:22 48:13
**retracting**
48:17
**return**
30:18 83:19 93:17
115:22
**returning**
48:4 103:14
**revealing**
17:6
**review**
5:3 17:1 18:6,10,18
18:19,22 44:20
45:14,20 95:21
96:10,18,20,24 97:3
97:5,7 98:20 99:1
99:16 100:5 102:4
109:8 117:10,12,16

134:10
**Review's**
48:1 100:14
**reviews**
94:19,25 95:1,8,14
96:1,7,8,9,13 97:18
97:25 98:16,23 99:2
102:1
**rewriting**
123:11
**right**
12:6 17:11,25 41:16
48:8 51:14 65:14
77:16,23 80:5 83:2
83:17 95:22 96:4,6
97:10 98:2,3 102:13
114:7 115:6 116:15
119:20 124:4 126:5
130:11 134:4
138:24
**rights**
118:24
**rigor**
103:4,7
**rigorous**
73:22 95:1
**rise**
21:6,21
**rising**
22:1
**risk**
52:18,24 53:10 54:15
54:18 55:6,10,14,19
56:9 62:20 63:5,11
63:17 65:14 68:7
127:19,23,25 129:1
**risks**
51:24 58:3,21 60:12
62:18 64:22 65:1,24
66:1 67:4
**roles**
31:14
**room**
47:2
**roughly**
84:14



**routine**
83:21
**routinely**
79:25 108:7
**RPR**
1:16
**rule**
123:11
**rules**
8:20 104:1

**S**

**safe**
66:3,15,22 67:8,9,15 67:21 68:21 69:8,13 69:19 76:25 77:15
**safety**
60:16 96:21 97:10,17 98:4
**San**
122:22
**satisfaction**
88:9
**save**
71:23
**saw**
119:11,19 129:16
**saying**
26:24 40:15,19 65:9 65:9,12 66:21 69:12 89:9 97:8 100:4 107:7 112:14 119:19 125:22 126:16 130:9
**says**
18:5,22 23:10 24:17 35:21 47:21 57:13 61:19 74:9,18 94:24 100:21 101:3 102:18 103:20 118:19 122:11 123:7 124:1 129:23 131:13 132:2
**scale**
90:1 91:2,5,9,14 100:15,18 102:24
**scales**
89:23 90:2,15
**scant**
114:15,18
**scenario**
59:10 107:16
**science**
19:2,8 112:18
**scientific**
60:25 61:6 104:1 105:25
**scientifically**
21:8 22:6
**scoring**
103:6
**screen**
53:17
**screening**
36:6
**scrotum**
86:6
**search**
95:1
**second**
10:14,17 50:9,11 53:9 54:8,12 56:2 72:19 86:23 87:3 102:12 103:17 105:11 122:7
**secondary**
73:6
**see**
24:9,13 27:10 33:13 34:11 38:16 41:10 59:2 60:13 61:16 63:2 64:15,23 67:24 68:1 80:25 81:19 89:25 94:20 102:4 102:16 103:3 105:11 111:16 118:15 119:11 121:12,13 122:3,5,9 126:24
**seeing**
22:5 79:21 83:10,19 83:20,21,24
**seek**
40:14
**seeking**
37:20 40:9 41:16 42:6,8
**seen**
21:21 30:5 44:18 54:19 58:13 68:2 81:17 83:16 99:23 118:9 121:15
**Seldin**
2:4 7:1,1 8:1 9:13 11:18 12:7,15 14:20 17:12,13,17 19:11 19:25 20:9,16 21:2 21:10 22:2,14,22 23:3,12 24:25 26:12 27:20 28:5,12,19 29:21 30:11 31:1,7 31:15,20 32:4 33:5 34:2,16,23 36:13,25 37:22 38:22 39:12 39:21 40:7,16 41:5 41:17,25 42:18 43:2 43:23 44:6,11 45:12 46:6,22 47:5,17 48:9,22 50:23 51:15 52:6,20,25 53:12,15 53:20 54:2,17 55:8 55:16 56:5,11,16,22 57:3,8,20,23 59:12 60:8,22 61:3,9 62:1 63:7,13,18,24 64:5 66:4,10,25 67:10 69:2,6,18 70:5,17 70:24 71:25 75:6,23 76:9,13 77:10,17,24 78:14 79:1,8 80:6 80:16 84:9 86:15 87:9 88:4,20 89:16 89:22 92:9 93:1,10 96:22 99:10,19 101:6 104:22 105:3 107:11,25 109:6 111:3 114:8 115:13 116:21 117:6,17,24 121:22,25 124:11 124:19 125:20 127:21 130:13,24 132:22 133:11,17 135:4,11,18,20 136:6,8 137:13 138:8 139:7,19 140:6,8,10,14
**Selendy**
2:9 7:3 8:2
**self-acceptance**
91:19,20
**seminars**
10:5
**sense**
9:6 36:8 85:17 106:19
**sensitivity**
129:16
**sentence**
24:15 25:3 26:15,17 27:11,22 31:22 45:24 46:4 47:20 48:5,8 61:18 74:9 74:15,18,24 94:17 94:18 100:21 102:14,15 108:1 118:12,17 122:7 131:11
**sentences**
18:3 74:4 103:18 124:1
**separate**
9:17
**separation**
43:11
**sequence**
89:13
**services**
1:20 6:19 82:5 83:15
**set**
142:10
**seven**
9:16 75:20 98:13
**severe**
127:19



**sex**
35:22 73:6
**sexology**
113:2
**shaft**
86:1
**shares**
22:20
**sheet**
4:12,16 14:4 15:9 143:1 144:1
**shift**
20:21 33:16
**shifted**
20:13 21:4
**short**
49:4,11
**Shorthand**
1:17 142:4
**showing**
106:20
**shown**
68:21 69:7 115:3
**sic**
139:17
**side**
60:16 66:8,17 67:16 67:17,24 68:12
**sign**
126:12 139:21
**SIGNATURE**
143:24 144:24
**signed**
16:18
**significant**
38:25 39:7,11 40:23 41:9 51:13 73:19 96:7
**significantly**
40:20,21 112:3 129:19
**similar**
65:3 82:11 87:4,10
**similarly**
87:1
**Singer**
2:10 7:25 8:1
**single**
46:14 99:6 106:12
**situation**
108:19 109:9 125:17 126:18 128:4,13
**situations**
87:6 129:2
**six**
97:22 98:13,13
**skepticism**
23:14
**skin**
85:25 86:3,5,6
**Skrmetti**
4:18 16:5,11
**slightly**
68:10 84:24 135:7
**slower**
27:23
**small**
34:10 82:12,22 92:17
**Smith**
2:20 7:10,10
**SOC**
116:2 131:14 132:3 132:15,20 133:10 134:3 135:2
**social**
11:16,20 24:18 25:4 25:12,19,23,25 26:18 28:23,24,25 29:4,6,16,18 98:7
**socially**
12:1,13 26:3 29:10 29:14,25
**society**
18:13 33:16 131:19 131:19 132:8,9
**sole**
111:25
**somebody**
19:19 35:21 36:3,4 37:11 39:17 51:10 53:14 59:10,16,23 80:1 83:17 85:22 86:2 92:12 99:21 125:9,12,22 127:1 127:12 128:2 129:15
**somebody's**
91:24 113:9
**someone's**
90:17
**sorry**
7:8 15:19 17:16 19:5 57:22 62:17 91:18 104:7 120:18 130:14 135:4
**sort**
9:18 106:19 129:3
**source**
120:2,22
**South**
1:2,9 2:22 3:6 6:12 7:11,18 16:25
**Southern**
1:14 6:17
**span**
42:9
**speak**
106:12 123:2
**speaking**
123:1
**specific**
19:3,9 72:17 96:5 99:4 116:13 134:18
**specifically**
11:8 27:4 30:4 55:18 85:6 90:8 91:5 96:9 96:16 97:15 103:2 110:17 123:21 137:16
**spectrum**
35:8
**speculation**
119:12,13
**spent**
34:9
**sperm**
52:14
**spoken**
120:5,14 137:9
**sponsor**
137:25 138:1,13
**sponsoring**
137:15 138:7
**SRs**
95:5
**Sruti**
2:4 7:23 17:15,19
**sswaminathan@ac...**
2:7
**staffer**
119:3,8,14,19
**stage**
59:17,23 72:25
**stages**
73:2,8
**stamp**
133:20
**standard**
95:2,9
**standards**
18:12 43:1,21 98:3,4 98:8 134:11
**start**
9:8 30:16 35:14
**started**
11:25 29:4 33:8,9 51:10,18 62:4,10 75:10 80:1 108:3
**starting**
6:22 30:24 51:19 59:5
**starts**
45:13 78:3 118:13 122:7
**state**
13:3 100:22 142:5
**stated**
16:14
**statement**
25:10,12 26:11 27:12 48:20 118:22 119:3 119:5
**states**
1:1 4:18 6:11 16:4,6



16:10,12 18:7 34:19 45:25 48:21 108:21 131:16 132:5
**status**
62:4,10
**staunch**
118:23
**stay**
52:13,15
**stenographically**
142:11
**step**
43:1,21
**stereotype**
33:3
**stereotypical**
23:16
**stereotypically**
31:25
**stereotyping**
31:5,11,13,18 33:11
**Sterling**
1:5 6:10
**sticking**
12:25 17:25 60:11 62:17 94:14 100:10 103:1
**stop**
59:18 89:17
**stopped**
62:6
**stopping**
49:3 93:3
**stops**
61:23
**store**
33:23,24
**Street**
1:15 2:5
**stress**
37:14 39:11 40:24 89:1
**stroke**
53:11 54:15,21,25 55:2,23 63:5
**strong**
100:24 101:4,14
**studies**
28:8,15 29:18 58:14 58:16 65:18 77:16 78:5 80:9 95:24 96:1 109:25 110:13 112:1,13 114:6,9
**study**
10:11,24,25 11:1 12:4,9,10,12 27:17 28:1 30:5 50:8,17 54:19 68:4 95:13 96:21 99:6,12,22 103:22 108:5 110:15,17,22,23,23 111:1,11,18,19 112:5,9 113:4 137:16,25 138:1,7 138:13,24,25
**studying**
109:4
**subject**
118:22
**subjective**
95:21 96:11
**subjects**
12:13
**submitted**
4:23 10:1 16:4,10 72:4,10 131:7
**subscale**
91:2,6
**subscales**
91:15
**subscribed**
142:16
**substance**
137:2
**substantial**
103:24 104:20 105:17 107:21
**successful**
112:7
**suffering**
37:21 38:20
**sufficient**
79:5
**suggests**
18:22
**suicide**
99:8,17 100:6
**suicides**
99:12
**Suite**
1:15
**superfluous**
39:11,14
**support**
77:8 100:24 128:11
**supporter**
118:23
**supposed**
8:20
**suppress**
73:5
**suppressed**
84:7
**suppression**
61:1,7
**Supreme**
16:5,11 48:20
**sure**
13:15 16:21 23:5 26:8 29:3 49:6 53:18 84:22 92:1 101:7 106:16 108:9 114:3 133:4
**surgeon**
86:9
**surgery**
5:5 84:8,15,20 85:7 118:6,21 129:19
**surgical**
97:16
**suspect**
139:8
**Swaminathan**
2:4 7:22,23
**Sweden**
42:24 43:19 44:3
**Swedish**
103:8
**Switching**
42:21
**sworn**
8:5 142:8
**symptomatology**
22:21
**syndrome**
128:15 129:16
**system**
101:3,13 108:20
**systematic**
5:3 94:25 95:8,14,25 96:7,8,9,13,17,20 96:24 97:3,5,7,18 97:25 98:16 101:25 102:4

**T**

**Tabachini**
3:7 7:14
**table**
103:2 129:18
**take**
9:2 29:16 45:10 49:4 60:1 67:19 68:8 125:23 127:3 128:5 133:16 140:1
**taken**
1:14 6:16 141:6 142:9,14
**talk**
8:16 25:2 43:13 79:14 95:19 112:22 122:8,12,15
**talked**
35:7 87:5 90:3 98:25 138:21
**talking**
12:19 16:25 21:18 30:4 35:5 37:9 43:13,14 45:12 50:13 81:22,23 83:4 83:5 93:21 105:12 110:2 111:23 112:4 112:23 113:13 122:19 124:2



129:22,24
**Tando**
122:15,21 123:1
**Tanner**
59:17,23 73:3,9
**Target**
33:13,22
**Taylor**
5:3 98:23 101:25
**team**
58:18
**technical**
73:3 133:1,3
**technically**
100:23
**tell**
29:24 65:5 68:7
**telling**
75:21
**tells**
123:15
**tension**
38:6
**terminology**
92:20
**terms**
135:7
**Terranova**
3:8 7:15
**test**
19:22 20:5
**testified**
8:6 14:10
**testify**
17:18
**testimony**
12:8 14:7 15:20
  38:23 39:13,22
  40:17 41:6,18 51:16
  59:13 66:5 67:11
  69:3 77:18,25 79:2
  88:21 99:20 141:9
  142:10,14
**testosterone**
61:15,20 62:6,18
  64:13,22 65:1,16,24

68:6,8,9 128:18
**tests**
80:7
**text**
23:6
**thank**
8:8 12:24 13:10
  14:19,20 15:5,17
  32:23 47:5 49:18,24
  50:18 51:22 52:16
  71:24 93:5,16
  117:18 121:8
  130:19,24 135:19
  139:7,22 140:8,16
**theirs**
140:15
**therapist**
122:22
**therapy**
61:15 64:14 65:2,24
  113:1,1
**thing**
13:14 46:14 65:6
  76:1 82:4 88:23
  97:13 98:21 99:4
  109:7 134:18
  138:21
**things**
23:16 27:22 29:9,13
  29:13 33:10 35:12
  42:8 43:6 53:13
  54:20 68:2 78:22
  79:14 82:16 86:8
  97:16 113:2,12
  114:25 123:10
  129:3
**think**
11:20 16:21 17:15
  20:1 21:3,13 23:10
  23:13 25:1,4,19,22
  25:25 26:3,13,22
  29:22,22 30:4,5,7,8
  33:13,15,17,25 34:3
  34:6,21,24 35:2,20
  36:9,23 37:23,25
  38:9,24 39:6,23

40:8,9 42:19 43:3,6
43:11 46:13 48:19
55:18 58:14,18 62:3
71:5,8 76:12,17
78:1 86:11 89:2,25
90:2 91:25 92:6,10
92:23 95:19 96:23
98:1,3,11,20 99:13
105:19 106:25
107:8,13,15,16
108:19,23 109:1,15
109:20 110:5,16,17
111:9,19 113:16,18
113:20 119:15
120:2,21,24 123:12
124:20,24 125:2,4,7
125:7,21 126:6,24
127:4,8,22 129:22
132:24 133:15,23
135:16 137:22
138:6 139:3
**thinking**
33:9,11 34:9 85:1
**thinks**
125:22
**thinner**
128:25
**third**
30:20 74:4
**Thirteen**
75:7
**thought**
34:25 112:19
**thoughts**
43:9
**three**
7:14 17:23 23:13
  61:13 62:24
**time**
6:14,21 9:16 11:2,3
  11:13 12:3 16:16
  20:22 28:13 33:16
  33:20 34:9 35:19
  42:2 47:6,11 48:11
  49:8,14 53:22 54:4
  70:2 75:2 76:4 82:6

83:16 85:1 86:19
90:5 93:7,12 107:13
108:16 110:3 113:3
117:21 118:1
123:21 128:6
129:15 136:22
139:13,17,23 140:4
142:10,14
**times**
5:4 22:10 86:12
  108:10 118:5 119:6
  124:15 127:4
**timing**
16:21 84:22,25
**tissue**
85:12,19
**title**
58:25 61:14
**today**
6:14,19 50:21,22
  112:23 123:13
  139:23
**today's**
17:8,23 140:2
**told**
75:2 76:4,4
**tolerate**
127:5 138:4
**tools**
108:16
**top**
57:13 72:17 121:12
  130:21,23 131:10
**topics**
10:9 42:10
**total**
9:16
**touched**
30:7
**toys**
31:5,19 33:3,15
**trainings**
123:3,5
**trajectories**
11:3 81:22
**trajectory**



11:4,9
**trans**
10:12 26:5 37:8 38:14 112:20 123:16
**transcribed**
142:12
**transcript**
4:11,12,16 5:6 13:13 13:18 14:5 27:3 121:17 140:7 141:6
**Transexperience**
91:21
**transfeminine**
51:4 54:10
**transgender**
5:5 18:6,8,15,23 19:4 19:10,20,23 22:13 25:20 26:6 28:10,11 28:17,18 29:20 30:1 68:5 72:6 75:11 90:14 91:1,4,8,14 91:21 112:17 113:8 118:7,24 122:23 123:12 137:4
**transgender-specific**
73:25
**transition**
11:16,21 14:12 24:18 25:4,13,19,24 26:1 26:18 28:23,24,25 29:4,7,17,19 81:6 87:20 98:7 99:7,17 100:6
**transition,'**
18:11
**transitioned**
12:1,13 26:4 29:10 29:15,25
**translates**
35:24
**transmasculine**
84:6,15
**Transyouth**
83:6
**treat**
69:24 70:3,15,22 71:6 74:6 75:13,17 79:17 97:20 98:18 115:11 128:8
**treated**
79:18 80:11 111:6
**treating**
81:9
**treatment**
50:5 68:20 69:4,7 72:6,24 73:3,9,17 74:21 80:12 105:7,8 107:1 109:3 112:6 116:3 136:3 137:10 138:18
**trend**
21:7
**trial**
106:3 107:23 109:4,9 109:13,16,21,22
**trials**
107:9
**tried**
138:11
**true**
77:7,11 78:8 112:21 125:2 141:9 142:13
**truthful**
14:7 15:20
**try**
8:15 10:17 99:16 100:4 107:2,7 126:24
**trying**
20:2 113:24 119:10
**tumors**
57:1,6
**Turban**
119:22 121:18 123:25 129:22 130:9
**Turban's**
5:6
**turn**
15:19 111:12 139:5
**turning**
16:2
**twice**
79:18
**two**
10:6 17:11 18:3 36:19 43:12 57:11 64:12 79:19 91:15 98:6 103:17 109:16 109:21 110:24 114:14 116:14 124:1,25 135:6
**two-thirds**
20:14,17
**twofold**
105:6
**Tylenol**
67:19,20,21
**type**
95:1 110:14,20 111:18,19
**types**
94:6,11
**typewriting**
142:12

**U**

**U.K**
46:2 47:22 120:12
**U.S**
73:13,20 74:11 124:4
**uncertainty**
32:13
**undergoing**
83:22
**understand**
8:17,25 21:8,12 22:1 29:23 65:8 69:20,21 90:16 112:12 114:3 127:17
**understanding**
7:13 9:21 29:16 34:18 42:3 48:10 73:23 82:7 94:10 119:2 120:24 130:3 130:5
**understood**
12:24 20:8 60:17
**undertaking**
97:3
**undesired**
73:6
**unethical**
78:20 109:15 110:7
**unexplained**
98:22
**unintentional**
82:15
**UNION**
2:3
**United**
1:1 4:18 6:11 16:4,6 16:10,12 34:19 44:9 48:21 108:21 131:16 132:5
**University**
95:4 130:1
**unrelated**
97:12
**unresolved**
9:15
**untreated**
111:22
**updates**
10:3
**upwards**
83:11
**use**
32:10,12,13,14,19 34:18 35:9 44:10 46:25 59:4,7,22 68:23 69:14 70:19 71:6 73:24 76:24 77:8 79:10 85:25 86:2,4,5,6 90:8,10 100:14 106:17 107:9,23 116:8 133:22 136:2 137:9 138:17
**uses**
35:16
**usual**
8:15



**usually**
32:9 37:13,17 128:9
**uterine**
82:14
**utility**
34:6
**utilize**
90:14 108:16 125:16
**utilized**
79:15
**utilizing**
33:19 71:13 90:18
**Utrecht**
89:25

**V**

**v**
13:2,13,19 14:5 117:13 131:7
**vaginal**
85:11,13
**vague**
119:16
**Van**
110:17
**variability**
88:15 89:9
**variable**
12:5
**variables**
116:20
**variety**
87:12
**vary**
72:25
**vein**
54:21 55:15,20
**versus**
6:10 14:11,23 15:9 15:21,25 16:5,10 25:8 26:9 27:3 43:17 66:13,20 68:15 84:13 92:15 94:5 100:3 101:10
**Vice**
2:15
**video**
17:20 140:9
**videoconference**
2:21 3:5
**videographer**
3:4 6:5,7,19 7:5,9 47:6,11 49:8,13 53:22,25 54:4 93:7 93:11 117:21,25 139:11,13,16,25 140:9
**videotape**
6:8
**videotaped**
1:14 140:2
**view**
22:25 77:14 106:18
**vision**
57:6
**visit**
86:13,24 87:3,8 129:17
**Voe**
4:15,17 14:11,23 15:9,21,25 25:8 26:9 27:3 43:17 66:13,20 68:15 84:13
**vomiting**
56:15
**vs**
1:7 4:11,13,15,17,18 5:8
**vulva**
85:10,12
**vulvovaginoplasty**
85:8

**W**

**W-e-l-l**
32:22
**W-o-r-r-i-e-d**
32:21
**walk**
104:7
**want**
43:25 44:17 48:25 53:19 59:17,25 60:1 76:21 91:25 92:13 97:8 110:12 133:18 138:1,4 140:12
**wanted**
9:14,19 59:18 128:5
**wanting**
60:3 123:11
**wants**
92:18
**Washington**
2:16
**wasn't**
53:18 98:25 133:3
**watch**
108:14
**way**
25:2 26:13,14,15,17 33:11 85:23 95:18 96:12 103:22 112:23
**ways**
25:23 128:24
**we'll**
8:15 9:8 47:4,10
**we're**
12:5 45:1 49:10,14 53:23 106:16 107:2 108:12,13,15,15 111:23 112:23 117:24 119:25 120:1 135:21
**we've**
58:7 67:3 77:21 91:25 128:6
**wear**
35:8,9
**Webberley**
120:7,10 121:18 122:4,25 123:4
**week**
118:20
**welcome**
49:17 93:15 139:24
**Welfare**
103:9
**well-accepted**
116:2
**went**
108:7 122:14
**West**
1:15
**whatsoever**
38:2
**WHEREOF**
142:16
**Wilson**
1:8 6:10
**wind-up**
77:25
**witness**
4:2 7:7 11:19 12:9,16 13:10 14:19 15:5,17 17:15,19 19:12 20:1 20:10,17 21:3,11 22:3,15,23 23:4,13 25:1 26:13 27:21 28:6,13,20 29:22 30:12 31:2,8,16,21 32:5 33:6 34:3,17 34:24 36:14 37:1,23 38:24 39:14,23 40:8 40:18 41:7,19 42:1 42:19 43:3,24 44:7 44:12 45:22 46:7,13 47:18 48:10,23 49:6 49:24 50:24 51:17 52:7,21 53:1,13,21 54:3,18 55:9,17 56:6,12,17,23 57:4 57:9,21,25 59:14 60:9,23 61:4,11 62:2 63:8,14,19,25 64:6 66:6,11 67:1 67:12 69:21 70:6,18 70:25 71:24 72:1 75:7,24 76:10,14 77:11,19 78:1,15 79:3,9 80:7,17 84:10 86:16 87:10 88:5,22 89:17,23



91:4 92:10 93:2,5 96:23 99:11,21 101:7 104:23 105:4 107:12 108:1 109:7 111:4 114:9 115:14 116:22 121:8 124:12,20 125:21 127:22 130:14,19 130:22 132:23 133:12,18 135:16 136:7,10 137:14 138:9 139:6,24 142:8,16
**witnessed**
95:25
**word**
31:25 52:7 106:17,17 106:18 133:3,13,22 135:3
**words**
8:23 12:4 29:8 44:25 80:3 108:8
**work**
30:2 33:8 49:5 107:3 107:8 112:14 114:13 128:23
**worked**
135:25
**working**
81:23 125:9
**works**
49:4 78:2 105:21 122:22
**workup**
86:18 87:12
**world**
95:13 106:24 112:18 114:11
**worried**
32:14,20
**worth**
127:19
**would've**
62:13 87:11
**wouldn't**
97:12 110:12 128:11
**WPATH**
18:12 43:1,21 116:2 131:14 132:3,15,20 133:10,20 134:3,11
**written**
26:16,17 31:22 75:11
**wrong**
46:13 133:8
**wrote**
44:19 74:15,24 104:16 134:22
**www.MagnaLS.com**
1:21

**X**

**X**
125:24

**Y**

**yeah**
49:6 53:20,21 83:8 95:25 98:13 115:21 124:2 133:2
**year**
84:19,23 85:4,4,5
**years**
33:8,12,17 71:13 75:7,9,20 80:23,24 87:19 88:2 111:24 113:24 114:1,2,7 137:14
**York**
2:5,5,11,11 5:4 95:4 95:5,25 97:25 118:5 119:6
**young**
32:17 35:4,5 61:1,7 64:17 77:4 122:23
**younger**
10:12 76:25 81:18
**youth**
10:12 18:9,24 64:14 72:7 73:1,2,17 74:21 75:11 77:2 108:4 115:1

**Z**

**Zealand**
42:25 43:4,20
**zero**
102:9
**Zoom**
2:21 3:5 7:5,21 53:17

**0**

**01**
72:5

**1**

**1**
4:10 6:8 9:10,11,23 12:25 93:20 103:2 115:23 131:25
**1:05**
117:21
**1:06**
118:1
**1:30**
139:13
**1:31**
1:16 6:3 140:4
**1:32**
139:17
**10**
4:23 45:9,24 48:5 71:17,18 83:1
**10:36**
47:6
**10:37**
47:11
**10:39**
49:8
**10:52**
49:14
**10:58**
53:22
**10004**
2:5
**101**
5:3 137:4
**10104**
2:11
**11**
5:3 101:18,19,23 121:20 122:2
**11:03**
54:4
**11:51**
93:7
**11549**
2:21
**116**
5:4
**12**
5:4 68:17 116:23,24 117:3 118:5 131:9
**12:34**
93:12
**121**
5:6
**1213502**
1:25
**125**
2:5
**1290**
2:10
**13**
4:11,12 5:6 27:11 75:9 121:5,6,11
**130**
5:7
**1313**
1:15
**13th**
142:17
**14**
4:14 5:7 27:13 130:16,17 131:3
**15**
4:16,18 71:13
**151**
68:16,17 69:3
**152**
68:18,22 69:13
**1523**
2:16
**163**
72:13

**18**
13:1 18:9,24 33:8,12 33:17 84:20 96:3,3 100:11 102:9 111:12
**18s**
47:24
**1989**
76:21
**1991**
70:12 75:10 77:3

**2**

**2**
4:11 13:7,8 54:11
**2:24-cv-04734-BHH**
1:7
**2:24-cv-4734[sic]-...**
6:13
**20**
93:19 141:12
**200**
1:15
**20036**
2:16
**2006**
70:10 71:7 75:17 77:22
**2007**
69:25 75:13 76:19 77:22
**2011**
73:21
**2014**
4:23 72:10 75:11
**2015**
20:14,25
**202**
2:17,17
**2022**
103:9
**2024**
1:16 6:2,14 23:17 141:7 142:17
**21**
103:16
**212.390.9000**
2:11
**212.390.9399**
2:12
**212.549.2500**
2:6
**22**
69:3
**220-9600**
2:17
**220-9601**
2:17
**23**
4:19
**23-477**
16:5,11
**233**
73:3
**24**
100:20
**25**
80:24 81:5 87:19,24 88:2
**28**
18:1
**29211**
2:22

**3**

**3**
4:12 13:23,24 14:3 45:3 61:18 68:22 69:13 82:23 104:5
**3024**
1:17,24 142:21
**32**
131:25
**34**
115:25

**4**

**4**
4:14 13:1 14:16,17 27:2 59:17,23 68:14 73:9 94:15
**46**
4:21
**49**
4:22

**5**

**5**
4:16 15:2,3,8 45:2 52:2 68:18 73:9 103:2
**50**
20:13,14,22
**50/50**
21:1
**512**
30:21
**516**
24:7

**6**

**6**
4:18 15:14,15 16:3 17:25 44:15 48:4 52:17 53:9 54:11 93:18 100:10 103:14
**62**
27:4,5

**7**

**7**
1:16 4:19 6:2 23:20 23:21,25 30:19 56:1 56:2 141:7
**71**
4:23
**7th**
6:14

**8**

**8**
4:4,21 27:8 43:1,21 46:10,11,17 47:15 56:25 83:1,8 134:11 135:2
**80**
114:2,6
**803-734-4127**
2:22
**866-624-6221**
1:20

**9**

**9**
4:10,22 44:16 45:8 48:6 49:21,22 50:3 54:8 57:12 58:10,10 83:8 115:24 131:25
**9:43**
1:16 6:3,15
**90**
81:8 83:11 84:5 114:1,2,7
**90017**
1:15 6:17
**95**
81:8